IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-19ML
*
UNITED STATES OF AMERICA *
*
VS. * JULY 18, 2006
* 9:30 A.M.
CARLOS DIAZ, *
a/k/a Carlos Miguel *
a/k/a Carlos *
a/k/a Jose Luis *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

DISTRICT JUDGE

(Jury Trial)

**E X C E R P T**

APPEARANCES:

FOR THE GOVERNMENT: MARY E. ROGERS, AUSA
SANDRA BECKNER, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: WILLIAM J. MURPHY, ESQ.
Murphy & Fay, LLP
127 Dorrance Street, 2nd Floor
Providence, RI 02903

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

Interpreter: Ana-Cecilia Rosado

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| Patrick Reilly | |
| Direct Examination by Ms. Rogers | 3 |


## E X H I B I T S


| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 1 and 1-A | | 43 |
| 3 and 3-A | | 46 |
| 4 and 4-A | | 49 |
| 10 and 10-A | | 52 |
| 11 and 11-A | | 58 |
| 12 and 12-A | | 59 |
| 13 and 13-A | | 69 |
| 14 and 14-A | | 72 |
| 16 and 16-A | | 81 |
| 19 and 19-A | | 89 |
| 20 and 20-A | | 91 |
| 22 and 22-A | | 93 |
| 24 and 24-A | | 94 |
| 29 and 29-A | | 96 |
| 31 and 31-A | | 97 |
| 32 and 32-A | | 108 |
| 33 and 33-A | | 112 |
| 34 and 34-A | | 115 |
| 35 and 35-A | | 118 |
| 36 and 36-A | | 120 |
| 37 and 37-A | | 121 |
| 38 and 38-A | | 123 |
| 39 and 39-A | | 125 |
| 40 and 40-A | | 128 |
| 41 and 41-A | | 129 |
| 42 and 42-A | | 130 |
| 60 | | 20 |
| 65 | | 33 |
| 70 | | 104 |
| 71 | | 105 |
| 72 | | 106 |
| 73 | | 111 |
| 74 | | 123 |
| 75 | | 127 |

18 JULY 2006

**BEGINNING OF EXCERPT**

(The jury is present for the following)

MS. ROGERS: The Government calls as its first witness Detective Patrick Reilly.

**PATRICK REILLY, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Patrick Reilly, R-E-I-L-L-Y.

THE COURT: Mr. Reilly, you can move that notebook out of the way, pull the microphone over so that you're speaking directly into it, and keep your voice up, please.

THE WITNESS: Yes, ma'am.

**DIRECT EXAMINATION**

**BY MS. ROGERS**:

Q. Where are you employed?

A. The Rhode Island State Police.

Q. And how long have you been with the Rhode Island State Police?

A. Approximately 14-and-a-half years.

Q. What's your current title?

A. Detective.

Q. And where are you assigned right now?

A. The Detective Bureau.

Q. Prior to that, where were you assigned?
A. The Rhode Island State Police HIDTA Task Force, the Narcotics Unit.
THE COURT: Please pull the mic -- pull it down so you really have to speak directly into it.
A. It's the HIDTA Task Force in the Narcotics Unit.
Q. Would you explain, please, to the jury, please, what the HIDTA Task Force is.
A. It's the High Intensity Drug Trafficking Task Force. It's comprised of state, local and federal police officers and agents.
Q. And what is its purpose?
A. Its purpose is to investigate high-level narcotics traffickers.
Q. And were you sworn in as a federal officer to be a member of this task force?
A. Yes, I was.
Q. How long in total have you been working in the field of narcotics?
A. My entire time with the Rhode Island State Police.
Q. Would you explain how that is.
A. Well, even the first six years I was in uniform and was involved in several narcotics arrests, and then after six years I went to the Detective Bureau and into the Narcotics Unit.

Q. And how long were you in the Narcotics Unit?
A. Approximately eight-and-a-half years, almost nine years.
Q. And during that time, was 100 percent of your work devoted to narcotics investigations?
A. Almost 100 percent, yes.
Q. What type of narcotics did the majority of your investigations involve?
A. Specifically or the majority of them, the major three, which is cocaine, heroin and marijuana.
Q. And approximately how many drug investigations and arrests have you been involved in?
A. Over a thousand.
Q. Approximately how many seizures of drugs have you participated in during these investigations or arrests?
A. At least a thousand.
Q. And this is the type of cocaine, heroin, marijuana?
A. Most often, yes.
Q. Have you participated in the execution of search warrants in narcotics?
A. Yes, ma'am.
Q. Approximately how many?
A. Several hundred.
Q. And have you ever been involved in undercover drug

investigations?
A. Yes, ma'am.
Q. What type?
A. All different types, cocaine, mostly cocaine, heroin, marijuana.
Q. Have you ever been involved where an individual on the State Police or the HIDTA Task Force acts as a purchaser of drugs?
A. Yes. I've done so myself, as well as several of the other members, we've worked investigations where other members have done undercover investigations.
Q. Have you also done the type where an individual pretends to sell drugs?
A. Yes. It's a reverse sting operation and where the police officer poses as the drug dealer.
Q. And what type of drugs have these undercover investigations --
A. They've been marijuana, heroin and cocaine.
Q. After you arrest a drug trafficker or dealer or user, do you have a practice that you routinely follow?
A. Yes. We talk to them, debrief them if they're willing to talk.
Q. And why do you do this?
A. To glean as much information as we can from the subject as far as his operation, how he conducted his

business, basically everything that could be possibly known that he's willing to provide.
Q. Do you talk to them about what users, what quantity users normally deal in?
A. Yes. We talk about quantities, prices, the quality of the product, the different ways it's packaged, basically everything that has to do with the narcotics business, all the different nuances and intangibles that are involved with it.
Q. Have you spoken with them also to learn the latest code or slang used in the drug trade?
A. Yes.
Q. And have you spoken to drug traffickers regarding the price to buy and sell various drugs?
A. Yes.
Q. Would you explain what is meant by street level.
A. Street level is the point at which the narcotics are distributed to the individuals who are going to consume it. That's the lowest level of the narcotics hierarchy.
Q. And where is it traditionally sold?
A. It's sold on the street.
Q. Is that where the name comes from?
A. Yes, it is.
Q. And would you explain what is meant by mid-level

dealers and high-level dealers.
A. Well, as you progress upwards in the different levels of distribution, you'll go to the different individuals who either sell or move or purchase larger amounts of narcotics for not their own personal use but to make money from.
Q. What quantities do street-level dealers deal in?
A. Those would be small individual amounts, more commonly used in price ranges like a $20 bag of cocaine perhaps or a dime bag of marijuana or a bag of heroin.
Q. Focusing on cocaine, what would a $20 bag of cocaine equate to in weight?
A. Under a gram.
Q. Less than a gram?
A. Yes.
Q. With regard to mid-level dealers, what quantities of cocaine do mid-level dealers --
A. Anywhere from three-and-a-half grams upwards to the common units of measure are normally in the ounce range in variations of it.
Q. How many grams in an ounce?
A. Twenty-eight grams, but those mid-level dealers will be three-and-a-half, 7 grams, 14 grams, 28 grams, and then they can duplicate into multiple ounces.
Q. And high-level dealers?

A. Kilogram size dealers.
Q. Kilogram what?
A. Kilogram size dealers. Those are the high-level.
Q. And how many grams in a kilogram?
A. One thousand.
Q. Approximately what is the weight of a kilogram in pounds?
A. Two point two pounds.
Q. Two point two?
A. Yes, one kilogram equates to 2.2 pounds.
Q. And can you explain what cut is in the drug trade.
A. Yes. It's an agent, powdery substance that is not narcotics that is added to the narcotic to take advantage of its size, to add more to the weight that you have.
Q. And what's the purpose of adding more weight to the drug?
A. Maximize profits.
Q. And how does it maximize the profit?
A. Well, you're taking what you have in the normal quality of cocaine and what you do is you add the cut to it, you mix it up, you repackage it for resale, unbeknownst to the dealer you're going to give it to, and then you're actually making more money because you're doubling up your narcotics.

Q. And how does cocaine differ in quantity and quality and form at the different levels, street level, mid-level and high level?
A. Obviously at the higher levels it's the higher quality and purity of the narcotics. As you -- it's sold from person to person, each dealer is attempting to maximize their profits and, therefore, they'll step on the material, that's what they mean by stepping on it, by cutting it up using the cutting agent, and each individual that's involved in the distribution process is trying to maximize their profit that way.
Q. By stepping on it or adding --
A. As it goes down until it's actually distributed on the street for consumption is when it's at its most diluted form.
Q. Are you familiar with the price of powder cocaine in the fall through the winter of 2005 and in January of 2006 at these three different levels in the District of Rhode Island?
A. Yes.
Q. And what were they?
A. The price of a kilogram of cocaine at a high level could be anywhere from 18 thousand to 26, 28 thousand.
Q. And a mid-level dealer?
A. If I could just back up. That varies in relation

to the supply and demand and what's available, obviously. So from the 18 to the 26, that could change in a month period.
Q. Why is that?
A. Depending on what's available for cocaine, what the suppliers have, what the source is able to produce for the individuals willing to purchase it.
Q. So the price goes up if there's not enough cocaine in the area?
A. Correct.
Q. And with regard to mid-level?
A. Again, that will go up. It could be almost doubled at that range.
Q. And street level?
A. Obviously you could double that again. So an actual price of cocaine which could cost a high-level dealer 18 to 26, 28 thousand could actually be valued on the street of over $100,000.
Q. Are you familiar with whether cellular telephones are used by drug traffickers?
A. Yes.
Q. And what reasons are they used in this business?
A. It's a communication business. You need to talk to your clients, the sources. You need to communicate with them, and cell phones obviously being mobile would

be more convenient.
Q. Regarding all the information that you're discussing, all the debriefings that you've done with various individuals that you have arrested or investigated, is it your practice to share this type of intelligence with other members of law enforcement, including members of the State Police, DEA, FBI?
A. Yes. Obviously, we work as a group, and the more you can learn personally and that you can share with others is beneficial for all the members to investigate.
Q. And do you also obtain information from other members of law enforcement?
A. Yes. It's a collaborative effort.
Q. And how else do you keep abreast of information regarding drug trafficking?
A. Continuing education, attending schools and conferences.
Q. And over the course of your career, have you been asked to give lectures regarding drug trafficking?
A. Yes.
Q. And where have you done that?
A. The Rhode Island State Police Training Academy.
Q. In your experience in the field of narcotics and your interviews with drug dealers and your training,

have you had occasion to discuss the use of code language used by drug dealers?
A. Yes. Code language is a common practice of individuals engaged in the distribution of narcotics. It's a way for them to self-preserve their operation, both with concerns to interaction with law enforcement as well as concerns with other individuals who are selling narcotics. It's a way to isolate themselves with --
Q. I'm going to interrupt just for a minute.
A. I'm sorry.
Q. I'm going to ask the basis of your information. So you've discussed it with drug dealers. Have you also discussed it with individuals that are referred to as confidential informants?
A. Yes, ma'am.
Q. Have you been involved in drug deals where individuals of law enforcement are acting as drug traffickers and they use code language?
A. Yes, ma'am.
MS. ROGERS: All right.
THE COURT: Ms. Rogers, try to stay at the mic.
Q. Have you also monitored confidential informants' conversations with drug dealers and heard code language used in these conversations?

A. Yes, ma'am.
Q. And have you monitored wiretaps?
A. Yes, ma'am.
Q. During which drug traffickers used coded language?
A. Yes. I never monitored one that hadn't used code language.
Q. Never monitored a drug trafficking wiretap?
A. Yes.
THE COURT: That's not what he said.
A. That hadn't used code language.
Q. That had not.
A. All the ones that we've investigated and have been part of at some point had used coded language during the investigation.
Q. In your experience investigating in the field of narcotics, why is coded language used?
A. Again, for the self-preservation of the individuals that are using it, both with their concerns for the interaction with law enforcement, possible investigative purposes, also for the concerns they have with other individuals that are selling who are competitors.
Q. And what are these concerns?
A. Well, they have to maintain the integrity of their own product, their own sources, their own individual

clients, if you will, of people that are purchasing those. And in doing so, they're able to minimize what they're relaying in a certain conversation to -- for their own protection concerns.
Q. Were you the lead investigator in this particular narcotics investigation?
A. Yes, ma'am.
Q. And were you also designated as the co-case agent?
A. Yes, I was.
Q. Who was your co-case agent?
A. Special Agent Michael Morehead with the Federal Bureau of Investigation.
Q. And he's seated at counsel table?
A. Yes.
Q. Prior to seeking Court authorization for wiretap intercepts, was traditional surveillance used by members of the HIDTA Task Force with regard to this group?
A. Yes. We did the best we can. It's -- obviously surveillance alone within the community that you are is limited due to what you have for resources. The community is an inner-city community with a large minority population, and the majority of our investigators are Caucasian. So you're limited in that fact that you can't be sitting in front of a residence

taking pictures of somebody being who you are. You have to pick and choose how you can do it.
Q. Did you also encounter what is known as counter-surveillance?
A. Yes.
Q. Would you explain to the jury, please, what counter-surveillance is.
A. Counter-surveillance is when you're actually attempting to observe members that are involved in this practice and they employ a technique of, if they notice something that's out of the ordinary, whether it's one of us or another individual in the area, they'll actually follow that individual or purposely keep an eye on them during the course of what you're doing.
Q. So did this method of counter-surveillance that was being used by the drug organization affect what methods you utilized in this investigation?
A. Very much so. This particular group employed a large amount of counter-surveillance, very sophisticated, in which we had viable concerns at the time as to what we could do and what we couldn't do.
Q. After you attempted visual surveillance, as part of the investigation, did you eventually use what is known as the Title 3 or a wiretap Court authorization?
A. Yes, ma'am.

Q. Would you explain, please, what that is.
A. It's the Court's permission. You apply for a wiretap through an application process --
MR. MURPHY: Judge, I object. I move to strike this answer.
THE COURT: Sustained. The answer may be stricken. The jury will disregard.
Q. Did you obtain Court authorization to use a wiretap in this investigation?
MR. MURPHY: Judge, objection.
THE COURT: Sustained. It's not relevant, Ms. Rogers. Let's get to the heart of it.
Q. Did you listen to wiretap conversations during this investigation?
A. Yes. Obviously as part of this investigation we were given permission to intercept the phone conversations --
MR. MURPHY: Judge, I move to strike the portion of "given permission."
THE COURT: It may be stricken. The jury will disregard it. Just tell us -- just listen to the question and answer only the question. Put another question, please.
Q. In listening to the conversations that were monitored, did you have limitations as to what type of

conversations you listened to?
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. Do you know how many telephones you obtained wiretaps authorization on?
MR. MURPHY: Objection.
THE COURT: Overruled.
A. We listened to the conversations of five separate telephones during the course of this active investigation.
Q. And during this wiretap investigation, did you also attempt to continue other types of surveillance?
A. Yes. Frequently you would intercept a conversation involving two individuals, and during the conversation they would discuss cryptically what would be happening. Normally you'd follow -- you'd couple the conversation with actual surveillance and go out and observe, if you could, what was transpiring.
Q. When did you start monitoring the telephones?
A. It was the end of September. I believe the first date was September 28th of 2005.
Q. And how many telephones were monitored at that time?
A. Initially two. One was delayed a couple of days, but two at the onset.

Q. I'm going to go back to when you were talking about doing other surveillances in addition to listening on the phone. Could you explain briefly what was done while listening to the conversations.
A. Basically as the conversations were intercepted, there were certified Spanish-to-English interpreters who would translate the conversation live as it was coming in, relay it.
We had an agent or a police officer in the monitoring room with the interpreters at all times so that they could actually help and assist in deciphering the code that was given as it was being interpreted to then relay it to the agents in the field as you were trying to conduct the surveillances.
Q. Were there any particular locations that you concentrated on in the city during this investigation?
A. Well, you know, it was a large investigation. It involved several locations. As it progressed, we narrowed the locations down to the main individuals that were involved at the higher level. And that would be areas such as the individuals' residences, locations, different bars that they would frequent and the main facility involved in this investigation.
Q. And what was the main facility?
A. 84 Union Avenue, California Liquors.

MS. ROGERS: If I may have a moment, your Honor.
(Pause)
Q. I'd ask that you look at the book in front of you and turn to Tab 60.
MS. ROGERS: Excuse me, your Honor, I don't believe the jurors should be looking at this point. We're not agreed that they're full exhibits.
THE COURT: Don't open the black notebooks. Did you say six zero?
MS. ROGERS: Six zero.
THE COURT: I don't have anything at six zero. What are we doing with Number 60?
MS. ROGERS: I'd like the witness to identify it.
THE COURT: Is there an objection to 60?
MR. MURPHY: Judge, there's not going to be, but if I could just have a background laid as to when the photo was taken and so forth.
THE COURT: We can get into that, but there's no objection to it coming in as a full exhibit?
MR. MURPHY: On 60, no, your Honor.
THE COURT: Okay. So 60 is a full exhibit.
(Government's Exhibit 60 was admitted in full)
THE COURT: What that means, members of the jury, is that you ought to be able to see it on the

screen. So you can actually twist those. Does everyone have an image on the screen? Do you have it?

THE WITNESS: Yes, ma'am.

Q. Now, looking at Government's 60, do you recognize that photograph?

A. Yes, ma'am.

Q. And you're aware that was taken yesterday?

A. Yes, I am.

Q. What is that photograph of?

A. That's the California Liquors establishment at 84 Union Avenue in the City of Providence.

Q. And later during your testimony we're going to be showing video footage from what is known as a pole camera. Is that substantially the same viewpoint or perspective of California Liquors that the pole camera shows?

A. It's similar, yes.

Q. Just the pole camera's quite a bit higher?

A. Correct.

Q. And would you please explain, if you tap the screen in front of you, the streets on which California Liquors is located.

A. That is --

Q. What street is that?

A. Union Avenue right there.

Q. And then if you would point out the side street.
A. That is Althea Street.
Q. And that's located in Providence?
A. Yes.
Q. During your investigation, did you learn who owned California Liquors?
A. Yes, I did.
Q. And did you also learn who worked there?
A. Yes, I did.
Q. And how did you determine who worked there?
A. Through information, through surveillance and then through intercepting the conversations.
Q. And do you know whether the Defendant worked at California Liquors?
A. Yes, he did.
Q. Do you see him in the courtroom today?
A. Yes, I do.
Q. What names did you know him by?
A. Carlos, Carlos Miguel, Carlos Diaz, Jose Luis, Luis Almonte.
Q. Would you point the Defendant out, please.
A. He's sitting at defense counsel table on the far left wearing the brown jacket.
MS. ROGERS: If the record will reflect that the witness has identified the Defendant.

THE COURT: So noted.
Q. During the course of the wiretap investigations, by what name did you hear him use or hear him referred to?
A. Most frequently as Carlos Miguel or just Carlos.
Q. What type of phones did you obtain wiretaps on?
A. Cellular telephones.
Q. And you indicated you first obtained authorization in September, September 20th of 2005?
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. Who were the users of those two telephones that were -- intercepts were started on in September of 2005?
A. The first two phones were -- one individual was Danny Cuello, and the second individual was a subject known to us as Jo Jo. His true identity is Alberto Sama-Graciano.
Q. But he was referred to as Jo Jo?
A. Yes.
Q. During what period of time were you listening to Jo Jo's telephone?
A. Right at that time, towards the end of September, beginning of October, it was a two- or three-day delay on the technical aspect of going up on his phone, but

we began listening to Danny's phone September 28th and then Jo Jo's a couple days later, and we listened to Jo Jo's throughout the entire investigation.

Q. Which ran through?

A. Through January.

Q. Of 2006?

A. Of 2006.

Q. And how long were you listening to Danny's telephone?

A. I believe until November.

Q. Did you obtain authorization to listen to other telephones?

A. Yes, we did.

Q. What were the next telephones you obtained authorization on?

MR. MURPHY: Objection. Form of the question.

THE COURT: Sustained.

Q. What other telephones did you start listening to?

A. We listened to the Defendant's telephone as well as the other individual from California Liquors.

Q. Focusing on the Defendant, how many of his telephones did you listen to?

A. Two separate cellular phones.

Q. And what was the time period?

A. November -- one from sometime in November through

January and the other one, I believe it was November until later December.

Q. And why did you stop listening in December to one of the telephones?

A. Towards the end of the intercepts, the Defendant gave his cell phone to a relative.

Q. Were there any other telephones that you were listening to?

A. Yes, the owner of California Liquors.

Q. And what was he referred to as, and do you know his real name?

A. Yes. His nickname was Belige, and his name was Estoredarcio Bernard.

Q. When did you begin listening to his telephone?

A. January or the end of December.

THE COURT: Ms. Rogers, we're going to take a short recess.

Would you step down, please.

Members of the jury, we're going to take about a 15-minute recess to give you a chance to stretch and maybe have a cup of coffee. You are not to discuss the case at all during the recess. Please leave your notebooks on your seats, and we'll reconvene at 11:30.

(Recess)

Q. As the lead investigator, did you become familiar

with the voices that you were listening to over the course of this five-month wiretap?

A. Yes, I did.

Q. In what language were the conversations?

A. Almost entirely in Spanish.

Q. Were any in English?

A. Yes.

THE COURT: Mr. Reilly, two things. You have to speak directly into the microphone, and then project your voice out to the back of the courtroom.

THE WITNESS: I'm sorry, your Honor.

THE COURT: Okay. It's a big room.

THE WITNESS: I tend to mumble.

THE COURT: And a very tiny microphone.

Q. Do you speak Spanish?

A. Not very well, no.

Q. How is it that you understood what was being said?

A. Through the Spanish-to-English interpreters.

Q. And they were listening to the intercepts?

A. Yes, they were.

Q. Would you explain how the intercepts were used.

A. The Spanish-to-English interpreters would listen to the calls live. They would be recorded. They would be translated live, presented to the agent or the police officer that was there, who would relay them

over a walkie-talkie type telephone feature that is on the Nextels. It's called a group talk. They would relay that information so all the parties, all the agents and police officers in the field could understand at the same time what was transpiring from the conversations.

Q. And at the time of these intercepts, were other investigators also out doing visual surveillance?

A. Yes.

Q. And would they call out what they were seeing over this group talk?

A. Yes. This would be a constant flow of information that was relayed, whether it be from the monitoring room, from the translations, or the agents that were in the field working and making their observations known.

Q. Would you describe the neighborhood around California Liquors.

A. It's an inner-city neighborhood, not far from Route 10, and high traffic area at times, but -- it's a minority community.

Q. Did you use other methods of surveillance in addition to agents going out and driving and making observations?

A. Yes. Towards -- during the entire course of the investigation, we were attempting to put up a pole

camera in the area which would give us the opportunity to scale back the physical surveillance so we could observe what was transpiring in the area of the liquor store.

We faced several technical complications in the beginning; and once an actual new piece of technology was obtained, we were able to implement it and use it to set up a pole camera.

MS. ROGERS: And if I could have Government's 60 on the screen.

Q. Could you explain, please, to the jury where approximately the pole camera was located.

A. Down Union Avenue. I'm going to point to it right here. If you went backwards approximately 20 feet or so, maybe a little bit more than that, the camera was mounted on the top of the telephone pole which would give you an aerial view of that almost exact location.

Q. And was the camera on top of that telephone pole able to be manipulated?

A. Yes. You could control it over the computer and pan side to side and zoom in and you could adjust your visual vantage point.

Q. So you said you could zoom in and pan?

A. Yes, you could zoom in. It had night vision capabilities. You could enhance the ambient light.

Q. But was the view limited?
A. The view was limited. It could only pan so far to the left and to the right. Once it had, you couldn't go further than that.
Q. And did you indicate approximately when the pole camera finally was operational?
A. I believe it was towards the end of December that we actually became operational.
Q. Were handheld cameras also used?
A. Yes. Almost every member had their own handheld camera or video camera.
Q. Were there any impediments to using these handheld cameras?
A. Certainly. Obviously, the location and the availability to do it as we were limited us to what we could get away with without being compromised.
Q. And what do you mean by that?
A. You know, they're obviously doing counter-surveillance, which I previously talked about. What they're doing is looking for members of law enforcement. During the course of their day they're making observations themselves.

And if you saw myself in a specific vehicle driving by and looking or sitting there attempting to take photographs, that would obviously stand out

greatly. It would be a possible compromise to the investigation.

MR. MURPHY: Objection, Judge. Move to strike the answer as speculative.

THE COURT: Overruled.

Q. Now, you indicated that you listened to these conversations. Did you listen to conversations in Spanish even though you didn't understand much of Spanish?

A. Yes. Having done these before, these investigations before, I know the importance of listening to the voices and how they're talking to get a feel and flavor, if you will, of who the individuals are as they're talking. Although you don't understand it, you want to hear it. Every day I would listen to the calls just to know in my mind who I'm dealing with to put a face with the voice.

Q. And did you become familiar with the voices?

A. Yes.

Q. Did you later have an opportunity to talk to certain of these individuals in person after the wiretap investigation was over?

A. Yes, I did.

Q. And were you able to identify certain individuals' voices that you talked to in person with those voices

that you had heard over the course of the wiretap?
A. Yes, I did.
Q. Whose voices were you able to identify?
A. Jo Jo's, Alberto Sama-Graciano, Cocoa's.
Q. You said Cocoa's?
A. Yes.
Q. Was he referred to as other names also on the wiretap?
A. Yes. There's a variation there. That's how we referred to him. It was Cua or Cocoa. It was a variation of that. We were also able to listen to the Defendant's voice as well.
Q. Carlos Diaz?
A. Carlos Miguel, yes.
Q. And anyone else's?
A. Belige's, who was the owner of the liquor store.
THE COURT: We're losing you again, and I think it's because you're trying to use both microphones. It's really better if you just come forward, use this one. The jury understands that you won't be looking at them but you'll be talking. So just use the one. Thank you.
Q. So you were able to recognize these four individuals?
A. Yes, I was.

Q. And their voices. Did you also have an opportunity to speak with an individual by the name of Patrick Schwab?
A. Yes, I did.
Q. And did you hear his voice over the wiretap?
A. Yes, I did.
Q. And were you able to identify his voice?
A. Yes, I was.
Q. Now, in September and the early part of October of 2005, did you listen to conversations that were spoken in English over Danny and Jo Jo's telephones?
A. Yes, mostly Danny's telephone.
Q. And when the English conversations took place over Danny's telephone, what name was used by the person to whom Danny was speaking?
A. Pat.
Q. He just referred to himself as Pat?
A. Yes.
Q. And you identified that individual as Patrick Schwab?
A. Yes, ma'am.
Q. How did you do so?
A. While intercepting the conversations, coupling it with surveillance, we were able to observe several of the transactions that Mr. Schwab, Pat Schwab, was

involved with. Through the use of surveillance and background investigative work, we were able to obtain his true identity, match it with a picture that we obtained from the Division of Motor Vehicles.

MS. ROGERS: By agreement, your Honor, the Government would ask that Number 65 be shown to the witness and published to the jury.

THE COURT: Go ahead. Sixty-five is full.

(Government's Exhibit 65 was admitted in full)

Q. If you could look on your screen, please, Detective.

A. Yes.

Q. And do you recognize Government's 65?

A. Yes, I do.

Q. How do you recognize that?

A. I took that photograph.

Q. And when did you take that photograph?

A. I believe the date was December 1st. I'm not positive on the date, but it was in mid-afternoon following an intercepted conversation between the Defendant and Patrick Schwab.

Q. And I know it's difficult to see on this particular monitor, but if you could point to where Patrick Schwab is located in that photograph.

A. That's -- I think I just covered him, but that's

Patrick Schwab right there. I'll point below it. I'm sorry. I'll try above it. That's him walking into the store. Sorry about that. That's his black Cadillac that he had pulled up in, and I took that photograph from an access road that's down in a northerly direction from the liquor store.

Q. If you would explain, please, the perspective of this photograph compared to Government's 60, the photograph that gave the view from the pole camera.

A. This is the opposite angle of the front of California Liquors. If you continued down Union Avenue as I showed you in that photograph, you would eventually get to Route 10. Well, Route 10 is back this way behind it, and this is a small access road that is near the Route 10 area. So it's just a different angle coming at it from the right side if you're facing it at the front of the establishment.

Q. Is the street or pavement that we see Union Avenue?

A. I'm sorry?

Q. Is the pavement that's depicted in that photograph Union Avenue?

A. No, it isn't. That's the access road, but where Patrick Schwab is is Union Avenue if you went up beyond the stop sign.

Q. Why were you there at the time?
A. There was a call between Patrick Schwab and the Defendant in which Patrick Schwab was going to drop off cash.
Q. Had you seen the Defendant arrive at California Liquors?
A. Yes. I observed him on Route 10 taking the exit and then driving to the front of the establishment, exit his vehicle and walk inside for a couple minutes and then return to his vehicle and depart the area.
Q. Now, I'm going to ask you questions with regard to the pole camera you've described and the intercept system. The intercept system, did it have a clocking mechanism that indicated what time the call occurred?
A. Yes.
Q. And are you familiar with that system?
A. Yes.
Q. All right. And with the pole camera, was there also a clocking mechanism?
A. There was, yes.
Q. And do you know whether the clock indicating the time of the intercept was synchronized with the pole camera clock?
A. No, it was not. There was approximately a six-minute differential between the times that's

depicted on each piece of technology.
Q. And approximately which way did the minutes go? Which system was fast?
A. I believe the pole camera was six minutes slower than the monitoring station. There's a technical problem with the rerouting of it. I have no idea what it's about, but it's not guaranteed to be the actual time.
MS. ROGERS: At this time, your Honor, I would ask that the witness be allowed to use the jury transcript books, and if you'd like, if we could approach and discuss --
THE COURT: Approach. Step down, please.
(Bench conference held on the record)
MS. ROGERS: John Duhamel indicated that you wanted this cleared up. There are two types of transcripts. One's all English. We do not intend to introduce those transcripts into evidence. The audios would be the full exhibit, and the jury can make up their own mind what they're hearing; but the transcripts would be used as an aid.
The Spanish transcripts we intend to introduce because the audio is meaningless to the jury.
THE COURT: How are you going to do that?
MR. MURPHY: Judge, I'm under the impression, I

don't object to the English portion, but I'm under the impression that the tapes have to be played even if they're in Spanish.

Now, if she has a transcript which is in English which says what the Spanish conversation is, that's fine; but I can't just say, here, admit the transcripts without playing the tapes. I think the tapes have to be played even if they're in Spanish.

THE COURT: I agree with you, but what do you say about the translated transcript coming in as an item of evidence?

MR. MURPHY: I'm saying right at this point to allow them to come in conditionally. The final version, and I'm not making a stink about this, the final version I got yesterday. We had other versions last week. So I haven't been able to listen to the new version.

I don't speak Spanish. I haven't been able to listen to the tapes with the new versions. I doubt I'm going to have a problem. I would ask that they be admitted conditionally. And I have Ray and Ana-Cecilia there; and while the tapes are being played, they'll be able to follow along. I doubt that there's much difference.

THE COURT: Are you going to do these in order,

or how are you going to do them?

MS. ROGERS: No, not in order. I'm going to be skipping over most of the English with Patrick Schwab and -- between the Defendant and Patrick Schwab and let Patrick Schwab testify to those.

THE COURT: And you had another objection to the recorded conversations which I understood to be a *Petrozziello* objection. I think what you need to do is to raise it with respect to each one, and I'll permit it de bene and then make my *Petrozziello* findings at the end of the Government's case.

MR. MURPHY: Judge, again, just to save time, having gone through one of these with Judge Torres before, my objection is to the tapes coming in. The Government has not established that there is a conspiracy and they should come in.

Now, I'm cognizant of *Petrozziello*, *Sepulveda*, *Bourjaily* and so forth. So I would say that the Government has to make the preliminary showing.

THE COURT: I'm going to ask Ms. Rogers to make a proffer right now.

MR. MURPHY: Right here?

THE COURT: Yes.

MR. MURPHY: Okay.

MS. ROGERS: And this is the disadvantage of

having only one attorney for the Government. Sandra Beckner is the one that has researched and briefed this particular issue, so she is the one who is in a position to make a more cogent, coherent --

THE COURT: Have her come up. Ms. Beckner.

(Ms. Beckner joins bench conference)

MS. BECKNER: Yes, your Honor.

THE COURT: Mr. Murphy is objecting to the conversations being introduced at this time because the Government has not yet made its showing under *Petrozziello*. So I'm going to ask you to go ahead and make a proffer as to what the Government's evidence is going to show in terms of the existence of the conspiracy and the Defendant's participation in the conspiracy.

MS. BECKNER: Yes, your Honor. The Government believes that the evidence will show, number one, through the substance of the phone calls themselves, which the Court may consider, that there was, in fact, a conspiracy.

Specifically, I believe the calls that we're talking about are calls in which the Defendant was not a participant and yet some of those calls, in fact, even discuss the Defendant, they discuss how much money he gets paid and they also discuss various drug deals

that are occurring within the conspiracy.

That evidence, statements themselves, your Honor, have been corroborated. It will be corroborated by Patrick Schwab. It will be corroborated by the video surveillance which will show the Defendant present on crucial days in question. And, most importantly, it will be corroborated by conversations of the Defendant himself that indicate not only that he is, in fact, an intermediary in this conspiracy but that he is fully aware of the price, the locations and the deals that are going on during the life of the conspiracy.

THE COURT: I'm satisfied with the Government's proffer. I'll permit the playing of the tapes conditionally and make my final *Petrozziello* findings at the conclusion of the Government's case.

MR. MURPHY: Judge, for the record, if you can note my objection to the Court's ruling. And also, Judge, my objections to the tapes being played are, number one, that they are hearsay. So I will accept the Court's *Petrozziello* ruling.

THE COURT: Unless I ruled that they were the statements of conspirators in the course of a conspiracy.

MR. MURPHY: Judge, second of all, I would

object to these tapes being played as also in violation of Rule of Evidence 403 that any probative value is substantially outweighed by the prejudice.

THE COURT: Overruled.

MR. MURPHY: My objections would be on *Petrozziello*, 403 and that case law.

THE COURT: Overruled.

MR. MURPHY: And, Judge, I have a request just to make the trial go through smoother. With each tape, I am going to have to make an objection, otherwise I waive it. Can I just say the words "*Petrozziello*" and "403"?

THE COURT: Yes.

MR. MURPHY: Thank you.

(End of bench conference)

Q. Detective Reilly, as part of this investigation and in preparation for your testimony here today, have you listened to the Government's Exhibits 1 through 56, which are the wire intercepts that the Government is presenting?

A. Yes, ma'am.

Q. And you indicated during the course of the investigation you've had the opportunity to speak with individuals, and you've indicated that the voices you heard on these particular exhibits are the voices as

shown or labeled in the transcripts?
A. Yes.
Q. I'm going to start with Government's Exhibit Number 1. Are you familiar with that particular exhibit?
A. Yes, I am.
Q. And what is that?
A. It's a conversation that occurred between Danny Cuello and Jo Jo on the 29th of September at 12:48 in the afternoon.
Q. And that call was in Spanish?
A. Yes, ma'am.
Q. And have you had an opportunity to review the English transcription of that call?
A. Yes, I have.
MS. ROGERS: At this point in time, your Honor, I would ask that the call be played to the jury, Exhibit Number 1.
MR. MURPHY: Judge, I would object to the playing under *Petrozziello* and Rule 403.
THE COURT: Overruled.
Now, members of the jury, you also have -- you should have a black notebook with tabs that go from 1 to 56. You may turn to Tab Number 1. That is a translation.

What you will be hearing on the tape is in Spanish. The conversation is in Spanish. Please listen, however, to the tape as well.

Are you moving Government 1 full?

MS. ROGERS: Yes, your Honor, as well as 1-A, the actual recording.

THE COURT: So the Government is moving 1-A, which is the recording itself, as well as 1, which is the English translation.

MR. MURPHY: Judge, I object to 1-A under *Petrozziello* and 403. And I would ask as to the transcript at this point that it be conditionally admitted subject to cross-examination after we hear the tape.

THE COURT: So Government's 1 and 1-A are full conditionally. And, Mr. Murphy, I'll give you an opportunity to argue that later. You may play number 1-A.

(Government's Exhibits 1 and 1-A were admitted in full)

(Government's Exhibit 1-A was played)

Q. Detective Reilly, in reviewing this particular English translation and listening to the Spanish recording, based on your training and experience, do you have an opinion as to whether in this conversation

coded drug language was used?
A. Yes, it was.
Q. And would you please explain what coded words you noted in this transcript.
A. This transcript, there's brief coded discussions. Obviously when Danny's talking in the very beginning, the second heading --
THE COURT: Keep your voice up.
THE WITNESS: Yes, your Honor.
A. He's saying that Pat just called and he's telling me if you were going to hit him with that because they already -- they are already calling him and asking when.
The coded way that we would interpret it, obviously hitting him would mean taking care of him, providing him with narcotics that he needed; and the reason why is because his customers, when they're saying already calling him, his customers are anxious to get material.
Q. And when you say his customers, what pronoun, what individual does that pronoun refer to?
A. Pat's the one who's making the inquiry. It's Pat's customers that are calling.
Q. Is there any more in that particular transcript?
A. When they're saying bring the money, that's pretty

self-explanatory; but they're not explaining why, which would go towards its cryptic nature.

Q. Now, when you were listening and reviewing these conversations, were they also done in the context of other phone calls that were in English?

A. Yes, they were.

Q. I'm going to ask that you turn to Tab 3, Government's Exhibit 3. And are you familiar with that exhibit?

A. Yes, I am.

Q. What is that?

A. It's a conversation between Jo Jo and Danny again that occurred on the 29th of September at 1553 in the afternoon.

Q. And who participated in that conversation?

A. Jo Jo, Alberto Sama-Graciano, and Danny Caetano Cuello.

Q. And over what line or telephone number was that call?

A. Over Danny's line.

Q. Was this call also in Spanish?

A. Yes, it was.

Q. And have you reviewed the English transcript?

A. Yes, I have.

MS. ROGERS: At this time I would move

Government's 3 and 3-A as full exhibits.

THE COURT: 3-A, again, is the tape?

MS. ROGERS: Yes.

MR. MURPHY: Judge, 3-A, objection, *Petrozziello* and 403; and 3, conditional.

THE COURT: 3-A, then, your objection is overruled, is full; and 3 is in, also full.

MS. ROGERS: And I would ask that Government's 3-A be played to the jury.

THE COURT: Members of the jury should turn to Tab 3.

(Government's Exhibits 3 and 3-A were admitted in full)

(Government's Exhibit 3-A was played)

Q. Do you have an opinion as to whether coded language was used during this conversation?

A. Yes, it was.

Q. Would you explain, please, starting with the first part of the code that you note in the transcript, Government's 3.

A. Yes. At first Danny's explaining to Jo Jo that Pat is having a problem with his narcotics, meaning the stuff. He's explaining how it's not squaring him away very well. That's obviously his complaint towards the product.

Jo Jo's unsure as to why. Again, Danny goes back, it did not square him away very well. He further explains that it had already been prepared, which means that it had already been redone and stepped on so he's not getting the high quality that he's normally used to.

Q. When you say stepped on, do you mean --

A. Redone, cut up with the cutting agent, diluted. The material's more diluted than what he's used to having. And when he says that -- he explained that he has 400, what he's referring to is 400 grams, nondescriptly.

Q. Four hundred grams of what?

A. Cocaine. And he wants to exchange it, looking to exchange it. Jo Jo explains that that's all there is. Again Danny reiterates about it not squaring him away very much, what he's putting into it he doesn't have a good return, which would complicate things for him.

What Pat Schwab was telling him was cooking it up or rerocking it, and in doing so the normal amount of material that he's supposed to get out of that was not equating to what it was supposed to. So he could tell that he was having problems, that the stuff was already stepped on prior to his obtaining it.

Again, Danny -- Jo Jo's trying to explain that,

as it goes down further into the conversation, that these people, the people from where this comes from, they do not mess with it, meaning that it's the high-quality material that comes from an obviously large source. It said that by saying tell him that those people get 200 to 300 of those apparatuses. And when he's saying apparatus, he means kilos, so that this is from a major connection, that what you're getting is quality and it must be your problem, basically.

He's saying Jo Jo -- again says that where he mentioned Cabeza and the young kid, they have no problem, no complaints.

Q. And who were those individuals?

A. Cabeza ends up being another target in the investigation that comes to. . .

Q. Is he another customer of Jo Jo's?

A. Another customer of Jo Jo's, but there's no -- he's not having a problem with it. And then Jo Jo's just saying he's just making it up, basically they're trying to work an angle.

Q. Who is making it up?

A. Pat must be making it up, that it comes from the factory, meaning the source, and that it's supposed to be good. Then Danny tells him he didn't like what he

has to say.
Q. And I would ask that you turn to Government's Number 4. Are you familiar with that exhibit?
A. Yes.
Q. What is it?
A. It's a conversation again between Danny and Jo Jo that occurred on September 29th, 2005, at 1608 in the afternoon.
Q. That's the same date as the other call?
A. Yes, ma'am.
Q. And over what telephone line?
A. Again over -- Danny's conversing with Jo Jo.
Q. Is this call also in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time I would move Government's 4 and 4-A as full.
MR. MURPHY: Judge, objection to 4-A, *Petrozziello* and Rule 403; and 4, conditionally.
THE COURT: The objection is overruled. Both 4 and 4-A are full. The jury may turn to Tab Number 4.
(Government's Exhibits 4 and 4-A were admitted in full)
(Government's Exhibit 4-A was played)

Q. Do you have an opinion as to whether coded language was used during this conversation?
A. Yes, it was.
Q. And would you explain, please, the coded language and what it meant.
MR. MURPHY: Judge, I object to the form of the question, the answer to this.
THE COURT: Overruled.
A. Again, it's the discussion between Jo Jo and Danny about Pat and the problem. Jo Jo provides the number, making sure it's correct, which is Pat's telephone number.
Q. Is that the 419-2579?
A. Yes, 419-2579. And Danny acknowledges that he's been calling him. And then what Jo Jo says is yes, tell him that this package was better than the other one. What happens is that if he sees that it is fine, tell him that it comes in two tablets. Basically what he's trying to say is that there's two separate -- probably meaning there's two separate kilograms, tablets, and that the previous one you got was from the other one so this one hopefully you like is fine, there isn't a complication. And that concludes it.
Q. I'm going to ask that you turn ahead to Government's 10, and are you familiar with this

exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a call between Jo Jo and Kathy Pimental.
Q. And when was that call intercepted?
A. The call occurred on October 6, 2005, at 2133 at night.
Q. And over what line was it intercepted?
A. It was intercepted over Jo Jo's line, 345-9170.
Q. Now, this is a different telephone number than you previously referenced?
A. Yes. Right around that time Jo Jo had switched phones for fear that there was law enforcement interaction involved in his other phone.
MR. MURPHY: Objection. Move to strike that portion.
THE COURT: Sustained. That portion of the answer where he begins "for fear" may be stricken, and the jury will disregard it.
Just answer the question. Don't volunteer.
THE WITNESS: Yes, your Honor.
Q. So during that time period of October 6th, Jo Jo had switched telephones?
A. Yes, he had.
Q. And you were intercepting over that particular

telephone?
A. That is correct.
Q. And you indicated that Jo Jo and a woman named Kathy Pimental spoke?
A. Yes.
Q. Did you identify who Kathy Pimental was?
A. Yes. Kathy Pimental was Patrick Schwab's girlfriend and the Defendant's sister-in-law.
Q. Carlos Diaz's sister-in-law?
A. Yes, ma'am.
Q. And this call was also in Spanish?
A. Yes, it was.
Q. And have you had an opportunity to review the English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government would move Government's 10 and 10-A as full.
MR. MURPHY: Judge, 10-A, objection under *Petrozziello* and Rule 403; and 10, conditionally.
THE COURT: Overruled. Both 10 and 10-A are full. The jury may turn to Tab 10.
MS. ROGERS: At this time I would ask --
(Government's Exhibit 10 and 10-A were admitted in full)
(Government's Exhibit 10-A was played)

Q. Do you have an opinion as to whether coded language was used during this conversation?
A. Yes, it was.
Q. And what is that opinion?
MR. MURPHY: Judge, I would object to him giving an opinion.
THE COURT: Sustained as to asking for an opinion. Rephrase the question.
Q. What did -- was code used in this particular conversation?
A. Yes, it was.
Q. And what was the code, and what did it mean?
A. Initially in the --
MR. MURPHY: Judge, I would object again. He's being asked to give an opinion as to what the code is.
THE COURT: Overruled.
A. Initially in the beginning of the conversation Kathy, again nondescriptly, goes right into saying that that is touched, and then when she discusses because he made 100 and added 100 and he was supposed to receive 120 back, he only got 110 back, which is actually a large discrepancy being that if you're either cooking crack from powder or if you're rerocking it and you're going to lose 10 grams per 100 you're going to buy, that's a big chunk of profit that's going to be

missing.

So he's actually explaining -- she's explaining on his behalf that there's basically 10 grams of product that he's not going to be able to make money from.

Q. What does "this is touched" mean?

A. Redone, stepped on using a cutting agent. Obviously Jo Jo's explaining that that's a mess. She doesn't know what to do. Jo Jo explains to her that when he's done with what he has, meaning basically when he sold the product that he's already given him --

Q. Now, if could you use names so it's not so confusing.

A. Sure.

Q. When who is done and who is going to give?

A. When Pat's done. Jo Jo's explaining to Kathy when Pat's done, Patrick Schwab.

Q. Done what?

A. Selling the material that he has.

Q. And the material means?

A. The drugs that he has, that he is going to give him a whole one. And he goes on to say tell him, like, that way he opens it himself and will not have that problem. And a whole one basically is saying if he's getting hundreds of grams, like 400 grams or 500 grams

at a time and he's having problems with it, he's going to give him a whole one wrapped in its package so he can break it up himself.

Q. And what does "a whole one" mean?

A. A kilogram, one individual kilogram of cocaine.

Q. So Jo Jo was going to give Pat a whole one?

A. Jo Jo was going to give Patrick Schwab a whole kilogram of cocaine so he would be able to open it himself so there wouldn't be any complications with the product's dilution. Again, he reiterates about giving him a whole one because Jo Jo doesn't want to deal with the struggle, as he says, the problems that are going to arise or the complaints that are coming in, again, talking about giving him a whole one so he can take it and open it and all, basically meaning he'd take care of it himself and step on it and then he's not going to have any obvious complications.

He says yes. Again, Jo Jo -- Kathy asks so he can open it himself, and he says, yes, so he can open it and start paying me what he keeps making. So he's going to give him a kilo.

MR. MURPHY: Judge, I object and move to strike. He's reading from the transcript.

THE COURT: It may be stricken. And I will ask you, Ms. Rogers, if you can ask a more precise question

so that you don't ask for a narrative. The jury will disregard the last portion of Mr. Reilly's testimony starting with "again, he reiterates."

Q. You indicated that Kathy Pimental asked if he could open it himself. What did that mean?

A. That he would be able to break open a kilo, see its true form and that he would not have problems with its potentially being redone.

Q. With cut being added?

A. Correct.

Q. And what is meant by he can start paying me what he keeps making?

A. Basically that he's going to front him that kilogram.

Q. And what does "front" mean?

A. Providing it to him on consignment.

Q. Providing it to whom?

A. Providing it to Pat Schwab on consignment so he doesn't have to pay any money up front. Therefore, he's able to turn it around, sell it, and pay for it after the fact.

Q. So once Pat's customers have paid Pat --

A. He can pay Jo Jo.

Q. But Jo Jo will give him the cocaine without payment in the beginning?

A. Correct.
Q. Is there any more code that you have not discussed?
A. Not on that call.
Q. I would ask that you turn to Government's 11. Are you familiar with that exhibit?
A. Excuse me. Yes.
Q. And what is it?
A. It's a conversation that was intercepted between Jo Jo and Carlos on 10/6, 2005, at 2314 in the evening.
Q. And who spoke in that conversation?
A. Jo Jo and the Defendant.
Q. And what telephone was this phone conversation intercepted over?
A. Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time I would move Government's 11 as a full exhibit.
MR. MURPHY: Judge, 11 I would object to conditionally, and 11-A on *Petrozziello* and 403.
THE COURT: Is there an 11-A?
MS. ROGERS: Yes, your Honor.

THE COURT: Overruled. Government's 11 and 11-A are full.

(Government's Exhibits 11 and 11-A were admitted in full)

(Government's Exhibit 11-A was played)

Q. In this transcript, it indicates that the Defendant asked Jo Jo what the number is. Do you recognize whose telephone number that is?

A. That's Patrick Schwab's telephone number.

Q. And do you have an opinion as to whether any coded language was used during this conversation?

A. Yes, there was, just in the fact that it was nondescript.

Q. Do you mean vague?

A. Vague conversation.

Q. And what is the significance of vague conversation?

MR. MURPHY: Objection. Form of the question.

THE COURT: Sustained.

Q. Is there any code in the comment made by Jo Jo, "like we can make arrangements"?

A. Correct, there is.

Q. And what is that code?

A. For whatever transaction was going to be discussed.

MS. ROGERS: I would ask that the witness turn to Government's 12.

Q. Are you familiar with that exhibit?

A. Yes, ma'am.

Q. And what is it?

A. It's a conversation between the Defendant and Jo Jo that occurred on October 8th, 2005, at 2353 at night.

Q. Over what telephone line?

A. Over Jo Jo's.

Q. And who spoke during this conversation?

A. Jo Jo and the Defendant.

Q. And was this call in Spanish?

A. Yes, ma'am.

Q. Have you reviewed the English transcript?

A. Yes, I have.

MS. ROGERS: At this time I would move Government's 12 and 12-A as full exhibits.

MR. MURPHY: Objection to 12, conditional, your Honor; and 12-A, *Petrozziello* and Rule 403.

THE COURT: Overruled. Twelve and 12-A are full.

(Government's Exhibits 12 and 12-A were admitted in full)

(Government's Exhibit 12-A was played)

Q. Detective Reilly, do you have an opinion as to whether code language was used during this conversation between Jo Jo and Carlos Miguel?
A. Yes, there was.
Q. I'm going to direct your attention to midway down the first page where it identifies the Defendant as speaking. Do you have an opinion as to whether there was code in that language?
A. Yes. He was talking about what somebody did to the product. Apparently there was an argument, and he put more than 30, that he put into it, meaning more than 30 of redone product.
Q. Do you have an opinion as to whether that is 30 grams, 30 percent?
A. I would believe it to be 30 grams.
MR. MURPHY: Judge, move to strike. He says he believes.
THE COURT: Sustained. It may be stricken, and the jury will disregard.
Q. With regard to the two-thirds of the way down, Carlos told me he divided it all. What does that mean?
A. The third-party individual already broke it up.
Q. Broke what up?
A. Broke up the material, the drugs.
Q. And what does break up mean?

A. Again, redone, broke it up and distributed it after cutting it up.
Q. And the line after that where Jo Jo speaks, what does that mean?
A. Jo Jo's again referring to Patrick Schwab saying that Kathy had called earlier, see how much he owed, how much Patrick owed him. She's looking to reduce his debt.
Q. His debt to who?
A. To Jo Jo based on the complications.
Q. And turning to the second page of the transcript, is there coded language used in that portion of the transcript?
A. Yes, ma'am.
Q. Where?
A. Again, Jo Jo's talking about reducing, deducting the debt. They discussed when, the call came in about two hours ago.
Q. What call?
A. The call between Kathy and Jo Jo. The Defendant is discussing that will not happen next time.
MR. MURPHY: Objection. Move to strike that portion of his answer.
THE COURT: Just a minute. Sustained. The answer may be stricken.

Q. On the second page, the second time it reflects that the Defendant spoke, is there code used in that?
A. Yes.
Q. And what is that code?
A. That the complications between the individuals will not happen again.
Q. What individuals are you talking about, and what complications are you referring to?
A. The complications between the phone calls between Kathy Pimental, Patrick Schwab and the problems.
Q. What problems?
A. With the material, the drugs.
Q. The next line down where Jo Jo speaks, is there code in that?
A. There is. They begin to talk about Danny and the problems that he has. Danny in his role as a runner for Jo Jo had complications of his own, and he's trying to make up the difference by recuperating it.
Q. And when you're saying make up the difference, what are you talking about?
A. Trying to make up the loss in currency that he had based on a woman robbing him.
Q. And what does it mean when Jo Jo's saying what I know about my stuff, Carlos Miguel, is if they put 10, they throw in 30 or 40?

MR. MURPHY: Objection. Form of question.

THE COURT: Overruled.

A. Basically that they know what is supposed to be returned when they do their own business of rerocking it or stepping on it, and they know what's going to happen. If there's a problem that they're not getting what they know they're supposed to have, well, then that's obviously a problem and they can narrow down what the problem is.

Q. So are these still complaints that the cocaine has too much cut in it?

A. Correct. It's complaints about Danny.

Q. Who is --

A. Danny Caetano Cuello, the runner for Jo Jo. The complaint is that he must be stepping on it.

Q. And where is the next code on that page?

A. Obviously's saying that this is a delicate thing --

Q. If you could explain -- thank you.

A. That's a delicate thing, that there are problems that you obviously don't realize, that you don't anticipate when you're having problems within your organization.

MR. MURPHY: Move to strike that last portion, your Honor.

THE COURT: Sustained. It may be stricken, and the jury will disregard.
Q. Was code used in the line halfway down where Carlos says, he said okay, but damn, it looks like he already knows that he has done it to him several times?
A. Correct. That's acknowledging that Pat is also suspicious of Danny's activities in the transition.
Q. And the next line by Jo Jo, is there code used?
A. Again, they're talking about a previous conversation in which a whole one, and Jo Jo's saying he's not going to give him a whole one because he's not -- what he's saying is he's delinquent, he doesn't pay enough. So if he's going to give out that much product, it would be too much of a risk for Jo Jo to provide him with an entire kilo because he doesn't usually pay on time. Therefore, he has a lot of unpaid debt in his product that's out there.
Q. And turning to the third page, is there any code reflected there?
A. Talking about 125 is a common quantity of narcotics in terms of grams. It's considered a big 8, 125 grams. That's a common quantity that's sold.
Q. A common measure?
A. A common unit of measure.
Q. So you're saying that cocaine is sold in 125

grams?
A. Correct. Sometimes it's sold in grams, but it's just a way that is utilized in discussing it. It's a big 8, 125 grams.
Q. And does the comment by Jo Jo later, he sells balls but he also sells quantity, understand, is that code?
A. Correct. It means he's selling small amounts, balls, meaning possibly ounces or even smaller, but he utilizes Danny to move quantity, meaning larger units of measure. And in doing so, it's tough to part with him because he's someone that can actually move the product for him, reducing the risk to Jo Jo.
Q. And the next line where it indicates quantity but cooked, he cooks, puts in 20, 25, I know he puts in 35, I know?
A. Correct. Part of Danny's role is also to rerock it and cut it for Jo Jo, cook it into crack as well, and that he knows what he's supposed to be putting into it and what he could actually be possibly putting into it. Then they go into about him being quiet and then he's also -- Jo Jo's also quiet, but he can calculate.
Q. Meaning he can understand?
A. He understands units of measure, what's needed, what's required for the individual breakdowns of the

product and what would be owed to him in the process.
Q. And the quiet one, he's referring to Patrick Schwab?
A. Correct.
Q. The next line where Carlos says it's a mess, you're going to have to give it to him yourself, is that code?
A. Yes. It's nondescript, but it's basically saying that you might have to bypass Danny and actually hand-deliver the stuff yourself to avoid the complications of this material, the drug being stepped on.
Q. And then a few lines later it says, by Jo Jo, I personally give him a whole one, and if he only wants a half, I'll personally give it to him personally because I'm not doing anything else. Is that code?
A. Yes, it is.
Q. And what does that mean?
A. Basically, again, a whole one being a kilogram of cocaine or half a kilogram of cocaine and that he's going to personally give it to him.
Q. Four lines from the bottom, it reflects that Carlos said, I told him the next time you were going to do it like that. What does that mean?
A. Meaning that he had already relayed what was going

to transpire to Patrick Schwab on behalf of Jo Jo.
Q. That he would give him a purer form of cocaine?
A. Personally.
THE COURT: Are you moving on to another exhibit?
MS. ROGERS: I have quite a few.
THE COURT: Excuse me?
MS. ROGERS: I have quite a few exhibits.
THE COURT: We're going to take a break.
You may step down.
Members of the jury, we're going to break for lunch. I know that some of you need to leave early today because of family obligations, and I'll try to get you out of here in time to do that.
What that means, though, is that we're going to shorten up the lunch break a little bit. I'd like to reconvene as close to 1:30 as possible. Bob can point you in the direction of several small restaurants in the area where you can get a quick sandwich or cup of soup and be back here in time for a 1:30 session.
Please fold up your notebooks and the black notebooks. Leave them on your seats. Remember, you are not to talk about the case at all during the recess. It would be helpful if you can be back in the building by 1:25, that way Bob can get you all in line

and ready to go at 1:30.

(Lunch recess)

THE COURT: It's always a good sign when all the jurors come back after lunch the first day. How hot is it outside? Really hot? Well, I don't know what the rest of the week is going to be like. There are facilities downstairs. If you want to bring lunch, you can do that.

Q. If the witness would turn to Government's 13. And are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's an intercepted conversation between Jo Jo and Kathy Pimental on October 9th, 2005, at 1804 in the evening.
Q. Over what telephone line?
A. Over Jo Jo's.
Q. And was this call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, ma'am.

MS. ROGERS: At this time I would ask that Government's 13 and 13-A be admitted as full.

MR. MURPHY: Judge, objection to 13-A, *Petrozziello* and 403, and 13 as conditional.

THE COURT: The objection to 13-A is overruled. Both 13 and 13-A are full. The jury may turn to Tab Number 13, please.

(Government's Exhibits 13 and 13-A were admitted in full)

(Government's Exhibit 13-A was played)

Q. Do you have an opinion as to whether coded language was used during this conversation?

A. Yes, it was, ma'am.

Q. And is Kathy Pimental -- excuse me, Kathy Pimental's Patrick Schwab's girlfriend that you referred to earlier?

A. Yes, ma'am.

Q. There is a name Rafaelito. Are you familiar with who that is?

A. Yes, another individual involved in the organization.

Q. And would you point out where there is code.

A. The beginning portion of the conversation that is involving Kathy Pimental. She explains that he, meaning Pat Schwab, is going to give half when he gets the money. Basically when he gets the money, he's going to give him half of what he owes him for the product that he's going to obtain, the cocaine that he's going to obtain.

Q. When you say him, are you referring to Jo Jo?
A. Kathy's explaining that Patrick's going to pay half to Jo Jo, and then he'll pay the rest later. Again, she goes on inquiring into what Jo Jo --
MR. MURPHY: Objection. Move to strike.
THE COURT: It may be stricken. Wait for the question.
Q. What does Kathy mean when she says he wants to know how much you're going to charge him?
A. The price that he will be paying for the amount of material.
Q. And Jo Jo replies for that 25. What does that mean?
A. It would be $25 per gram.
Q. Per gram of cocaine?
A. Correct.
Q. Jo Jo states that tell him I make out 1,500 dollars, one point and a half. What does that mean?
A. That means in relation to this transaction, Jo Jo would only be profiting $1,500. One point is commonly referred to as a $1,000 unit regarding a transaction. A point and a half would be 1.5, which would be $1,500.
Q. And when you're saying that $1,000 or $1,500, what's the quantity of cocaine that you're referring to with that profit?

A. Referring to the profit that he would realize as a result of selling one kilogram of cocaine.

Q. The next line states that I only make out that $1,500, I get it for $25, that's the price I get it for. What does that mean?

A. That's the price that he's going to be getting it for, Jo Jo, and then in return that would be the price that he was able to profit from.

Q. When the conversation terminates with Kathy, Jo Jo speaks with an unidentified male and states on the second page, from Pedro Martinez, he is on his way and wants 20, 20 hard ones. What does that mean?

A. That would be the unit of measure that he's selling to an individual, twenty hard ones meaning crack cocaine, 20 units meaning 20 grams.

Q. And when you say 20 hard ones means crack cocaine, why do you know that hard means crack?

A. That's the way it was referred to, hard meaning crack. Powder would be white cocaine, powder cocaine.

Q. Would you describe the difference in texture and appearance between crack cocaine and powder cocaine.

A. Yes. I mean that the crack is a harder, almost rock-like substance that is solid. You can break it up, but it's in solid form. It's a yellowish color. Powder cocaine is exactly how it's explained. It's in

powder form.
Q. And if you would turn to Government's 14, are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation between the Defendant and Jo Jo that occurred on October 9th, 2005, at 6:26 p.m.
Q. Over what telephone?
A. Over the Defendant's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time I would ask that Government's 14 and 14-A be admitted as full exhibits.
MR. MURPHY: Your Honor, objection as to 14-A under *Petrozziello* and 403, and 14 conditionally.
THE COURT: Objection to 14-A is overruled. Both 14 and 14-A are full. The jury may turn to Tab 14.
(Government's Exhibits 14 and 14-A were admitted in full)
(Government's Exhibit 14-A was played)
Q. Do you have an opinion as to whether coded language was used during this conversation?

A. Yes, ma'am.
Q. And reviewing transcript page number 1 of Government's 14, Jo Jo states to Carlos, you know he asked, so you can tell him that I get that at three and one half, that I only make $500. What does that mean?
A. He's basically saying that to tell Patrick Schwab, for the Defendant to tell Patrick Schwab what he would be making on the sale of the material.
Q. And what is it that he would be making?
A. Five hundred dollars.
Q. And what does the "I get that at three and one half" mean?
A. It would basically be breaking down the kilogram, three-and-a-half -- the percentage of the kilogram, 350 grams, and that would be the profit that he would realize on that percentage.
Q. Jo Jo then states, I told him to give it to him whole because he is quiet and calm, but he's not dumb. You know that about 30, you can't win nothing on that. That's an assassination at 30. I told him at the Brillante yesterday. He called and was very upset. It's 30 that was missing. That's a problem. I have to pay for that. What does that mean?
A. Again, they're referring to the amount of product that was diluted from the material and then

Patrick Schwab would realize the discrepancy.
Q. What does he mean by "I have to pay for that"?
A. He would have to make up the difference because of the complaints.
Q. Who has to make up the difference?
A. Jo Jo.
Q. Jo Jo then says, well, that's what he said. He said that no one complains, not Moreno and this guy and this guy. Well, I don't know. Let's see what he does now. I know he is going to call, too. If he is missing 12, 13, 14, watch, he will be calling. Is he referring to the same individual in this?
A. Yes, he is.
Q. And who is he referring to?
A. That Patrick Schwab will realize there's product missing.
Q. And what does he mean when he says that no one complains, not Moreno and this guy and this guy?
MR. MURPHY: Objection, Judge. Calls for speculation.
THE COURT: Sustained.
Q. Do you know what is meant by he said that no one complains?
A. There are no other complaints from other customers.

Q. And Carlos replies, maybe give it to him more detailed. What does that mean?

MR. MURPHY: Objection.

THE COURT: Sustained.

Q. Do you know what Carlos means by maybe give it to him -- maybe give it to him more detailed?

A. With the more amount of product in it, more of the quality substance, not diluted.

Q. So when you say more amount of product, are you talking about more cocaine?

A. More detailed. More of the actual quality of product, not having been diluted.

Q. Not diluted?

A. Correct.

Q. Carlos then says, give it to him in two parts. What does he mean?

A. Instead of giving him in one kilo, give it to him in two 500-gram increments.

Q. Jo Jo states, I'm going to have to tell him something. Imagine, I tell him that I'm not the one that does it because some of them bring four or five. What does that mean?

MR. MURPHY: Objection. Calls for speculation.

THE COURT: Sustained.

Q. Do you know what that means?

A. Basically that he's going to have to explain that it's not his responsibility, that it's not his fault that he's having these complaints.
Q. On the second page, Jo Jo states, tell him he's giving it to you whole to prevent problems. So you don't have those problems on top of you, you get it for 25, because all he gets is $1,500 out of the deal. Fifteen hundred dollars, you know, that's almost nothing. He can't give you a better deal than that. He lowered a point. He, Jo Jo, used to make $2,500, but lowered one point, even though they did not lower it for him. He only makes $1,500. What does that mean?
MR. MURPHY: Objection to the form of the question.
THE COURT: Sustained.
Q. Do you know what that means?
MR. MURPHY: Objection. Calls for speculation.
THE COURT: Sustained.
Q. Specifically when Jo Jo states, tell him he is giving it to you whole to prevent problems, do you know what that means?
A. Yes. They're referring to a full unit kilogram of cocaine to prevent any problems of having complications with the redoing of the material with the cutting

agent.
Q. You get it for 25, because all he gets is $1,500 out of the deal. What does that mean?
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. Do you know what that means?
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. When it states you get it for 25, do you know what that means?
MR. MURPHY: Objection.
THE COURT: Approach. Would you step down, please.
(Bench conference held on the record)
MR. MURPHY: Judge, my objections are based that we have the transcripts in front of us. The jury is supposed to -- I'm not saying how to try the case, but the jury should be following the transcripts as it relates to the tape, and then we're asking -- we're reading from the transcript and then having him try to decipher.
I'm saying, number one, he's not qualified to give an opinion. Number two, it's speculation and it's an improper form of questioning.
THE COURT: I have to agree. If what you're

trying to elicit is what the code words mean, then you ask him those questions; but to have him essentially reiterate and rephrase an entire section of a transcript is improper. All he can do is to say what a particular word or phrase means in the drug trade.

So I'm not going to permit you to have him essentially put his own gloss on what's on the page. The page is in as an exhibit at this point.

MS. ROGERS: Okay.

(End of bench conference)

Q. Did you interpret the code for 25 in that particular section?

A. Yes, ma'am.

Q. And what does that code --

A. Twenty-five thousand dollars for the price of a kilogram of cocaine.

Q. And then the code for gets -- Jo Jo gets $1,500 out of the deal, what is the interpretation of that code?

A. That's his explanation of what he's going to make on that specific sale for the kilogram.

Q. And the section where Jo Jo says, Jo Jo used to make $2,500 but lowered one point even though they did not lower it for him, what does that code mean?

MR. MURPHY: Objection.

THE COURT: Sustained.
Q. Is there code in the phrase "even though they did not lower it for him"?
MR. MURPHY: Objection.
THE COURT: It's a yes or no.
A. Yes.
Q. And do you know what that code is?
A. Yeah. He's explaining that he's going to make a good deal on it, that he's going to lower the price.
Q. I'd ask for you to turn to Government 16, and are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation between Jo Jo and an unidentified member of the organization referred to as Manuel.
Q. When did the call take place?
A. It occurred on November 20th, 2005, at 2143 at night.
Q. And over what telephone?
A. Over Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.

MS. ROGERS: I would move Government 16 as a full exhibit at this time.

MR. MURPHY: Judge, 16-A, objection, 403 and *Petrozziello*; and 16, I would ask that it be admitted just conditionally.

THE COURT: I'm going to sustain the objection on 16-A, which means I'm going to sustain the objection on 16. I think you need to lay some foundation. Please don't turn to 16 yet, please.

Q. You indicated that this conversation involved an individual named Jo Jo and an individual named Manuel?

A. Yes, ma'am.

Q. How do you know he's -- Manuel's a member of the organization?

A. They are obvious acquaintances, and they discuss in a pertinent nature the narcotics trafficking operation.

Q. In this conversation?

A. Yes, ma'am.

MS. ROGERS: At this time I would move 16 and 16-A as full.

MR. MURPHY: Judge, the same previous objections.

THE COURT: Overruled. Sixteen and 16-A are full.

(Government's Exhibits 16 and 16-A were admitted in full)

(Government's Exhibit 16-A was played)

THE COURT: Stop the tape for a minute, please. Counsel, approach. Step down.

(Bench conference held on the record)

THE COURT: Since the transcript is coming in as a full exhibit and since absolutely nothing is coming out of listening to these tapes, can we dispense with the playing of the tapes? I leave it to you. It seems like an awful waste of time.

MS. ROGERS: The Government has no objection.

MR. MURPHY: Judge, my only hesitance is that I haven't been able to compare these transcripts with last week's transcripts. I don't think there's much difference in them. I think this is the only long call. I don't know if there's any real long calls.

THE COURT: It's a waste of time.

MR. MURPHY: But I don't want to be in a position where somebody on my side says --

THE COURT: Can you do anything else today besides this? Do you have other witnesses here? We're going to break early today because a juror's got to get home to take care of his kids, and if you can look over -- I mean, these were late. These were due in

about two weeks ago. If you can --

MR. MURPHY: I'm not objecting to that, Judge, for the record.

THE COURT: If you can take some time tonight and if you don't have any real objection to the transcripts, I'd just as soon have the transcripts come in.

MS. ROGERS: The only thing I can think of --

THE COURT: You can put the tapes in as evidence, and I will explain that to the jury; but the playing of these tapes in the courtroom I think is a huge waste of time because nobody understands them.

MS. ROGERS: I agree.

THE COURT: And you're losing them. You're going to lose these jurors.

MS. ROGERS: I would just as soon not play them --

THE COURT: Do you have anything else you can do today?

MS. ROGERS: The only thing I can think of is we have Patrick Schwab.

THE COURT: Where is he?

MS. ROGERS: The marshals have him. In fact, they've kept him here, and we can put him on, so it would be in context; but then I would start, if you had

time to make a decision --

THE COURT: Well, we're going to break today at 3:30, so you've got an hour and a half to go. I don't want to sit here for another hour and a half listening to this stuff.

MR. MURPHY: Judge, I think, maybe, this tape is exceedingly long. Some of the other ones are like a page.

THE COURT: Can you agree to stop this, because she's only about a fifth of the way through it?

MS. ROGERS: Oh, this particular tape? I have no objection.

THE COURT: If you need to, you can come back to it.

MR. MURPHY: No, not on this tape. Fine.

THE COURT: Okay. The transcript is in, and I'm going to suggest to the jurors that they read the rest of the transcript and let me know when they're done.

(End of bench conference)

THE COURT: Members of the jury, to save some time, because these tape recordings are in Spanish and because the transcript that has been translated into English has been admitted into evidence and you have it, what I'm going to ask is that rather than having the tape played, which apparently nobody understands

anyway, I'll have you read the transcript that you have. And when you are through, let me know that you're through. And if Ms. Rogers has questions of the witness that pertain to the transcript, she will ask those questions.

I think it will save some time if we do it that way. So if you would all read the transcript at Tab 16; and when you're through, let me know that you are through. You can just read it to yourselves.

(Jurors read Exhibit 16)

MR. MURPHY: Judge, may we approach?

(Bench conference held on the record)

MR. MURPHY: Judge, I think what happened here -- this one is only five pages, but this tape has been going on extra long. Are you playing stuff that's not in the transcript? That's what's happening.

THE COURT: Why are we doing that? That's a bloody waste of time. Why are we doing that? The only thing I think somebody needs to explain to them is what UI means, and I think that means unintelligible; but I don't want -- if you play the tape, only the part that's transcribed should be played.

MS. ROGERS: This is the only one where that appears.

THE COURT: Okay.

(End of bench conference)

THE COURT: Members of the jury, have you all finished reading Number 16? You will see the letters UI, "unintelligible." That's what it stands for. Okay. It's not code, and it's not a person. It's "unintelligible." Sometimes they can't hear what's on the tape.

All right, Ms. Rogers. If you have questions for Mr. Reilly as they pertain to Number 16, you may proceed.

MS. ROGERS: Thank you.

Q. On page 1, Jo Jo states, I give half point. What does that mean?

A. Five hundred dollars.

Q. Manuel states midway down the page, but you move five or six a month, right, or more? What is that a reference to?

A. Five or six kilos a month, he's asking if that's what he actually moves.

Q. Jo Jo replies, no, more like 15. What is that a reference to?

A. That he's actually moving about 15 kilos a month.

Q. Manuel states, so you are talking about $7,500. What is that a reference to?

A. That is the amount that Carlos Miguel would

receive for his role.
Q. On the second page, Manuel states, he's making it easy. Manuel then states, yeah, because there is no risk. What is that a reference to?
A. Basically it's -- in his role in this operation, he's not taking possession of the product. He's basically a conduit for Jo Jo.
MR. MURPHY: Objection. Move to strike. Speculation.
THE COURT: Sustained, and the jury will disregard.
Q. On the third page, the third line down, Jo Jo states, so I gave him 300 pesos. Is that code?
A. Yes.
Q. And what does that refer to?
A. The amount of money in dollars that he would receive.
Q. Three hundred dollars?
A. Three hundred dollars.
Q. Two-thirds of the way down, Jo Jo, it's UI for unintelligible, 18 hours and what leaves now is like 50 parts. Is that code?
A. Yes, it is.
Q. And what does that reference?
A. Fifty parts being what they're actually moving for

product.
Q. And what does 50 parts mean?
A. Fifty kilos.
Q. The last line, Jo Jo states, no, in Santo Domingo he has two million and has like 300,000 more on the side. Is that code?
A. Yes, it is.
Q. And what is that a reference to?
A. The dollar amount of savings that has been amassed.
Q. One-third of the way down on the fourth page, Jo Jo states, here the process is like $100,000. Is that code?
A. Yes.
Q. And what is that a reference to?
A. The processing which the operation's being run.
MR. MURPHY: Judge, I'm sorry, I could not hear.
A. The process in which the operation is being run.
Q. And what is the process?
A. The moving of kilograms of cocaine.
Q. But what does the $100,000 refer to?
A. The cost.
Q. The cost of what?
A. The operation, what it would take for them to move it, buying and selling material.

Q. On the last page, four lines down, Jo Jo states, like 11 and a half with money, cash, 20 and a half. Is that code?
A. Yes, it is.
Q. And what does that mean?
A. Talking about, again, 20 and a half refers to the price of the kilogram of cocaine.
Q. And what is that, 20,500?
A. Twenty thousand five hundred, yes.
Q. And what is the reference of 11 and a half with money?
A. The -- a portion of what might be needed to put down for that, to obtain that kilogram.
Q. A down payment?
A. Yes, ma'am.
THE COURT: Ms. Rogers, I would suggest that you substitute a 16-A that does not include the extraneous materials.
Q. I would ask you to turn to Government's 19. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a call between the Defendant and Jo Jo that occurred on November 25th, 2005, at 1313 in the afternoon.

Q. Over whose telephone line?
A. The Defendant's.
Q. And who spoke in that conversation?
A. Jo Jo and the Defendant.
Q. Were the calls in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.
Q. And in preparation for testifying here today, too, did you review other phone calls just prior to this particular intercept?
A. Yes, ma'am.
Q. And did that assist you in understanding what this conversation referred to?
A. Yes, ma'am.

MS. ROGERS: At this time I would ask that Government's 19 and 19-A be made full.

MR. MURPHY: Judge, objection to 19-A, *Petrozziello* and 403; and 19, conditionally.

THE COURT: The objection to 19-A is overruled. Both 19 and 19-A are full.

(Government's Exhibits 19 and 19-A were admitted in full)

THE COURT: And, again, to save time, members of the jury, you may turn to Tab 19 and you may read the

conversation that is recorded there to yourselves. You'll have copies of these exhibits in the jury room at the end of the case as well.

(Jurors read Exhibit 19)

THE COURT: Is everyone finished? Ms. Rogers.

Q. In reviewing this call, it states, he'll take that, but he's eating right now. Do you know who the "he" is referring to?

A. Patrick Schwab.

Q. And what does Carlos mean when he's saying he'll take that?

A. Meaning the amount of product, the amount of material, the drugs.

Q. Thank you. If you would turn to Government's 20, please. Are you familiar with that exhibit?

A. Yes, ma'am.

Q. What is it?

A. It's a conversation between the Defendant and Jo Jo that occurred on December 1st, 2005, at 1319 in the afternoon.

Q. Over what line?

A. Jo Jo's.

Q. Is this call in Spanish?

A. Yes, ma'am.

Q. And have you reviewed the English transcript?

A. Yes, ma'am.

MS. ROGERS: At this time I would move Government's 20 and 20-A as a full exhibit.

MR. MURPHY: Judge, 20-A, objection under *Petrozziello* and Rule 403; and 20, conditionally.

THE COURT: Overruled. Twenty and 20-A are full.

(Government's Exhibits 20 and 20-A were admitted in full)

THE COURT: The jury may turn to Tab Number 20 and read the transcript to yourselves.

(Jurors read Exhibit 20)

THE COURT: All set? Ms. Rogers.

Q. The seventh line down, Jo Jo states, does he have anything else? This is following up on Carlos saying, to give me money. What does the "anything else" refer to?

A. Does he have additional money.

Q. And then Jo Jo stated, he was looking, you are snoring, guy. Is that code?

A. Yes.

Q. And what does that mean?

A. Wake up, pay attention. He's obviously in the market to get something.

Q. And if you would turn to Government's 22, are you

familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a call between Jo Jo and the Defendant that occurred on December 1st, 2005, at 2007 in the evening.
Q. On whose telephone?
A. Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time the Government would move 22 and 22-A as full exhibits.
MR. MURPHY: Judge, at this point could I have a continuing objection as to all transcripts?
THE COURT: What's the nature of your objection?
MR. MURPHY: On this one I'm not going to object, but further objections under *Petrozziello* and Rule 403.
THE COURT: I understood you to be objecting to the tape under *Petrozziello* and 403 but that you were only conditionally objecting to the introduction of the transcripts. Is that what you're doing here?
MR. MURPHY: Yes, Judge, just a conditional objection just to the transcript.

THE COURT: But you're not objecting to the tape itself?

MR. MURPHY: No.

THE COURT: Okay. Twenty-two and 22-A are full.

(Government's Exhibits 22 and 22-A were admitted in full)

THE COURT: The jury may read Tab 22.

(Jury reads Exhibit 22)

THE COURT: Ms. Rogers.

Q. The first line Jo Jo states, those guys told me for tomorrow. What does that mean?

MR. MURPHY: Objection.

THE COURT: Sustained.

Q. Is code used in the first line, those guys told me for tomorrow?

A. Yes, ma'am.

Q. What does it mean?

A. It means that the product would be available tomorrow.

Q. The product meaning the cocaine?

A. Yeah.

Q. Jo Jo states five lines down, I've had to pay two times. Is that code?

A. Yes.

Q. What does that mean?

A. It means he's already had to pay twice for the material, for the drugs.
Q. And if you would turn to Government's 24, are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation that was intercepted between Jo Jo and the Defendant on December 13th, 2005, at 1519 in the afternoon.
Q. Over whose telephone?
A. The Defendant's.
Q. And was this call in Spanish?
A. Yes, ma'am.
Q. Was the -- did you review the English transcript?
A. Yes.
MS. ROGERS: I would ask that Government's 24 and 24-A be admitted as full.
MR. MURPHY: Judge, *Petrozziello* as to 24-A and conditional as to 24.
THE COURT: Overruled. Twenty-four and 24-A are full.
(Government's Exhibits 24 and 24-A were admitted in full)
THE COURT: The jury may read what's behind Tab 24.

(Jury reads Exhibit 24)

THE COURT: Ms. Rogers.

Q. Detective Reilly, the fourth line down, the Defendant states, Pat, the same, just has twelve. Is that code?

A. Yes, it is.

Q. What does that mean?

A. Pat's going to get the same amount of material, he has $1,200 to pay for it.

Q. Then Carlos states two lines further, the other he'll give you tomorrow. What does that refer to?

A. He'll make up the difference what he owes him for that specific unit of measure.

Q. And then the second to the last line, well, call Cua. Is that code or is that a reference to an individual?

A. It's reference to an individual, another runner for Jo Jo.

Q. And he was referred to as Cua?

A. Cua, Cocoa, Cocua.

Q. Turning to Government's 29, are you familiar with that transcript?

A. Yes, ma'am.

Q. What is it?

A. It's another conversation between Jo Jo and the

Defendant that occurred on January 16th, 2006, at 1741 in the afternoon.

Q. Over whose telephone?

A. The Defendant's.

Q. Was this call in Spanish?

A. Yes, it was.

Q. And have you reviewed the English transcript?

A. Yes, ma'am.

MS. ROGERS: At this time the Government would move Government's 29 and 29-A as full exhibits.

MR. MURPHY: Judge, 29-A, objection, 403 and *Petrozziello*; 29, conditional.

THE COURT: Overruled. Twenty-nine and 29-A are full.

(Government's Exhibits 29 and 29-A were admitted in full)

THE COURT: The jury may read 29.

(Jury reads Exhibit 29)

THE COURT: Ms. Rogers.

Q. There's only three sentences here between Jo Jo and Carlos. Is there code in that?

A. Yes, there is.

Q. And what does it mean?

A. Well, the nondescript nature of the conversation as well as that somebody was outside with

Pat Schwab.

Q. If you would turn to Government 31, please. Are you familiar with that exhibit?

A. Yes, ma'am.

Q. What is it?

A. It's another intercepted conversation between Jo Jo and the Defendant that occurred on January 19th, 2006, at 1429 in the afternoon.

Q. Over whose telephone?

A. The Defendant's.

Q. And was that call in Spanish?

A. Yes, ma'am.

Q. And have you reviewed the English transcript?

A. Yes, ma'am.

MS. ROGERS: The Government moves 31 as a full exhibit and 31-A as a full exhibit.

MR. MURPHY: Judge, objection, 31-A, Rule 403 and *Petrozziello*; and 31, conditional.

THE COURT: Overruled. Thirty-one and 31-A are full.

(Government's Exhibits 31 and 31-A were admitted in full)

THE COURT: The jury may turn to Tab 31 and read it.

(Jury reads Exhibit 31)

THE COURT: Go ahead, Ms. Rogers.
Q. Carlos about almost halfway down states, you buying something. And Jo Jo replies, after it's repeated, no, I'm here because there was no one on the street. Is that code?
A. Yes, it is.
Q. What does that mean?
A. Basically he's killing time at the mall because there's nothing happening in the street, no movement of distribution.
Q. Of distribution of what?
A. Cocaine.
Q. Carlos then states, the guy said he has to run some errands, right? Jo Jo states, who, the jefe? Are you familiar with what jefe means?
A. Yes, it's boss.
Q. And are you familiar with who in this organization was referred to as the boss?
A. Yes, Belige.
MS. ROGERS: I'd just like to give Miss Grassick some time to prepare. I'm now going to switch to the videotape portion of the questions.
THE COURT: We'll take a short recess, 10 minutes.
Would you step down, please.

Members of the jury, you may fold up your notebooks and leave them on your seats. We'll take about 10 minutes for you to stretch, have a cold drink. Remember, you're not to talk about the case at all during the recess.

(Recess)

Q. Detective Reilly, I'm going to direct your attention now to January 20th of this year. Do you recall that day?

A. Yes, ma'am.

Q. And was the pole camera operational?

A. Yes, it was.

Q. And had you received some intercepts that caused the task force to do increased surveillance?

A. Yes, ma'am.

Q. What was the protocol or procedure that everyone engaged in with regard to surveillance on January 20th, 2006?

A. We had additional numbers for surveillance; but what we did was put an additional investigator into the room, the monitoring room, to better relay the information that was coming over the different phone lines. As we set up, I ran the pole camera, and we set up units in and around the California Liquors establishment.

Q. Was the group talk radio used as well?
A. Yes. As I had previously stated, it's the walkie-talkie feature on the Nextel radio that allows for the entire investigative body, all the members to communicate over the same frequency and relay the observations so all can hear it.
Q. So the individuals out in the field could relay what they were seeing, the people in the room listening to the intercepts could convey what they were hearing?
A. Yes, ma'am.
Q. And were you in the room with the pole camera?
A. I was.
Q. And were you also relaying what you were seeing through the pole camera?
A. Yes, ma'am.
Q. And those observations that you made through the pole camera, those were recorded on a video as well?
A. Yes, ma'am.
Q. By January 20th of 2006, were you familiar with the vehicle that the Defendant drove?
A. Yes, ma'am.
Q. Did you have occasion to see the Defendant drive the vehicle on January 20th, 2006?
A. Yes, ma'am.
Q. And approximately what time did it first arrive at

California Liquors?
A. Approximately 9:00.
MS. ROGERS: Your Honor, it's my understanding --
THE COURT: Is that a.m. or p.m.?
THE WITNESS: Morning, your Honor, a.m.
MS. ROGERS: It is my understanding that the defense has no objection to the video clips coming in as full, and I would ask that video 7, number 7 --
THE COURT: Well, wait a minute now. Is this Exhibit Number 7?
MS. ROGERS: Seventy. Sorry, Exhibit Number 70.
MR. MURPHY: Judge, I have no objection as to the entire video coming in.
THE COURT: What are we doing?
MS. ROGERS: The video itself is all day long, so the Government is taking clips. The video is available to the Defendant if he wishes to take other portions of the clips, but to save time --
THE COURT: Is the entire video Number 70?
MS. ROGERS: No, only a very small portion at 9:05 a.m. is 70.
THE COURT: And as I understand it, Mr. Murphy has no objection to Number 70.
MR. MURPHY: Judge, I have no objection with the

Government trying its case however they choose, but I'm saying that I have no objection to the video as a whole to come in as an exhibit.

THE COURT: That's not what she's offering, Mr. Murphy. She's offering a portion of it at 9:05. Do you have an objection to Number 70? As I understand it, that's what Number 70 is, a portion of the entire --

MR. MURPHY: Judge, may we approach?

THE COURT: Approach. Step down.

(Bench conference held on the record)

MR. MURPHY: Judge, I have no problem with her playing portions to point out what she thinks is important for her case. However, I have no objection to the video itself coming in as a whole because when she gets done, I may want to use my own portions. And I don't know how you can take a video and say just this clip, just this clip, where if she moves to introduce the whole thing, then she goes back, however she wants to try her case, piecemeal, I think that would probably be easier.

THE COURT: I'm not going to tell you how to put this stuff in.

MS. ROGERS: I'll tell you the technical issue here is, I'm happy to move the entire video as full,

but there is no way to play it in the Sanctions program and fast forward. It would have to be --

THE COURT: So it's not like a video?

MS. ROGERS: It's a video, but the Sanctions program doesn't have a timer that shows and says, okay, go to 9:05. We just have to buzz all the way through it until it looked like we were getting to the right point, and there's so much of it just sitting there. There's like an hour of nothing happening.

MR. MURPHY: If she moves the video as a whole --

THE COURT: She's not. Do you understand what she just said?

MR. MURPHY: Yes, I do.

THE COURT: Most of it's irrelevant.

MR. MURPHY: Well, it may be irrelevant to her.

THE COURT: But we can't do it like we can a regular videotape. So I'm going to permit her to put in the portions she wants to put in. If you want to play otherwise, you can mark them and put them in. Let's go.

(End of bench conference)

THE COURT: This is Number 70?

MS. ROGERS: Yes, your Honor.

MR. MURPHY: Judge, as to only a portion, I

would object.

THE COURT: Overruled.

(Government's Exhibit 70 was admitted in full)

THE COURT: Just a minute. How long is this clip?

MS. ROGERS: Very short, within 60 seconds.

THE COURT: Okay. Does the jury have it up on the screen? Okay.

(Government's Exhibit 70 was played)

MS. ROGERS: Pause.

Q. I would ask you, Detective Reilly, to look at the portion -- and if you could indicate, please, again for the jurors where the back parking lot is to California Liquors.

A. It's to the left of it. Whoops. That way, straight down.

Q. And do you note a vehicle that is entering the entrance to that parking lot?

A. Yes. It is the Defendant's newer model Nissan Maxima, Rhode Island registration NZ 355, color blue.

Q. And that arrived at 9:05 a.m. on January 20th?

A. Yes, ma'am.

MS. ROGERS: If you continue, please.

(Government's Exhibit 70 continued)

MS. ROGERS: Stop.

Q. Now, did you maintain surveillance of California Liquors throughout the day using this pole camera?
A. Yes, ma'am.
Q. I would now direct your attention to approximately 9:53 a.m., and did another vehicle show up that was of significance?
A. Yes, ma'am.
Q. What was that?
A. A U-Haul.
Q. And who drove it?
A. Belige.
MS. ROGERS: I would ask that Government's Number 71 be published to the jury.
MR. MURPHY: Objection.
THE COURT: Basis?
MR. MURPHY: It's not the exhibit as a whole.
THE COURT: As I understand it, it is a portion.
MS. ROGERS: Yes, your Honor.
THE COURT: Seventy-one is full, as is 70.
(Government's Exhibit 71 was admitted in full)
(Government's Exhibit 71 was played)
(Pause)
Q. Is that the U-Haul to which you were referring?
A. Yes, that is.
Q. And did you watch Belige exit?

A. Yes, ma'am.
Q. And where is he in the video?
A. Right there. (Indicating)
Q. Is he the individual in the white long-sleeve shirt?
A. Yes, ma'am.
MS. ROGERS: Stop. And if you could end. Thank you.
Q. Did there come a time around 10:51 that morning where the U-Haul drove away again?
A. Yes, ma'am.
Q. And is that also on the video?
A. Yes.
MS. ROGERS: At this time I would ask that Government's 72 be played to the jury.
THE COURT: Well, 72 has to be admitted.
MS. ROGERS: I would move 72 as a full exhibit.
MR. MURPHY: Judge, I would object. Again, it's only a portion of the video. It's not the video in its entirety.
THE COURT: Seventy-two is full.
(Government's Exhibit 72 was admitted in full)
(Government's Exhibit 72 was played)
MS. ROGERS: End.
Q. Detective Reilly, did you or any of the members of

the HIDTA Task Force follow the U-Haul at that point in time?
A. No, ma'am.
Q. Now, at approximately 10:57 a.m., were you informed that an intercepted conversation between Carlos Diaz and Jo Jo had taken place?
A. Yes, ma'am.
Q. And I would direct your attention to Government's 32, which is an audio recording and a transcript. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation between the Defendant and Jo Jo that occurred on the 20th of January 2006 at 10:57 in the morning.
Q. And this is after the U-Haul had left?
A. Yes, ma'am.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time, the Government moves 32 and 32-A as full exhibits.
MR. MURPHY: Judge, 32, conditional; 32-A, *Petrozziello* and 403.

THE COURT: Overruled. Thirty-two and 32-A are full.

(Government's Exhibits 32 and 32-A were admitted in full)

THE COURT: The jury may turn to Tab 32 and read the transcript at those two pages.

(Jury reads Exhibit 32)

THE COURT: Ms. Rogers.

Q. Detective Reilly, Carlos Diaz states, did you settle anything? And Jo Jo states, no. Is that code?

A. Yes, ma'am.

Q. What does that refer to?

MR. MURPHY: Objection.

THE COURT: Basis?

MR. MURPHY: Speculation.

THE COURT: Overruled.

A. He's asking if he was able to obtain narcotics. Jo Jo answers no.

Q. About halfway down, Carlos Diaz states, the guy told me but with the two. And Jo Jo replies, damn. Is that code?

A. Yes, it is.

Q. What did the Defendant refer to when he said --

MR. MURPHY: Objection. Speculation.

THE COURT: Overruled.

A. He referred to the price of a kilogram limiting the conversation to just two, meaning $22,000.
Q. And how is it that you know that the code for just the word two means twenty-two thousand?
A. Because the variations of the price of a kilo and the key figure being the last one of two.
Q. Do you mean that it varies between --
A. Twenty-eight down to twenty thousand or so, and the last figure of two indicating the price that would be given, and obviously Jo Jo --
MR. MURPHY: Objection.
THE COURT: Sustained. Don't volunteer anything. Wait for another question.
Q. Diaz states, Carlos Diaz states, I don't know, he's going to talk with the guy. I don't know. Is that code?
A. Yes.
Q. And what does that refer to?
A. He doesn't know if there's going to be a change in the price.
Q. Jo Jo replies, well, I'll have to do it as a last resort. Is that a code?
A. Yes, it is.
Q. What does that refer to?
A. If he's not able to obtain any other product,

material, cocaine, for a better price, then he'll have to take that at the price of $22,000.
Q. And Carlos Diaz states, I did tell him what is -- what you were looking for. Is that code?
A. Yes, it is.
Q. What does that refer to?
A. That he was looking for a better price than $22,000.
Q. On the second page, the Defendant states, that's the -- I told him he's not -- her not going to work for that number. Is the term "work" code?
A. Yes.
Q. And what does that refer to?
A. He's not going to offer it for the figure that Jo Jo would want.
Q. The lower price than twenty-two thousand?
A. Yes.
Q. And then the Defendant goes on to state, no, he already got rid of five. Is that code?
A. Yes.
Q. What does that refer to?
A. It means he's already moved five kilograms.
Q. Now, this conversation took place at 10:57. A few minutes later, did you see the U-Haul return?
A. Yes, ma'am.

Q. Was it the same U-Haul?
A. Yes, it was.
Q. And was Belige driving it?
A. Yes, ma'am.

MS. ROGERS: At this time the Government would move Government's 73 as a full exhibit.

MR. MURPHY: Judge, I would object if it's another clip of the tape.

THE COURT: I believe it is, and the basis for the objection?

MR. MURPHY: Would be that I would ask that the video itself as a whole be admitted.

THE COURT: Overruled. Seventy-three is full.

(Government's Exhibit 73 was admitted in full)

(Government's Exhibit 73 was played)

Q. And this is at approximately 11:07 that morning, January 20th?
A. Yes, ma'am.

MS. ROGERS: Stop.

Q. And did you see Belige exit that vehicle and return to the store?
A. Yes, ma'am.

MS. ROGERS: End.

(Government's Exhibit 73 continued)

Q. At approximately 11:22, did another intercept

occur?
A. Yes, ma'am.
Q. And I would ask you to turn to Government's Exhibit 33, and are you familiar with that exhibit?
A. Yes.
Q. What is it?
A. It's an intercepted conversation between the Defendant and Jo Jo that occurred on the date of January 20th, 2006, at 11:22 in the morning.
Q. Over whose telephone?
A. The Defendant's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time, the Government moves 33 as a full exhibit.
MR. MURPHY: Judge, objection to 33 as conditional; and 33-A, *Petrozziello* and 403.
THE COURT: She hadn't moved 33-A.
MS. ROGERS: Thirty-three and 33-A. Thank you.
THE COURT: Overruled with respect to 33-A. Thirty-three and 33-A are full.
(Government's Exhibits 33 and 33-A were admitted in full)

THE COURT: The jury may read the transcript behind Tab 33.

(Jury reads Exhibit 33)

THE COURT: Go ahead, Ms. Rogers.

Q. Detective Reilly, are you aware of where the Defendant was born?

A. Yes.

Q. Where is that?

A. Dominican Republic.

Q. And with regard to Jo Jo, are you aware of his nationality?

A. He's also from the Dominican Republic.

Q. The third line down, Carlos Diaz states, listen, the Virgen de la Altagracia's Day. Are you familiar with what the Virgen de la Altagracia's Day is?

A. Yes, ma'am.

Q. What is it?

A. It's a common Dominican holiday.

Q. And do you know what date it falls on?

A. The 21st of December.

Q. Was code used in this conversation when they were referring to the Virgen de la Altagracia's Day?

A. Yes, it was.

Q. And what did it refer to?

A. The lowered price of the kilogram of cocaine.

Q. And what was the price at this time?
A. Twenty-one thousand.
Q. Twenty-one thousand dollars?
A. Yes.
Q. And that's the reference to the date December 21st?
A. Yes, ma'am.
Q. And then Jo Jo states, damn, I've got to find Cua. Again, is Cua the individual you referred to before and not a code?
MR. MURPHY: Objection. Leading.
THE COURT: Sustained as to form.
Q. In that sentence that I just read, what or who is Cua?
A. Cua is the runner for Jo Jo. Cocoa, Cua, Cocua.
Q. I'd ask that -- strike that. Did a second intercept occur within minutes of the conversation between the Defendant and Jo Jo?
A. Yes, approximately a minute later.
Q. I'd ask that you turn to Government's 34. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation between Jo Jo and Cocua, Cocoa, Jo Jo's runner.

Q. And whose telephone was used?
A. Jo Jo's.
Q. And that was at 11:23 on January 20th?
A. Yes, ma'am.
Q. Was this call in Spanish?
A. Yes.
Q. And have you reviewed the English transcript?
A. Yes.
MS. ROGERS: At this time the Government moves 34 and 34-A as full.
MR. MURPHY: Judge, objection to 34-A, *Petrozziello* and Rule 403; and as to 34, conditional.
THE COURT: Overruled. Thirty-four and 34-A are full.
(Government's Exhibits 34 and 34-A were admitted in full)
THE COURT: The jury may read what's behind Tab 34.
(Jury reads Exhibit 34)
THE COURT: Go ahead, Ms. Rogers.
Q. Detective Reilly, under participants, the first two letter are UM. Does that stand for unidentified male?
A. Yes, it does.
Q. And then across from that is BG. Is that for

background conversation?
A. Yes, it is.
Q. Was code used in "the other day I grabbed one like that for 21"?
A. Yes, it is.
MR. MURPHY: Objection, Judge.
THE COURT: Sustained.
Q. Are you aware of whether this unidentified male was a member of these drug organizations?
MR. MURPHY: Objection, Judge. Form of the question.
THE COURT: Sustained.
Q. Do you know who the unidentified male was?
A. Yes. It was Ulysses.
Q. And who was Ulysses?
A. Another member of the organization.
Q. And what role did he have?
A. He was a customer of Jo Jo's.
Q. Did he also perform any other services for Jo Jo?
A. He used to drive him around in his vehicle. Jo Jo didn't have a car, so he would frequently catch rides with Ulysses.
Q. And was Ulysses using code when he stated, I grabbed one like that for 21?
A. Yes.

Q. And what did that refer to?
A. Grabbing a kilo for $21,000.
Q. A kilo of cocaine?
A. Yes.
Q. Jo Jo states, damn, they are there, but that is around, but it's quick, they called me right now. Is that code?
A. Yes, it is.
Q. What does that refer to?
A. That means the cocaine to be purchased is available.
Q. On the second page, the top line, Jo Jo states, yes, from what I was telling you. When you're in your, call me. The liquor. The liquor. Is that code?
A. Yes, it is.
Q. What is that a reference to?
A. He was purposely omitting what liquor store.
Q. What liquor store were they referring to?
A. California Liquors.
Q. Now, this conversation began at 11:23 a.m. Are you familiar with whether an intercept occurred on 11:25, just two minutes later?
A. Yes, ma'am.
Q. I would ask you to look at Government's 35. Are you familiar with that intercept?

A. Yes, I am.
Q. And what is Exhibit 35?
A. It's a conversation between the Defendant and Jo Jo that occurred again that same date, January 20th, 2006, at 11:25 in the morning.
Q. Over whose telephone?
A. Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed this English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government moves 35 and 35-A as full.
MR. MURPHY: No objection.
THE COURT: Thirty-five and 35-A are full.
(Government's Exhibits 35 and 35-A were admitted in full)
THE COURT: The jury may read the transcript behind Tab 35.
(Jury reads Exhibit 35)
THE COURT: Go ahead, Ms. Rogers.
Q. The Defendant states, tell me. And Jo Jo replies, I have to come down with the papers, money, right. Is that code?
A. Yes.

Q. What is that a reference to?
A. He has to come down with the currency to pay for the transaction of narcotics.
Q. And this is the kilogram of cocaine?
A. Yes.
MR. MURPHY: Objection. Form of the question. Move to strike.
THE COURT: Sustained. The answer may be stricken. The jury will disregard.
Q. At approximately 11:32, did another conversation take place that was intercepted?
A. Yes, ma'am.
Q. And I'd ask you to turn to 36. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is that?
A. It's a conversation that occurred -- that was intercepted between Jo Jo and Cocoa, Cocua, Cua, on January 20th, 2006, at 11:32 a.m.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government moves 36 and 36-A as full.

MR. MURPHY: Judge, same objection, 36-A, *Petrozziello* and 403; and 36, conditional.

THE COURT: Overruled. Thirty-six and 36-A are full.

(Government's Exhibits 36 and 36-A were admitted in full)

THE COURT: The jury may read the transcript at 36.

(Jury reads Exhibit 36)

THE COURT: You may inquire, Ms. Rogers.

MS. ROGERS: Thank you.

Q. Detective Reilly, approximately two-thirds of the way down, Jo Jo states, no, so just tell those people to wait for you outside so you have to pam and you leave. Is that code?

A. Yes.

Q. What does that refer to?

A. Conduct the transaction and then depart.

Q. Cocua states, no, it's a, unintelligible, it's a man that's going to give it to me. I'm going to see what to do. I'm going over there. Is that code?

A. Yes, it is.

Q. What does that refer to?

A. How he's going to obtain the narcotics.

Q. A few minutes later, was another conversation

intercepted?
A. Yes, ma'am.
Q. If you would turn to Government's 37. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation that was intercepted between Belige and an unknown male who works at the U-Haul facility. The conversation occurred on the 20th, January 20th, 2006, at 11:38 in the morning.
Q. And was that call in Spanish?
A. Yes, it was.
Q. Have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time the Government moves Exhibit 37 and 37-A as full.
MR. MURPHY: No objection.
THE COURT: Thirty-seven and 37-A are full.
(Government's Exhibits 37 and 37-A were admitted in full)
THE COURT: The jury may read 37.
(Jury reads Exhibit 37)
THE COURT: You may inquire, Ms. Rogers.
MS. ROGERS: Thank you.
Q. Detective Reilly, did this conversation take place

after the U-Haul had returned?
A. Yes, ma'am.
Q. And at approximately 11:54, was another intercept overheard?
A. Yes, ma'am.
Q. And I would ask you to turn to Government's 38.
A. Okay.
Q. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. And what is it?
A. It's a conversation that occurred that was intercepted between Jo Jo and Cocua on January 20th, 2006, at 11:54 in the morning.
Q. Over whose telephone?
A. Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time the Government moves Exhibit 38 and 38-A full.
MR. MURPHY: Objection to 38-A, *Petrozziello* and 403, and 38 as conditional.
THE COURT: Overruled. Thirty-eight and 38-A are full.

(Government's Exhibits 38 and 38-A were admitted in full)

THE COURT: The jury may read the transcript at 38.

(Jury reads Exhibit 38)

THE COURT: You may inquire, Ms. Rogers.

MS. ROGERS: Thank you.

Q. At the time that this conversation was intercepted, were you aware whether Carlos Diaz's car was still in the parking lot where we first saw it parked at 9:05 that day?

A. Yes, it was.

Q. And did you see either or both Jo Jo and Cocua at approximately that time over the pole camera?

A. Yes, ma'am, both.

MS. ROGERS: At this time, the Government would move a video clip, Number 74, as full.

MR. MURPHY: Objection, your Honor. Again, it's not in its entirety.

THE COURT: Overruled.

(Government's Exhibit 74 was admitted in full)

MS. ROGERS: This is approximately two minutes long. I would ask --

(Government's Exhibit 74 was played)

MS. ROGERS: Pause.

Q. Detective Reilly, looking at that video, what of significance do you see, if anything?
A. Right there is Jo Jo emerging from the money order area of the liquor store. He's wearing the white-sleeved, dark sweatshirt with a hood.
MS. ROGERS: Continue.
(Government's Exhibit 74 was continued)
Q. And can you see what he is doing at this point in time?
A. Yes. That is Jo Jo on his cell phone talking.
Q. And this is at the time that the intercept between he and Cocua occurred?
A. That is correct.
MS. ROGERS: If I may have a moment, your Honor.
(Pause)
Q. Have you had an opportunity to review an additional portion of that pole camera video?
A. Yes, ma'am.
Q. And at the time, January 20th, did you also note additional footage?
A. Yes, ma'am.
Q. And what occurred after Jo Jo closed his phone and walked down Althea Street towards the parking lot?
A. He walked towards the open entrance to the back parking lot, side parking lot, and waited as Cocoa came

from the area where Carlos Miguel's, the Defendant's, vehicle was.

Q. At approximately noontime or 12, did another intercepted conversation occur?

A. Yes, ma'am.

Q. And I'd ask you to turn to Government's 39. Are you familiar with that exhibit?

A. Yes, ma'am.

Q. What is it?

A. It's a conversation that occurred between Jo Jo and Ulysses on January 20th, 2006, at 12 noon.

Q. Over whose telephone?

A. Jo Jo's.

Q. Was this call in Spanish?

A. Yes, ma'am.

Q. And have you reviewed the English transcript?

A. Yes, I have.

MS. ROGERS: At this time the Government moves 39 and 39-A as full.

MR. MURPHY: Judge, objection to 39-A, *Petrozziello* and Rule 403; and 39, conditional.

THE COURT: Overruled. Thirty-nine and 39-A are full.

(Government's Exhibits 39 and 39-A were admitted in full)

THE COURT: The jury may read 39.
(Jury reads Exhibit 39)
THE COURT: You may inquire, Ms. Rogers.
Q. Detective Reilly, you indicated earlier that the California Liquors was on Union Avenue?
A. Yes, ma'am.
Q. And do you know where Cranston Street was in relation to Union Avenue and Althea?
A. Yes. If you continued down Union, you'd eventually run into Cranston Street. You'd also be able to join up with Cranston Street if you were to take the right on Althea Street where the liquor store is and continue straight down, you'll eventually come into Althea at your next light.
Q. Approximately how many blocks is Cranston Street from either Althea or Union?
A. Two or three blocks.
Q. A few minutes later, did you notice anything occur with regard to the U-Haul?
A. Yes.
MS. ROGERS: And at this time I would ask that Government's 75 be admitted as a full exhibit and played to the jury.
MR. MURPHY: Judge, objection if it's just a portion of the tape.

THE COURT: Overruled. Seventy-five is full.

(Government's Exhibit 75 was admitted in full)

(Government's Exhibit 75 was played)

Q. Detective Reilly, do you know who that individual is?

A. Yes. That's Belige, the owner of the liquor store.

MS. ROGERS: Thank you. End.

Q. And directing your attention to Government's 40, are you familiar with that exhibit?

A. Yes, ma'am.

Q. What is it?

A. It's a conversation that was intercepted between Jo Jo and the Defendant on January 20th, 2006, at 12:10 in the afternoon.

Q. And this is approximately the same time as we saw Belige place something in the back of the U-Haul?

A. Yes, ma'am.

Q. Was that call in Spanish?

A. Yes, ma'am.

Q. And have you reviewed the English transcript?

A. Yes, I have.

MS. ROGERS: At this time the Government moves 40 and 40-A as full exhibits.

MR. MURPHY: Objection. 40, conditional; 40-A,

*Petrozziello* and Rule 403.

THE COURT: Overruled. Forty and 40-A are full.

(Government's Exhibits 40 and 40-A were admitted in full)

THE COURT: The jury may read Number 40.

(Jury reads Exhibit 40)

THE COURT: You may inquire.

Q. Detective Reilly, the first line with regard to Jo Jo is, is it ready for, like, in an hour or so because I have to go somewhere. Is that code?

A. Yes, it is.

Q. And what does it refer to?

A. It refers to if the transaction would be ready for an hour.

Q. Jo Jo's asking?

A. Jo Jo's asking if he would be able to obtain the kilogram of cocaine.

MR. MURPHY: Objection. Move to strike.

THE COURT: It may be stricken.

Q. And I would ask you to turn to Government's 41. Are you familiar with that exhibit?

A. Yes, ma'am.

Q. What is it?

A. It's a conversation that occurred between -- that was intercepted between Jo Jo and the Defendant on

January 20th, 2006, at 1341 in the afternoon.
Q. And that's military time. What time is it?
A. That's 1:41.
Q. P.M.?
A. Yes, ma'am.
Q. And was that call in Spanish?
A. Yes, ma'am.
Q. Did you review the English transcript?
A. Yes, I did.
MS. ROGERS: The Government moves 41 and 41-A as full.
MR. MURPHY: Objection, 41-A, *Petrozziello* and Rule 403; 41, conditional.
THE COURT: Overruled.
(Government's Exhibits 41 and 41-A were admitted in full)
THE COURT: The jury may read 41. Forty-one and 41-A are full.
(Jury reads Exhibit 41)
THE COURT: You may inquire.
Q. Detective Reilly, is that code?
A. Yes.
Q. What does it refer to?
A. It refers to when the time's going to be for the transaction.

Q. I'd ask you to turn to 42.
A. Okay.
Q. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation that was intercepted between Belige and the Defendant on January 20th, 2006, at 1:47 p.m.
Q. Over whose telephone?
A. Belige's.
Q. And was that in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes.
MS. ROGERS: At this time the Government moves 42 and 42-A as a full exhibit.
MR. MURPHY: No objection.
THE COURT: It's full.
(Government's Exhibits 42 and 42-A were admitted in full)
THE COURT: The jury may read the transcript at 42.
(Jury reads Exhibit 42)
THE COURT: You may inquire, Ms. Rogers.
Q. Did you recognize that to be Carlos Diaz's voice?

A. Yes, ma'am.
Q. And do you recognize that to be Belige's voice?
A. Yes, ma'am.
MS. ROGERS: I'd ask you to turn to 43.
THE COURT: We're going to break there, Ms. Rogers.
Would you step down, please.
THE WITNESS: Yes, ma'am.
THE COURT: Members of the jury, we're going to break for the day. Please fold up your notebooks as well as the black exhibit book, and you can leave them right there at your seats. They will be collected and locked away.
Now, I remind you that you are not permitted to discuss the case with anyone, including your fellow jurors. And so tonight when your family wants to know what you did all day, you need to be firm, yet polite, and tell them that you have been instructed not to talk about the case.
In addition, I remind you that you must not read or listen to anything on the news, whether it's television, radio or newspaper, that might even remotely touch on this case or any of the issues that you've been hearing about in this case.
Instead, I suggest you find a real cool spot and

get a good night's rest. I'd like to begin tomorrow morning at 9 a.m., so adjust your schedules. Leave early enough to allow for parking and traffic. I know some of you come from a distance; but since we have to break early, we need to leave a little early. So, again, if you would be in the courthouse by about quarter to 9, Bob will get you all lined up and ready to go at 9 a.m.

Have a nice evening, and we'll see you tomorrow.

Bob, you may see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel, please, to talk about scheduling for tomorrow.

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/Karen M. Wischnowsky

Karen M. Wischnowsky, RPR-RMR-CRR

June 3, 2008

Date