IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-19ML |
| UNITED STATES OF AMERICA * | |
| VS. * | JULY 19, 2006<br>9:00 A.M. |
| CARLOS DIAZ, *<br>a/k/a Carlos Miguel *<br>a/k/a Carlos *<br>a/k/a Jose Luis * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

DISTRICT JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: MARY E. ROGERS, AUSA
SANDRA BECKNER, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: WILLIAM J. MURPHY, ESQ.
Murphy & Fay, LLP
127 Dorrance Street, 2nd Floor
Providence, RI 02903

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

Interpreter: Jaime DaSilva

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| Patrick Reilly, Resumes | |
| Continued Direct Examination by Ms. Rogers | 4 |
| Cross-Examination by Mr. Murphy | 52 |
| Continued Cross-Examination by Mr. Murphy | 155 |
| Patrick Schwab | |
| Direct Examination by Ms. Beckner | 63 |
| Voir Dire Examination by Ms. Beckner | 114 |
| Voir Dire Examination by Mr. Murphy | 119 |
| Continued Direct Examination by Ms. Beckner | 125 |
| Cross-Examination by Mr. Murphy | 126 |
| Redirect Examination by Ms. Beckner | 152 |


# E X H I B I T S


| DEFENDANT | FOR ID | IN FULL |
|---|---|---|
| C | | 157 |
| Y | 120 | |

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 2 | 79 | |
| 2-A | | 79 |
| 5 | 79 | |
| 5-A | | 79 |
| 6 | 79 | |
| 6-A | | 79 |
| 8 | 79 | |
| 8-A | | 79 |
| 9 | 79 | |
| 9-A | | 79 |
| 17-A | | 96 |
| 18-A | | 96 |
| 21-A | | 96 |
| 23-A | | 96 |
| 26-A | | 96 |
| 30-A | | 96 |
| 44 | | 15 |
| 44-A | | 15 |
| 45 | | 15 |
| 45-A | | 15 |
| 46 | | 15 |
| 46-A | | 15 |
| 47-A | | 96 |
| 48 | | 33 |
| 48-A | | 33 |
| 49-A | | 96 |
| 50 | | 35 |
| 50-A | | 35 |
| 51-A | | 96 |
| 52 | | 37 |
| 52-A | | 37 |
| 53-A | | 96 |
| 54 | | 39 |
| 54-A | | 39 |
| 55-A | | 96 |
| 76 | | 9 |
| 77 | | 12 |
| 78 | | 17 |
| 79 | | 19 |
| 80 | | 21 |
| 81 | | 28 |

19 JULY 2006 -- 9:00 A.M.

THE COURT: Good morning. I know that you've probably figured out by now that we have lost another alternate juror in this case. And so in addition to my instructions to you that you not listen to anything about the case, that you not talk about the case, I'm now adding another and that is you all have to take very good care of yourselves. And if you need a written order to that effect, I'll see to it that you get one.

Ms. Rogers, are we ready to go?

MS. ROGERS: Yes, we are, your Honor.

THE COURT: Mr. Reilly, please. You're still under oath.

THE WITNESS: Yes, ma'am.

**PATRICK REILLY, GOVERNMENT WITNESS, RESUMES**

**CONTINUED DIRECT EXAMINATION**

**BY MS. ROGERS**:

Q. I'd ask you to turn to 43 in your book, and are you familiar with Government's 43?

A. Yes, ma'am.

Q. What is it?

A. This is a conversation that was intercepted between Jo Jo and an unidentified -- another member of the organization that occurred on January 20th, 2006,

at 1401 in the afternoon.
Q. And who was that other member?
A. I'm sorry?
Q. Who was that other member? What was his name?
A. His name was Gume. We don't have his --
MR. MURPHY: Objection, Judge. Move to --
THE COURT: Just a minute.
MR. MURPHY: Move to strike.
THE COURT: Approach, please. Would you step down.
(Bench conference held on the record)
MR. MURPHY: Judge, I move to strike the question. The question assumes facts not in evidence. She asked who was the other -- something to the effect of who was the other member of the organization.
THE COURT: I'm going to sustain the objection. You're going to have to lay some foundation. Otherwise this doesn't come in.
MS. ROGERS: He did testify that it was a member of the organization in his answer, but I'll lay some foundation.
THE COURT: I'm going to strike the answer because you need to, as I said, lay the foundation if you want this to come in under *Petrozziello*.
(End of bench conference)

THE COURT: Members of the jury, I have ruled that the last answer is stricken from the record, and so you will disregard it. You will also disregard the question that was put to Mr. Reilly.

Ms. Rogers, please.

Q. You indicated that there were two participants in this conversation?

A. Yes, ma'am.

Q. And who were they?

A. Jo Jo and Gume.

Q. And do you know who Gume was?

A. We do not know his true identity, no.

Q. Do you know how he fit into this investigation?

A. He was another member of the organization, an associate of Jo Jo's.

Q. And how do you know that?

MR. MURPHY: Objection. Move to strike.

THE COURT: Sustained.

Q. Have you reviewed this particular transcript, Number 43?

A. Yes, ma'am.

Q. And is there any information in that transcript that helped you form your opinion?

A. Yes, ma'am, very much so.

Q. With regard to Gume?

A. Yes.
Q. And your opinion is?
MR. MURPHY: Objection. It's not in evidence.
THE COURT: Sustained.
Q. What telephone line was used during this conversation?
A. Jo Jo's.
Q. And what was the date and time of the conversation?
A. Again, on the date of January 20th, 2006. The time was 1401, 2 p.m. in the afternoon.
Q. And was the call in Spanish?
A. Yes, ma'am.
Q. And you've indicated you've reviewed this English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government moves 43 and 43-A as a full exhibit.
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. Was code used in this conversation?
MR. MURPHY: Objection.
THE COURT: Sustained.
MS. ROGERS: Your Honor, I would ask to make an offer at the sidebar.

THE COURT: Move on to another question, and we'll take that up later.
Q. Now, this particular call you said occurred at 2:01?
A. Yes, ma'am.
Q. At approximately the same time, did you notice anything over the pole camera occurring in the back parking lot of California Liquors?
A. Yes. At approximately 2 p.m., the Defendant and other individuals responded to the back parking lot area of the liquor store and moved several vehicles that were parked near the rear entrance.
Q. And just after they moved the cars, did anything occur that you noticed?
A. Shortly after they repositioned the vehicles in the back parking lot, the U-Haul returned or a U-Haul returned.
Q. Was it the same U-Haul that had left?
A. No, it was not.
Q. How do you know it was a different U-Haul?
A. It was larger, for one thing, and had a different emblem on the side, had mushrooms on the side as opposed to a green price sticker.
Q. And have you reviewed the video --
A. Yes, ma'am.

Q. -- in preparation for trial?

MS. ROGERS: At this time the Government would move 76 as a full exhibit.

MR. MURPHY: Judge, I would object since it's not the whole video.

THE COURT: This is a segment of it; is that correct?

MS. ROGERS: Yes, your Honor.

THE COURT: Okay. Seventy-six is full.

(Government's Exhibit 76 was admitted in full)

(Government's Exhibit 76 was played)

Q. And there are two individuals coming out in the back parking lot. Do you recognize who they are?

A. Yes. Getting in the Maxima -- the Defendant's Maxima is the Defendant. He has a white shirt on. And the other individual is believed to be Belige's son moving the Lexus.

Q. And do you recognize who is exiting the Nissan Maxima?

A. Whoops. That is the Defendant right there.

Q. Now, is this the U-Haul that you previously testified concerning?

A. Yes. This is the larger U-Haul that came back.

Q. And the individual in back directing the U-Haul?

A. It's an unidentified employee of California

Liquors.
Q. And would you indicate on the screen where it is that the U-Haul backed up to.
A. Well, it eventually takes him a while to get it there, eventually backs up to the back door. If you go to your right, directly to your right, that is the back entrance to the liquor store. It's flush with the back of the building, and it's on a diagonal trajectory, if you will, from this corner right there. And eventually, after a series of three-point turns, he backs up to that door.
Q. And who is it that was driving?
A. It was Belige.
Q. And were there any other individuals that helped back that truck up?
MS. ROGERS: Stop.
A. Actually backing it up?
Q. Yes.
A. There appeared to be at least one other employee assisting in guiding it backwards.
Q. Was that employee the Defendant?
A. I didn't see him there. Initially I saw him move his car, obviously; but backing it up right then, no.
Q. And rather than play the entire video, does the U-Haul move again after several minutes?

A. Yes. It's in that position for several minutes, and then it's repositioned so it is completely flush, that is, perpendicular with the building and the rear entrance so that if you saw this location, it would be straight out towards the back left corner of the parking lot.
Q. So rather than an angle, it's at a 90 degree angle with the back of the building?
A. Correct.
Q. And who backed it up the second time?
A. Belige.
Q. Now, this was approximately 2:00. At approximately 2:21 p.m., did you see Belige return to the U-Haul?
A. Yes.
Q. And what did he do?
A. He was carrying a box, and he brought it to the driver's side of the vehicle, opened the driver's side door, placed it in the area of the driver's seat and pushed it over to the passenger's seat.
Q. And have you reviewed the video in anticipation of your testimony?
A. Yes, ma'am.
MS. ROGERS: At this time the Government would move Exhibit 77 as full.

MR. MURPHY: Judge, objection, unless she's offering the entire video.

THE COURT: Overruled. Seventy-seven is full.

(Government's Exhibit 77 was admitted in full)

(Government's Exhibit 77 was played)

Q. And who was entering the driver's side of the U-Haul?

A. That is Belige.

Q. And is this the position you described that it was backed up flush?

A. Yes.

Q. And that's the box you referenced?

A. Yes.

(Pause)

Q. A vehicle just drove up on the Althea Street. Do you recognize who just exited that vehicle?

A. Yes. That is Jo Jo being dropped off by Ulysses, his associate.

MS. ROGERS: Continue.

Q. And would you explain what that is.

A. That would be me having a technical problem at the time. I must have dropped the controller.

Q. And there's a white truck driving in front of California Liquors. Do you know what that was?

A. I believe that to be a beer distribution truck.

Q. Now, can you see what it is that Belige is carrying in his hand?
A. Yes, I can.
Q. And what is that?
A. It's just an empty cardboard topping.
Q. And who is that still beside him?
A. That's Jo Jo staying by the passenger side.
Q. And the individual that just walked over?
A. It's another unidentified individual.
MS. ROGERS: Stop.
Q. I'm going to direct your attention now to Government's 44. Are you familiar with that exhibit?
A. Yes, ma'am.
Q. What is it?
A. It's a conversation between the Defendant and Jo Jo that occurred on that date, January 20th, 2006, at 2:27 p.m.
Q. Over whose phone?
A. Over Jo Jo's phone.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government moves 44 and 44-A as full.

MR. MURPHY: Judge, 44 as conditional, I would ask that the tape be played, and 44-A as a violation of Sixth Amendment.

THE COURT: I thought you were going to take some time yesterday to review the transcripts, Mr. Murphy. Did you have an opportunity to do that?

MR. MURPHY: Yes, we did, Judge.

THE COURT: So are you still making a conditional objection?

MR. MURPHY: I am, Judge. Judge, may we approach?

THE COURT: Approach. Step down.

(Bench conference held on the record)

MR. MURPHY: Judge, I'll withdraw the conditional, but I have a new objection to 44. It's just a Sixth Amendment, because my client is the subject matter of that tape. However, I'm saying that I have no way of cross-examining Jo Jo. So I'll withdraw the conditional.

MS. ROGERS: My comment is, it comes in under the *Petrozziello*. It's admissible. It's not hearsay because it's an exception to the hearsay rule.

THE COURT: I'm overruling your objection.

MR. MURPHY: On *Petrozziello* and the Sixth Amendment?

THE COURT: Yes. What are you going to do with the conditional objections you made yesterday? I thought you were going to review the transcripts to make sure that they were all right.

MR. MURPHY: I'll have to withdraw those.

THE COURT: All of those conditional objections to the transcripts are withdrawn?

MR. MURPHY: Yes, because I'm not going to have time to go through yesterday's.

THE COURT: Well, I'll give you time. I just thought you were going to do it yesterday. I'll give you one more day grace period.

MR. MURPHY: The ones today I have no conditional; but the ones yesterday, if I could have one more day.

THE COURT: You can have a one-day grace period.

MR. MURPHY: Thank you.

(End of bench conference)

THE COURT: Forty-four and 44-A are full exhibits.

(Government's Exhibits 44 and 44-A were admitted in full)

THE COURT: And again, because this conversation is in Spanish, I'll ask the jurors to open your books to Tab 44 and read the transcript at that tab.

(Jury reads Exhibit 44)
THE COURT: Ms. Rogers, you may inquire.
Q. Detective Reilly, in reviewing 44, Exhibit 44, is there any code language used in there?
A. Yes, ma'am.
Q. What is it?
A. Well, first, it's a nondescript nature, and then the involvement of to come over there, which would be, obviously, Jo Jo's runner, to move the product, the material, the cocaine. And then when Jo Jo --
MR. MURPHY: Objection. Move to strike the next portion of the answer.
THE COURT: It may be stricken. Just please listen to the question. And, Ms. Rogers, be more precise with your question.
Q. Is there coded language used in this conversation?
A. Yes.
Q. What coded language is in this conversation?
A. Further, what Jo Jo refers to as a box of beer, he's obviously referring to the product, the cocaine that's to be picked up.
MR. MURPHY: Objection. Move to strike.
THE COURT: Overruled.
Q. At approximately 2:27, did you note more activity occurring in the back parking lot?

A. Yes, ma'am.
Q. And did you see the Defendant at that time in the back parking lot?
A. Yes, ma'am.
Q. And have you reviewed the video in anticipation of your testimony?
A. Yes, ma'am.
MS. ROGERS: The Government would move Government 78 as a full exhibit at this time.
MR. MURPHY: Judge, objection to the clip. I have no objection if the Government moves to admit the whole video.
THE COURT: Overruled. Seventy-eight is full.
(Government's Exhibit 78 was admitted in full)
(Government's Exhibit 78 was played)
Q. Who is standing with their back against the U-Haul at this time?
A. Another individual believed to be a Hector Nunez, another member of the organization.
MR. MURPHY: Objection. Move to strike the last portion.
THE COURT: Sustained, and the jury will disregard the answer.
Q. Was that Belige standing near the U-Haul?
A. Yes, ma'am.

Q. Do you recognize the individual who just exited the back of California Liquors and is walking?
A. Yes.
Q. With the jacket?
A. With the jacket and the white shirt is the Defendant, Carlos Miguel.
Q. And is he going to his blue Nissan?
A. Yes, appears to go towards the trunk initially and then the passenger side. I'm sorry, the driver's side. He puts the coat inside.
MS. ROGERS: Stop.
Q. Now, this took place at approximately 2:27. Have you reviewed also the video at 2:34 of that afternoon regarding what the pole camera showed?
A. Yes, ma'am.
Q. And you were looking through this lens at the time on June 20th -- excuse me, January 20th?
A. I was directing -- yes, I was directing the camera.
Q. And does a vehicle arrive at California Liquors at approximately that time?
MR. MURPHY: Objection.
THE COURT: Sustained.
MS. ROGERS: At this time I would ask that Government's 79 be admitted as a full exhibit.

THE COURT: This is video?

MR. MURPHY: Objection.

MS. ROGERS: Yes, 79, video.

THE COURT: The same basis?

MR. MURPHY: Same basis, and there's no foundation.

THE COURT: Overruled. Seventy-nine is full.

(Government's Exhibit 79 was admitted in full)

(Government's Exhibit 79 was played)

Q. Did you note the individual that just exited the maroon minivan?

A. Yes.

Q. And do you recognize him?

A. Yes.

Q. Who is he?

A. Full identity unknown, believed to be Carlos Camillo.

MR. MURPHY: Objection. Move to strike.

THE COURT: Sustained, and it may be stricken. The jury will disregard.

Q. And is that the Budweiser truck still parked in front of California Liquors?

A. Yes, it was, just before I panned over.

Q. The individual walking in front of the U-Haul, is that the same individual that you saw being dropped off

by that minivan?
A. Yes, it was, and this is the minivan again attempting to get into the back lot with difficulties.
Q. And the individual standing in front of the U-Haul, is that still the individual you saw dropped off?
A. Yes, ma'am.
Q. And who is that with him at this time?
A. That was Belige.
Q. And is that the same minivan we've been referring to parked there?
A. Yes, ma'am.
Q. Detective Reilly, were attempts made to follow that minivan after it left California Liquors?
A. Yes. Actually, in the footage you can see the surveillance units following it. We were actually attempting to coordinate with the uniform cruiser to stop that vehicle at that time.
Q. Were you successful?
A. No. Unfortunately, the traffic situation didn't allow us to do so.
MS. ROGERS: Stop.
Q. Now, at approximately 2:39, did you see the Defendant enter the parking lot again?
A. Yes.

Q. Have you reviewed the video footage?
A. Yes, I have.
MS. ROGERS: At this time the Government would move 80 as a full exhibit.
MR. MURPHY: Again, objection to only a portion being admitted.
THE COURT: Overruled on those grounds. The exhibit's full.
(Government's Exhibit 80 was admitted in full)
(Government's Exhibit 80 was played)
Q. And who is that standing in front of the U-Haul?
A. That is Carlos Miguel, the Defendant.
MS. ROGERS: Stop.
Q. Did you note an individual exit California Liquors at that time?
A. Yes.
MS. ROGERS: Continue. Stop.
Q. Did you note a second individual exit California Liquors?
A. Yes.
Q. And did you recognize that individual?
A. That is the Defendant.
MS. ROGERS: Continue.
Q. And did you see where he headed?
A. He went to his vehicle, got inside it.

Q. Did you see any other individuals?
A. Yes. Just before panning away to the right, you'll see Jo Jo getting into the passenger side of the vehicle.
Q. Is that --
MS. ROGERS: Stop.
A. Yes.
Q. Was that Jo Jo entering the side of the vehicle?
A. Yes, it was.
Q. And the Budweiser truck is still in front of California Liquors?
A. Yes, ma'am.
Q. At approximately this time, did you receive another intercept?
A. Yes, ma'am.
Q. And if you would turn to 45.
THE COURT: Members of the jury, wait on that until I've ruled.
Q. Now, at the time of Government's 45, were Carlos and Jo Jo in his vehicle?
A. Yes, ma'am.
Q. And what is Government's 45?
A. It is a conversation between Jo Jo and the individual who had dropped him off there, Ulysses. The conversation occurred at that time -- I'm sorry, that

date, January 20th, 2006, at 2:44 in the afternoon.

Q. Was that call in Spanish?

A. Yes, ma'am.

Q. And have you reviewed the English transcript?

A. Yes, ma'am.

MS. ROGERS: At this time the Government moves 45 and 45-A as full.

MR. MURPHY: Objection to 45-A and 45, *Petrozziello*, Rule 403, foundation.

THE COURT: Overruled. Forty-five and 45-A are full.

(Government's Exhibits 45 and 45-A were admitted in full)

THE COURT: The jury may turn to Tab 45 and read the transcript to yourselves.

(Jury reads Exhibit 45)

THE COURT: You may inquire, Ms. Rogers.

MS. ROGERS: Thank you.

Q. Detective Reilly, is there code in this conversation?

A. Yes, ma'am.

Q. I'm going to direct your attention to the second line where Jo Jo says, damn, that guy is something else. I'm standing here waiting for that guy.

MR. MURPHY: Objection to the form of the

question.

THE COURT: Well, let her finish the question. She hasn't asked it yet.

Q. Is there code in that sentence or two sentences?

A. Yes, there is.

Q. What is it?

A. In --

MR. MURPHY: Objection. Foundation.

THE COURT: Overruled.

A. The fact that they're not explaining who it is and that what they're meaning is they're waiting for Cua to arrive.

Q. Halfway down Jo Jo states, yeah, it's, unintelligible, in pieces, unintelligible, splitting that stuff, it came separated. Is there code in that?

A. Yes, there is.

Q. And what does it mean?

MR. MURPHY: Objection.

THE COURT: Sustained.

Q. What portions are code?

A. Most of it.

Q. And would you explain what the code is.

MR. MURPHY: Objection.

THE COURT: Basis?

MR. MURPHY: Foundation.

THE COURT: Overruled.
A. The fact that they say it comes in pieces and that they're splitting that stuff up, it came separated, referring to the actual individual kilograms of cocaine.
Q. Ulysses asks how much came, and Jo Jo states, not just one, man, it all went out. It was incredible. Forty-three, gone, seconds. I was here watching it. And Ulysses says, uh-huh, 43. Is there code in that portion of the conversation?
MR. MURPHY: Objection. Form of the question.
THE COURT: Overruled.
A. Yes, there is. They're obviously referring to the unit that came in one bulk --
MR. MURPHY: Objection. Move to strike this portion.
THE COURT: It may be stricken. You have to wait for a question. The answer may be stricken. The jury will disregard.
Put a question to the witness, please.
Q. Detective Reilly, what is the code in that portion?
A. The fact that one delivery of 43 kilos was distributed and that he was here watching it.
Q. And is there code in the number 43?

A. Yes. It's the 43 kilograms that were there at that time that were distributed.
Q. Jo Jo states in the next line, in a second, all of it went out just now. The last one I just saw go out in a truck. The other one's about 8. One, wham, bang. Is there code in that?
A. Yes.
MR. MURPHY: Judge, objection to the form of the question.
THE COURT: Sustained.
Q. In the line where Jo Jo references seeing something go out in a truck, is there code in that section?
A. Yes, there was.
Q. What is the code?
MR. MURPHY: Objection.
THE COURT: Overruled.
A. That kilograms had departed in the truck.
Q. And is there any code in the numeral 8?
A. Yes, that eight kilograms went to that one specific person.
Q. On the second page after Jo Jo states, he's in the parking lot, Ulysses states, there's a truck around the park, there's a guy, an American, an American. Is there code in that?

A. Yes, there is.
Q. And what is it?
A. Their counter-surveillance techniques.
Q. What are they referring to?
A. They're referring to one of our members of the investigative team that was parked in the area of the park, and he was actually in a truck. At that point I instructed that individual to depart the area.
Q. Did that individual have on heavy headphones?
A. Well, it's a wireless part of the cell phone which would be in your ear droped (sic) down to be a headphone.
Q. So there was a member of the HIDTA in that area?
MR. MURPHY: Objection.
THE COURT: Sustained.
Ms. Rogers, please refrain from leading your witness.
Q. The individual that you've referred to that had the headphones on, where was he located?
A. The park, which is about 150 feet down Althea Street diagonally across, maybe 200 feet away.
Q. And would you describe what he looked like?
A. He was a white, middle-aged man.
Q. And what vehicle was he in?
A. Utility vehicle.

Q. Have you reviewed the video in Government's 81?
A. Yes, ma'am.
Q. And does it accurately depict what you saw at approximately 2:44 p.m. outside of California Liquors?
A. Yes, ma'am.
MS. ROGERS: At this time the Government moves 81 as a full exhibit.
MR. MURPHY: Judge, objection. The exhibit is not complete.
THE COURT: Overruled on that ground. Eighty-one is full.
(Government's Exhibit 81 was admitted in full)
(Government's Exhibit 81 was played)
Q. Who is the individual that is heading to the U-Haul driver's side?
A. That's Belige.
Q. Do you recognize who is walking into the parking lot at this time?
A. That is Cua, Cocoa, Cocua, Jo Jo's runner.
MR. MURPHY: Objection. Move to strike the last portion.
THE COURT: It may be stricken. The jury will disregard.
Q. And is that the Defendant's vehicle still parked in the same place?

A. Yes. It's over here to the -- that way. I was panning in on the U-Haul leaving, where the arrow is, yes.
Q. Do you recognize who was getting out of the Defendant's car?
A. That is Cua, Cocoa, Cocua.
Q. And who was exiting in the Defendant's vehicle at this time?
A. The Defendant and Jo Jo.
Q. And is it fair to say that this is approximately 2:47 p.m.?
A. Yes, ma'am.
MS. ROGERS: Stop.
Q. During your entire surveillance from the time that the U-Haul with the mushrooms on it arrived until the time that the Defendant exited at approximately 2:47, did you ever see the Defendant carrying any kind of liquor, beer, wine in the back of the parking lot?
A. Nor the front. I saw him in the front, also, but never.
Q. Did you ever see Jo Jo carrying any kind of beer or alcohol in the back of the parking lot?
A. I didn't observe anyone from the liquor store carrying any beer at any time.
Q. Did you ever see Cua or Cocoa carrying any type of

alcohol?
A. No.
Q. I'm going to direct your attention now to Government's 46. Do you recognize that exhibit?
A. Yes, I do.
Q. What is it?
A. It's a conversation between the Defendant and Jo Jo that occurred on that date, the 20th of January 2006 at 3:20 in the afternoon.
Q. So the Defendant's vehicle exited around 2:47, and this conversation takes place around 3:20?
MR. MURPHY: Objection, leading.
THE COURT: Sustained.
Q. Whose telephone was this call taking place on?
A. The Defendant's.
Q. And was this call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes.
MS. ROGERS: At this time the Government moves 46 and 46-A as full.
MR. MURPHY: Objection, 46-A, *Petrozziello*, 46.
THE COURT: Overruled. Forty-six and 46-A are full.

(Government's Exhibits 46 and 46-A were admitted in full)

THE COURT: The jury may turn to Tab 46 and read the transcript there.

(Jury reads Exhibit 46)

THE COURT: You may inquire.

MS. ROGERS: Thank you.

Q. Detective Reilly, is there code in this conversation?

A. Yes, there is.

Q. And in what line does the code start?

A. Where Carlos says, hey, that guy called.

Q. And what is the code?

A. Well, the -- they're not identifying the individual as Patrick Schwab.

Q. What is the next code?

A. In the sentence where Jo Jo says, oh, yes, I'm going to call you so you can tell them that they already cut the first piece, meaning he was going to call him to let Pat Schwab know that they're already breaking it apart.

MR. MURPHY: Objection. Move to strike.

THE COURT: Overruled.

Q. Breaking what apart?

A. The cocaine, the packaging.

Q. When Carlos asks how much and Jo Jo replies, 10, the first piece, is that code?
A. Yes.
Q. And what is the code?
A. How much of the product is being broken apart.
Q. And what does the 10 refer to?
A. Ten grams.
Q. Is there any other code in that conversation?
A. Down the bottom where Jo Jo is waiting for another piece, so I can tell you later.
Q. What is that code?
A. That he's waiting for another piece so he can break that up.
Q. I'm going to direct you, Detective Reilly, to Government's 47. When did this conversation take place?
A. The conversation took place the same date. I'm sorry, January 20th, 2006, at 3:37 p.m.
Q. And who spoke in that call?
A. The Defendant and Patrick Schwab.
Q. Turning to Government's 48, did you receive another intercept?
A. Yes, ma'am.
Q. And what time was this call?
A. The same date at 3:56 p.m.

Q. And who spoke in this phone call?
A. Jo Jo and the Defendant.
Q. What time did the call take place?
A. 3:56 p.m.
Q. On whose line?
A. Jo Jo's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. And have you reviewed the English transcript?
A. Yes, I have.
MS. ROGERS: At this time the Government moves 48 and 48-A as full.
MR. MURPHY: Objection, *Petrozziello*.
THE COURT: Overruled on that ground.
(Government's Exhibits 48 and 48-A were admitted in full)
THE COURT: The jury may turn to Tab 48 and read the transcript there.
(Jury reads Exhibit 48)
THE COURT: You may inquire.
MS. ROGERS: Thank you.
Q. Detective Reilly, is there code contained in this conversation?
A. Yes, ma'am.
Q. And on what line does the code start?

A. From the onset when they don't identify the individual as Patrick Schwab, referring to him as he.
Q. And is there code in Jo Jo's asking if he gave you anything?
A. Yes, there is.
Q. What is that?
A. Asking if he gave -- if Patrick Schwab gave the Defendant money.
Q. And I direct your attention to Government's 49, and are you familiar with that exhibit?
A. Yes, ma'am.
Q. Is that another intercept that occurred?
A. Yes, it is.
Q. And what time did this call take place?
A. In the same date at 4:08 --
Q. Over whose telephone?
A. -- p.m. Over the Defendant's.
Q. And who were the participants?
A. Patrick Schwab and the Defendant.
Q. And this call was in English?
A. Yes, ma'am.
Q. I'm going to direct your attention now to Government's 50. Are you familiar with this exhibit?
A. Yes, ma'am.
Q. And what is it?

A. It's a conversation that was intercepted between the Defendant and Jo Jo that occurred on the same date, 20th of January 2006 at 4:09 p.m.
Q. And on whose phone?
A. The Defendant's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time the Government moves 50 and 50-A as full.
MR. MURPHY: Objection to 50-A, *Petrozziello*.
MS. ROGERS: I'm sorry, 50 and 50-A.
THE COURT: Overruled. Fifty and 50-A are full, and the jury may turn to Tab 50 and read that transcript.
(Government's Exhibits 50 and 50-A were admitted in full)
(Jury reads Exhibit 50)
THE COURT: You may inquire.
MS. ROGERS: Thank you.
Q. Detective Reilly, is there code in this conversation?
A. Yes, ma'am.
Q. And where does it start?

A. It starts from not identifying the individual they're talking about, which is Patrick Schwab.

Q. And is there code in the conversation where Carlos says, he's saying in one hour he'll call 'cuz he's waiting for a guy to give him money?

A. Yes, there is.

Q. What is the code?

A. He's talking about Patrick Schwab who advises that as soon as he obtains the money from a third party, he'll have the money to provide it to Jo Jo.

Q. And if you would turn to Government's 51, are you familiar with this intercept?

A. Yes, ma'am.

Q. Who are the participants?

A. Patrick Schwab and the Defendant.

Q. And what time does this take place?

A. It occurred on the same date, the 20th of January 2006 at 6:41 p.m.

THE COURT: Six?

THE WITNESS: I'm sorry, seven, 7:41 p.m., 1941 military time.

Q. And was this call in English?

A. Yes, ma'am.

Q. I'm going to direct you now to Government's 52. Are you familiar with this exhibit?

A. Yes, ma'am.
Q. What is it?
A. It's a conversation that occurred between Jo Jo and the Defendant on January 21st, 2006, at 2:50 p.m.
Q. This is the next day?
A. Yes.
Q. And over whose line?
A. The Defendant's.
Q. Was the call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, ma'am.

MS. ROGERS: At this time the Government moves 52 and 52-A as full.

MR. MURPHY: Judge, an objection both to 52 and 52-A under *Petrozziello*.

THE COURT: Overruled on those grounds. They're both full exhibits.

(Government's Exhibits 52 and 52-A were admitted in full)

THE COURT: The jury may turn to Tab 52 and read the transcript there.

(Jury reads Exhibit 52)

THE COURT: You may inquire.

MS. ROGERS: Thank you.

Q. Detective Reilly, is there code in this conversation?
A. Yes, ma'am.
Q. And where is it?
A. When Carlos says, I have some papers for Pat, meaning currency, money.
Q. What word refers to money?
A. Papers.
Q. And then two lines down, Carlos states something to Jo Jo. Is that code?
A. Yes. It's when he says he wants the same today, meaning the same amount of material, and he's already provided $1,800. The one eight a head means $1,800 as payment for the specific unit of measure.
Q. Is the next comment by the Defendant and the rest full code?
A. It means he will pay the remaining portion at a later time.
Q. And then Carlos states, okay, I'll break it in a while. Is that code?
A. It means I'll get it to you in a while.
Q. Get what?
A. The money, the currency.
Q. And if you would turn to Government's 54, are you familiar with that exhibit?

A. Yes, ma'am.
Q. What is it?
A. It's a conversation that occurred and was intercepted between Jo Jo and the Defendant which occurred on the 21st of January 2006 at 4:56.
Q. And over whose telephone?
A. That was over the Defendant's.
Q. Was this call in Spanish?
A. Yes, ma'am.
Q. Have you reviewed the English transcript?
A. Yes, ma'am.
MS. ROGERS: At this time the Government moves 52 and 52-A as full.
THE COURT: I thought it was 54.
MS. ROGERS: My mistake. Yes.
MR. MURPHY: Judge, objection to 54 and 54-A both under *Petrozziello*.
THE COURT: Overruled. They're both full, and the jury may read the transcript at Tab 54.
(Government's Exhibits 54 and 54-A were admitted in full)
(Jury reads Exhibit 54)
THE COURT: You may inquire.
MS. ROGERS: Thank you.
Q. Detective Reilly, is there code in this

conversation?
A. Yes, ma'am.
Q. What is it?
A. Again, they're not mentioning third party which is Patrick Schwab and that Carlos says he is ready now.
Q. And is the comment "he wants a hundred" code?
A. Yes, it is. He's referring to a 100-gram unit of measure of cocaine.
MS. ROGERS: Your Honor, may I approach at this time with defense counsel in an attempt to save time?
THE COURT: Approach. Step down.
(Bench conference held on the record)
MS. ROGERS: I'm done with the questions of Detective Reilly. Right now the only thing I have left is what Mr. Murphy indicated that he was not inclined at that time to stipulate, that's the English-speaking calls, the date and time they took place on.
So I will go through -- I just wanted to ask if you still were not going to stipulate with Detective Reilly. He's reviewed the register that gives the date, the time and phone number and compared it to the transcripts. And for him to say Pat Schwab's calls took place at this time, on this date, it's going to be very tedious.
MR. MURPHY: I thought she was going to have

direct with Morehead yesterday.

MS. ROGERS: It's faster and easier if we keep the same witness up there. He's listened to just about every intercept in the entire case.

MR. MURPHY: There's 17 calls. I think it will be very quick.

THE COURT: Well, put your stipulation on the record so we know what it is.

MS. ROGERS: I don't think he's stipulating.

MR. MURPHY: I'm not stipulating. You're going to ask him which call between --

MS. ROGERS: The date, the time and the phone.

THE COURT: All right. Go through it.

(End of bench conference).

Q. Detective Reilly, the calls that we've been discussing, you've testified as to the date, time and line and user for each of the calls. What allowed you to obtain that information?

A. A pen register.

Q. And what is a pen register?

A. It's a Court-authorized implement that's used to track and capture the numerical digits that are used in each phone that's intercepted.

Q. Does it also capture any other data?

A. Yes. It captures the time, the date and the

numbers dialed.
Q. Were pen registers used, then, during this investigation?
A. Yes, ma'am.
Q. Was it tested and checked for accuracy before it was connected to the telephone?
A. Yes, it was.
Q. Now, you introduced Spanish calls. There were also English intercepts as well; is that correct?
A. Yes.
Q. Have you reviewed the transcripts prepared with the pen register data that was obtained?
A. Yes, ma'am.
Q. And I'm going to direct your attention to Government's 2, 5, 6 --
THE COURT: Members of the jury, don't look at this now.
Q. -- 8 and 9. Who are these conversations between?
A. Danny Caetano Cuello and Patrick Schwab.
Q. Have you compared the pen register data on each of these transcripts (sic) with the transcript data?
A. Yes, ma'am.
Q. As to Exhibit 2, what was the phone number, the date and the time that the call took place?
A. Over Danny's line of 699-6064, the time -- the

date was 9/29, 2005, and the time was 1552.

MR. MURPHY: Judge, I would object to that answer, not a proper foundation. There's no evidence of any calibration on that.

THE COURT: Overruled.

Q. As to Exhibit 5, who was -- what was the telephone number, the date and time of the call?

A. The number is 699 -- again, these are all (401) numbers, but 699-6064, date 9/29, 2005, and the time is 1628:54.

MR. MURPHY: Again, objection to the answer, no foundation as to calibration.

THE COURT: Overruled.

Q. As to Exhibit 6, what was the telephone number, the date of the call and the time of the call?

A. 699-6064. The date's 9/30/05. The time 1608:25.

MR. MURPHY: Again, objection as to the answer, no calibration.

THE COURT: Overruled.

Q. As to Exhibit 8, what was the telephone number, the date of the call and the time of the call?

A. Number 699-6064. Date, 10/3/05. The time is 12:46:02.

MR. MURPHY: Objection. No foundation.

THE COURT: Overruled.

Q. As to Exhibit 9, what was the telephone number, the date of the call and the time of the call?
A. Number is 699-6064. The date 10/3/05. The time is 1523:33.
MS. ROGERS: Your Honor, at this time the Government would move these exhibits as full.
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. I'm going to direct your attention to Government's Exhibits 17, 18, 21, 23, 26, 30, 47, 49, 51, 53 and 55.
A. Okay.
Q. And who are these conversations between?
A. Between the Defendant, Carlos Miguel, and Patrick Schwab.
Q. And have you compared the pen register data with the transcript?
A. Yes, ma'am.
Q. As to Government's Exhibit 17, what was the telephone number, the date of the call and the time of the call?
A. The number was 413-9125. The date was December 1st, 2005. The time was 1303:46.
MR. MURPHY: Objection. Move to strike. Foundation.
THE COURT: Overruled.

Q. As to Government's 18, what was the telephone number, the date of the call and the time of the call?
A. Number is 413-9125. The date is 11/25, 2005, and the time is 1309:49.
MR. MURPHY: Move to strike. No foundation.
THE COURT: Overruled.
Q. As to Government's 21, what was the telephone number, the date of the call and the time of the call?
A. The number is 413-9125. The date is 12/01, 2005, and the time is 1802:56.
MR. MURPHY: Objection. Move to strike. No foundation.
THE COURT: Overruled.
Q. As to Exhibit 23, what was the telephone number, the date of the call and the time of the call?
A. The number is 413-9125. The date is 12/13, 2005, and the time is 1519:09.
Q. As to Government's 26, what was the telephone number, the date of the call and the time of the call?
A. The number is 413-9125, the date is 12/20, 2005, and the time is 1443:16.
MR. MURPHY: Objection. Move to strike. No foundation.
THE COURT: Overruled.
Q. As to Government's 30, what is the telephone

number, the date of the call and the time of the call?
A. The number is 413-9125, the date is 1/18, 2006, and the time is 1956:52.
MR. MURPHY: Objection. Move to strike. No foundation.
THE COURT: Overruled.
Q. As to Government's 47, what is the telephone number, the date of the call and the time of the call?
A. Telephone number is 413-9125, the time is -- I'm sorry, the date is 1/20, 2006, and the time is 1537:04.
MR. MURPHY: Objection. No foundation for the answer. Move to strike.
THE COURT: Overruled.
Q. As to Government's 49, what is the telephone number, the date of the call and the time of the call?
A. The telephone number is 413-9125, the date is 1/20/06, and the time is 1608:04.
MR. MURPHY: Objection. Move to strike. No foundation.
THE COURT: Overruled.
Q. As to Government's Exhibit 51, what was the telephone number, the date of the call and the time of the call?
A. Telephone number is 413-9125, the date is 1/20/06, and the time is 1941:23.

MR. MURPHY: Objection. Move to strike. No foundation.

THE COURT: Overruled.

Q. As to Government's Exhibit 53, what was the telephone number, the date of the call and the time of the call?

A. The telephone number is 413-9125, the time is -- I'm sorry, the date is 1/21, 2006, and the time is 1652:45.

MR. MURPHY: Objection. Move to strike. No foundation.

THE COURT: Overruled.

Q. As to Government's Exhibit 55, what was the telephone number, the date of the call and the time of the call?

A. The number is 413-9125, the date is 1/21, 2006, and the time is 1728:25.

MR. MURPHY: Objection. Move to strike. No foundation.

THE COURT: Overruled.

MS. ROGERS: Thank you. If I could have a moment, your Honor.

(Pause)

MS. ROGERS: Your Honor, at this time the Government has no further questions other than I would

like to make a proffer.

THE COURT: Approach. Step down, please.

MS. ROGERS: Actually, Attorney Beckner will make the proffer.

(Bench conference held on the record)

MS. BECKNER: Yes, your Honor. I believe the defense objected under *Petrozziello* to Exhibit 43. While he did not state a basis, I'm guessing that the basis is that Gume is not a named conspirator. As a preliminary matter, I have a 2002 case --

THE COURT: Excuse me, you need to speak directly into this microphone.

MS. BECKNER: The facts are, first of all, the substance of the call itself discusses the price per gram at 26, if you look at the bottom of the page --

THE COURT: I understand that, but what connects him to the others?

MS. BECKNER: I'm sorry?

THE COURT: What connects him to the others? He's connected to Jo Jo.

MS. BECKNER: Mr. Gume. What I was going to say, your Honor, is that the rule does not require that the listener be a member of the conspiracy, merely that the Defendant and the declarant be a member of the same conspiracy, and that's the case that I've brought.

So while Gume for the substance of the call is clearly related to the conspiracy, which you may consider, the case law is actually that the Government doesn't even have to show that he is a member of the conspiracy. And that's what I wanted to show the Court.

If Jo Jo has already been established as a member, and the Government believes it's established by a preponderance of the evidence, the Defendant is a member of the same conspiracy with Jo Jo, and that is the only showing required under 801(d)(2)(E), and that is what this 2002 case actually says.

MR. MURPHY: Judge, first of all, I object to it. Forty-three and 43-A was objected to, and there were also foundation problems aside from *Petrozziello*.

As to *Petrozziello*, the Government has to establish before, and these transcripts are admitted under *Petrozziello* right now, but there's been no establishment of any conspiracy at this point yet involving Jo Jo and my client.

The objection was also as to the foundation of how it got in. Some of the talk from this officer was that Gume was a member of the organization. That had no foundation.

THE COURT: That's not in.

MR. MURPHY: That's not in?

THE COURT: No.

MR. MURPHY: That's why that was objected to.

THE COURT: On the basis of the proffer of the Government, I'm sustaining the objection. I find that there's not sufficient evidence under *Petrozziello* to bring this in. That's my ruling. Forty-three and 43-A remain for ID.

MR. MURPHY: Judge, can I ask you, if they're done with Reilly, can we take a five-minute break?

THE COURT: For what?

MR. MURPHY: So I can set up.

THE COURT: How long are you going to be on cross with him?

MR. MURPHY: I'm going to be 40, 45 minutes.

THE COURT: We'll take our break now.

(End of bench conference)

THE COURT: Members of the jury, we're going to take our recess at this time. We'll take about 15 minutes. Again, I remind you that you must not talk about the case during the recess. Instead, use the time to relax and maybe have a cup of coffee. We'll reconvene at 10:45.

(Recess)

THE COURT: Mr. Murphy.

MR. MURPHY: Thank you, Judge. Judge, at this time I would move the video in as a full exhibit as Defendant's Z.

THE COURT: What's the Government's position?

MS. ROGERS: Perhaps if we approach the sidebar.

THE COURT: Approach. Step down.

(Bench conference held on the record)

MS. ROGERS: I don't have an objection to it except that --

THE COURT: I do.

MS. ROGERS: -- it's going to be unplayable from my understanding.

THE COURT: What's the relevance of the entire video?

MR. MURPHY: I am not asking that the video itself be played in its entirety. I would not do that.

THE COURT: If you're offering it into evidence, Mr. Murphy, what that means is that the jurors are going to be required to look at the entire thing. It's how many hours?

MS. ROGERS: It's from, I think, 9 to 5. It runs the entire day.

MR. MURPHY: I mean, I would --

THE COURT: What is on it that is relevant to this case?

MR. MURPHY: What is relevant, your Honor, is under the doctrine of completeness, the Government in its case-in-chief used snippets, clips of the video, I think Exhibit 70 to 81, if I'm not mistaken, and they played only certain portions, you know, 30-second, one-minute segments.

I think under the doctrine of completeness that the jury should be able to at least look at the video from about 11:30 to 2:30.

THE COURT: Then that's not the entire video. If you want to make a video, if you want to make a portion of it that you can somehow convince me is relevant in this case, I'll permit it in. But at this point, I'm going to deny your request. Step back and start asking questions.

(End of bench conference)

THE COURT: Defendant's Z remains for ID only.

MR. MURPHY: Thank you, Judge.

**CROSS-EXAMINATION**

**BY MR. MURPHY**:

Q. Detective Reilly, that book that you've been referring to for the past two days, is that your book?

A. I'm sorry?

Q. Is that your book, sir?

A. No. I believe it was prepared for the Court.

Q. Have you written anything in that book?
A. No, sir.
Q. There are no notes in that book or anything?
A. No, sir.
Q. Now, Detective Reilly, when you were asked questions concerning conversations involving Carlos Miguel Diaz, you said you knew his voice?
A. That's correct.
Q. You did not know his voice from September until January 30th, 2006; correct?
A. That's correct.
Q. You learned that it was his voice afterwards; correct?
A. Yes, sir.
Q. So when you heard those calls, and if I could see your book, please, sir.
MR. MURPHY: Judge, may I approach the witness?
THE COURT: Don't you have a copy of it?
MR. MURPHY: Not of his book, but I have a copy of one, your Honor.
THE COURT: I'm assuming it's the same.
MS. ROGERS: They're identical, your Honor.
Q. When you looked at a call, for instance, if we go to exhibit or tape 15 in your booklet, it says a call on November 19, 2005, with Carlos Diaz and a person

typed in as Jo Jo. On November 19th, 2005, you did not know the voice of Carlos Diaz; correct?
A. Not associated with his face, no.
Q. Now, sir, directing your attention to Exhibit 16 in your book, do you have 16 in front of you?
A. Yes, sir.
Q. And 16 was marked full yesterday. Sixteen in your book is an English translation of a Spanish conversation that took place on November 20th, 2005, between Jo Jo and Manuel; correct?
A. Yes, sir.
Q. You do not know who Manuel is, do you, sir?
A. No, sir.
Q. You do not know where he is from, do you?
A. Yes. Actually, he's from New York.
Q. Have you ever seen Manuel in the State of Rhode Island, sir?
A. Yes. I believe he opened a bar in the Providence area.
Q. And what's his name, Manuel what?
A. We don't have his full identity, as I stated previously.
Q. Where's the bar?
A. Somewhere in South Providence. I believe it was called the Principale.

Q. Where is it, sir?
A. I'm not sure.
THE COURT: Mr. Reilly, please keep your voice up and speak slowly.
Q. Sir, when you described the conversations when Ms. Rogers for the Government asked you yesterday and you went through almost entirely that whole book; correct?
A. Are you still on this specific call?
Q. No, I'm not.
A. I'm sorry. Go ahead.
Q. But yesterday and today you went through almost the whole book with her, would you agree with me?
A. A good portion of it, yes.
Q. And there are 57 tabs in that book?
A. Fifty-six.
Q. And you went through that book prior to testifying, too, did you not?
A. Briefly, yes.
Q. Briefly?
A. Yes.
Q. So when you say it was an accurate translation, did you do that briefly or did you spend some time going through it?
A. Well, I don't speak Spanish, so I wouldn't know

the accuracy of the translation, sir.

Q. You said yesterday that those conversations were --

THE COURT: Mr. Murphy, if you move away from the mic, the interpreter can't hear you. So please stay at the mic.

MR. MURPHY: I apologize, your Honor.

Q. Mr. Reilly, yesterday you said that those tapes were being either transcribed or being translated into English from somebody in the booth listening to those calls?

A. Yes. At the time they were being intercepted, they were translated from a certified Spanish-to-English interpreter, and that was then relayed to the agents.

Q. Who was the certified translator?

A. We had various ones throughout the course of the five-month investigation.

Q. Who were they certified by?

A. The Federal Bureau of Investigation.

Q. By the FBI?

A. Yes.

Q. Not by the court?

A. I'm not aware if they're court certified or not.

Q. Now, Mr. Reilly, with those 56 conversations that

you went through yesterday and today with Ms. Rogers, I believe with the exception of two of them, you said that they were all in code; correct?

A. I don't remember the figure that wasn't in code, and I don't believe we went through all 56. We went through a good portion of them.

Q. The ones that you went through, sir, with the exception of two of them, you said they were all in code; correct?

A. A large percentage of them were in code, yes.

Q. I mean the specific ones that you went through with Ms. Rogers where she asked you whether or not they were in code, there were only two that you did not talk about the code. Is that a fair question on my part?

A. I don't recall the exact number, so I'm not sure; but it was the majority of them, yes.

Q. Now, Mr. Reilly, you've been employed by the State Police for 14 years?

A. About 14-and-a-half years, yes, sir.

Q. And you are now a detective with the State Police?

A. Yes, sir.

Q. And you were the co-chief agent on this case?

A. Co-case agent.

Q. Co-case agent?

A. Yes.

Q. And that means you were the boss, you were in charge of this case; correct?
A. No. We actually had superiors, supervisors that were overseeing the case. I was the lead investigator, if you will, and had an assistant co-case agent.
Q. Who was the co-case agent with you?
A. That would be Special Agent Michael Morehead.
Q. Is Mr. Morehead sitting at counsel table?
A. Yes.
Q. Now, sir, did you work on this case every day from September through January?
A. Unfortunately, yes.
Q. Seven days a week for five months?
A. More than I would have liked, yes.
Q. Now, Detective Reilly, you're a graduate of the Rhode Island State Police Academy; correct?
A. Yes, sir.
Q. And you graduated from the academy about 14-and-a-half years ago?
A. Yes.
Q. Now, at the academy, you took classes; correct?
A. Yes, sir.
Q. And one of the classes that you took was how to prepare a report of your investigation; correct?
A. I don't remember if there was an actual class

regarding it, but --
Q. Are you saying that you weren't taught how to write an investigatory report?
A. Well, I'm sure I was taught somehow. I don't recall an actual class that was given, but it was a long time ago.
Q. So you were never taught how to write a police report?
MS. ROGERS: Objection.
THE COURT: Sustained.
Q. Were you taught at the Rhode Island State Police academy how to write a police report?
A. At some point, yes.
Q. And that was part of a class, was it not?
A. I really don't recall if it was part of a class. I don't recall the actual class.
Q. You graduated, didn't you?
A. Yes, I did.
Q. Now, you've been taught during your 14 years how to write a police report, have you not?
A. Yes, sir.
Q. And you've been taught by superiors along with instructors; correct?
A. You learn along the way yourself, yes.
Q. And you're critiqued by superiors on reports,

right, along the way?
A. Yes.
Q. Now, sir, you would agree with me that it's important to write a report concerning your investigation of a case; correct?
A. Well, at times, yes.
MR. MURPHY: Judge, I would move now under Rule 26.2 for any reports that were written on this case by Detective Reilly.
MS. ROGERS: Your Honor, the Government has previously provided the reports prepared by Detective Reilly regarding the time frames that he's been questioned on during direct as well as all of the affidavits and search warrant affidavit.
Q. Detective Reilly, there is what's known as an FBI 302. Do you know what that is?
A. Yes, sir.
Q. What is that?
A. It's a report that is done for the FBI's database.
Q. A report dated between January 20th of '06 and 1/26 of '06, is that the only report that you did in this case?
A. No, sir.
Q. Well, let me ask you this. Do you recall assisting in the preparation of a 302 sometime in

January, late January, after January 20th of 2006?
A. No, I do not. I did several, so I'm not sure which one you're referring to.
Q. You did several 302s?
A. Yes.
MR. MURPHY: Judge, I would move for the production of those 302s.
THE COURT: Ms. Rogers?
MS. ROGERS: Your Honor, I will need time and ask the legal assistant to bring them over.
THE COURT: Approach. Step down.
(Bench conference held on the record)
THE COURT: Where are they?
MS. ROGERS: They're in the conference room, and there are a stack this high. Most of them are irrelevant. I provided to Mr. Murphy all the affidavits, search warrant affidavits and the -- there is an extensive multi-page report that Detective Reilly assisted in detailing everything on the 20th.
THE COURT: He doesn't have that?
MS. ROGERS: No, he was given that in discovery.
MR. MURPHY: I have one 302 that details what happened on January 20th, 2006. I was provided yesterday at my request a copy of this detective's affidavit in support of the search warrant of my

client's house. I have no other 302. He says he's prepared a bunch of them. I'm entitled to those, and I'm moving for them.

MS. ROGERS: The reports are done by the FBI and signed off by the supervisors. There are multiple individuals that do the reports.

THE COURT: I believe he's testified that he assisted in the preparation of several of these. That should have been turned over.

MS. ROGERS: If I could have the lunch break, then, too, to go through those because I'll need his assistance in ferreting out --

THE COURT: I don't want to hold this jury up now. I'll permit you to cross-examine. I'm ordering them to be produced to you. In the meantime, put Schwab on. Let's go.

MS. ROGERS: Okay.

(End of bench conference)

THE COURT: Members of the jury, we're going to take a very short recess now so that we can get another witness in here in order to expedite the presentation of evidence. We will continue the cross-examination of Mr. Reilly at some point later today.

So I'll ask you, Bob, to see the jury out, please. Please fold up your notebooks, leave them on

your seats. This should only take 5 or 10 minutes or so. I remind you not to talk about the case at all during the recess.

(The jury is not present for the following)

THE COURT: While the Court is in recess, I'm ordering the Government to provide to Mr. Murphy any of the reports that Mr. Reilly assisted in preparing.

Mr. Reilly, since you are on cross-examination, you may not discuss any aspects of your testimony with counsel for the Government until such time as you have completed your cross-examination.

Court will be in recess.

(Recess)

(The jury is present for the following)

THE COURT: Ms. Beckner, please.

MS. BECKNER: Yes, your Honor.

**PATRICK SCHWAB, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Patrick Schwab, last name S-C-H-W-A-B.

**DIRECT EXAMINATION**

**BY MS. BECKNER:**

Q. How old are you, Mr. Schwab?
A. Twenty-seven.

Q. And how far did you go in school?
A. Between eighth and ninth grade.
Q. Are you fluent in Spanish?
A. No.
Q. What languages do you speak?
A. English.
Q. Sir, where are you working?
A. I wasn't working.
Q. And how long have you been unemployed?
A. Around two years.
THE COURT: Would you keep your voice up, please.
Q. How are you supporting yourself, sir?
A. Selling drugs.
Q. Now, Mr. Schwab, do you have any adult felony convictions?
MR. MURPHY: Objection.
THE COURT: Basis?
MR. MURPHY: Relevance.
THE COURT: Overruled.
Q. Mr. Schwab, do you have any adult felony convictions?
A. No felony convictions.
Q. Now, sir, you said that you were supporting yourself by selling drugs; is that right?

A. Yes, ma'am.
Q. What kind of drugs were you selling, Mr. Schwab?
A. Cocaine.
Q. And in what form was this cocaine that you were selling?
MR. MURPHY: Objection, leading.
THE COURT: Overruled.
A. Powder cocaine and crack cocaine.
Q. What's the difference?
A. Crack cocaine is smokeable, and powder cocaine is sniffed.
Q. How about in terms --
THE COURT: Mr. Schwab, pull the microphone a little closer to you. Speak directly into it, and yell.
THE WITNESS: All right.
Q. If you could repeat your answer, sir, what is the difference between powder and crack cocaine?
A. Powder cocaine you sniff, and crack cocaine they smoke.
Q. Now, sir, have you pled guilty?
A. Yes, I did.
Q. What have you pled guilty to?
A. To possession of over 50 grams with intent to distribute.

Q. Fifty grams of what, sir?
A. Crack cocaine.
Q. Why did you plead guilty, Mr. Schwab?
A. Because I am guilty.
Q. Have you pled guilty with a plea agreement with the Government?
A. Yes, I did.
Q. And that plea agreement provided you certain benefits; is that right?
A. Yes, ma'am.
Q. In fact, the Government agreed to recommend the low end of the --
MR. MURPHY: Objection, leading.
THE COURT: Just a minute. Basis?
MR. MURPHY: Leading.
THE COURT: Sustained. Try not to lead the witness.
MS. BECKNER: Yes, your Honor. I apologize.
Q. Mr. Schwab, what benefit are you getting as a result of your plea agreement?
A. I get the low end of the guidelines.
Q. So the Government agreed to recommend that; is that right?
A. Yes, ma'am.
Q. Now, sir, have you also agreed to cooperate with

the Government?
A. Yes, I did.
Q. And why have you agreed to do that, sir?
A. Hopefully to get less than the guideline.
Q. Hopefully you get a lesser sentence?
A. Yes, ma'am.
Q. Have you been promised anything, Mr. Schwab, from the Government?
A. No, ma'am.
Q. Mr. Schwab, I want to talk about your drug use. Have you ever used any illegal drugs?
A. Yes.
Q. What kind of illegal drugs?
A. Marijuana.
Q. When did you start using marijuana, Mr. Schwab?
A. Around 12 years old.
Q. And you said you were 27?
A. Yes.
Q. So from the time you were 12 until the present or at least until the time you were arrested, how often would you use marijuana?
A. Around every day.
Q. What sort of effect would that have on you, Mr. Schwab?
A. I just felt like it relaxes me.

Q. What about impact on your memory?
A. I don't believe so.
Q. Now, Mr. Schwab, you've testified that you've dealt in cocaine and crack cocaine. How long have you been selling either type of cocaine?
A. Around two years.
Q. And why do you sell both, both crack and powder cocaine, Mr. Schwab?
MR. MURPHY: Objection, relevance.
THE COURT: Overruled.
A. Basically just however people want it.
Q. To expand your customer base?
A. Yes.
Q. All right. Now, do you remember when you were arrested?
A. Yes.
Q. What month was that, sir?
A. January.
Q. Of this year?
A. Yes.
Q. What happened when you were arrested, Mr. Schwab?
A. I pulled up to my house, a federal officer approached me, I tried to run, he sustained me (sic), brought me to the ground, grabbed my keys, brought me into the house, went into my house and they searched my

house.
Q. And what did the officers find inside your residence, Mr. Schwab?
A. Over 50 grams of crack.
Q. Crack cocaine?
A. Yes, ma'am.
Q. And where was this crack cocaine located?
A. In a football.
Q. Why was it in a football?
A. Because I had it hidden.
Q. Why did you hide it?
A. From the police or from people who would try to rob me or something.
Q. Now, where were you getting this cocaine that you were selling?
A. From Jo Jo.
Q. Do you know what Jo Jo's real name is?
A. No.
Q. How did you meet Jo Jo?
A. Through Carlos.
Q. Carlos who?
A. Diaz.
Q. Do you see Carlos Diaz in the courtroom here today?
A. Yes.

Q. Could you please describe for the record what Mr. Diaz is wearing.
A. He's wearing a black jacket and a blue shirt.
Q. And can you just point out where he's sitting.
A. He's sitting right over there.
MS. BECKNER: Your Honor, may the record reflect that the witness has identified the Defendant.
THE COURT: So noted.
Q. Mr. Schwab, how do you know the Defendant?
A. Through my girlfriend.
Q. And what relationship is your girlfriend to the Defendant?
A. It's her sister's husband.
Q. What's your girlfriend's name?
A. Kathy.
Q. How did it happen that the Defendant introduced you to Jo Jo?
A. I asked him one day if he could get me something. He told me no. He said maybe his cousin.
Q. Get you something, what did you mean by that, Mr. Schwab?
A. Get me cocaine.
Q. When did the Defendant introduce you to Jo Jo?
A. Around two years ago maybe.
Q. Once you were introduced to Jo Jo, how would you

place orders for cocaine?
A. He had this guy Danny call me.
Q. Do you know what Danny's last name was?
A. No.
Q. How did you communicate with Danny?
A. He called me up, and we communicate through the phone.
Q. Through the phone?
A. Yeah.
Q. Were these cellular phones?
A. Yes.
Q. Do you remember Danny's phone number?
A. I believe it was 699-6064.
Q. And do you remember the phone number you were using?
A. 419-2579.
Q. Now, when you placed these orders, you placed them with Danny?
A. Yes.
Q. Was Danny the individual that would actually hand you the drugs?
A. Yes.
Q. Was he always the individual that would hand you the drugs?
A. No.

Q. Who else had handed you drugs during the time that you were using Danny?
A. Just Danny and Jo Jo.
Q. And how would you pay for the cocaine?
A. I'd give it to Danny.
Q. So you'd give money to Danny?
A. Yes.
Q. Now, why did you have to use Danny to place your orders?
A. Because I don't speak Spanish.
Q. Who does speak Spanish?
A. Jo Jo.
Q. Does Jo Jo speak any English?
A. No.
Q. Now, how much did you have to pay for a gram of cocaine that you were buying from Jo Jo via Danny?
MR. MURPHY: Objection, time frame.
THE COURT: Would you set a time frame, please.
Q. Mr. Schwab, during the time frame in which you were purchasing cocaine from Jo Jo, how much would you have to pay for a gram?
MR. MURPHY: Objection. Same objection, time frame.
THE COURT: Overruled.
A. Between 25 and 26 a gram.

Q. Twenty-five and twenty-six dollars?
A. Yes.
Q. What sort of payment arrangement did you have with Jo Jo?
A. I would pay him whatever I had. He would cuff me the rest, throw me the rest.
Q. Cuff you the rest, what does that mean?
A. Like on consignment, more or less.
Q. So you would pay for part of it at the time and then part of it later?
A. Yes.
Q. And how would you get the money to pay later?
A. I would sell it first.
Q. Now, did you ever pay Jo Jo directly?
A. On a couple of occasions.
Q. But who would you usually pay?
A. Danny.
Q. How often were you ordering cocaine from Jo Jo?
A. Around once a week.
Q. And was this powder or crack cocaine?
A. Powder.
Q. All right. Well, you had said that you sold both powder and crack cocaine. How would you get the crack cocaine?
A. In the beginning I had -- they had a guy cook for

me.

Q. Who was the guy that was cooking for you?

A. A guy named Rafaelito.

Q. And who is "they"?

A. Jo Jo.

Q. Jo Jo and Danny put you in touch with this Rafaelito?

A. Yes.

Q. And you said in the beginning Rafaelito cooked for you. After that, who cooked for you?

A. I cooked myself.

Q. How did you learn?

A. I watched him.

Q. Well, can you describe for me how you would cook crack cocaine.

A. Basically take cocaine, crush it up, add however much baking soda and water, you mix it up and then you put it on the heat, whether it be in a microwave or on a stove.

Q. Well, what type of heating source would you typically use?

A. A microwave.

Q. And you'd mix this baking soda up with the cocaine?

A. Yes.

Q. Would you add anything else?
A. No.
Q. So when you put it in the microwave, then what happened?
A. It blows up, and then it drops down to an oil, and then as you mix it, when it cools off, it hardens.
Q. Was there any liquid added to the mixture before you cooked it?
A. Just water.
Q. Water. So you added water, baking soda and powder cocaine?
A. Yes.
Q. And what do you mean it would blow up, like it would explode in the microwave?
A. No, it would just, like, rise.
Q. Like a loaf of bread or something?
A. Yeah.
Q. And so you would remove it from the microwave, and then what would happen to it?
A. I would mix it up, and then as it cooled off, it would harden.
Q. Now, why would you mix it up again after putting it in the microwave?
A. Just so the baking soda and the oils come, like, one.

Q. Well, what impact would that have on the final product?
A. It would get a little bit more than what you put in.
Q. You would get more volume out of it?
A. Yes.
Q. Okay. And so after you'd mix it up, then what would happen or what would you do with it?
A. I'd put it on a paper towel to dry.
Q. And then how do you -- once it's dry, can you describe like what form it's in, what shape?
A. Like the shape of the jar, like a rock.
Q. And what would you do with it after that?
A. I would just let it dry, just sell it.
Q. You'd sell it. Would you sell it in the one solid piece or did you break it up?
A. It all depends.
Q. Depends on what?
A. Depends how much I cooked and how much people would want.
Q. So you'd do what your customers wanted?
A. Yes.
Q. Do you remember when you learned how to cook the cocaine into crack cocaine?
A. Say around six months after I started doing

business with him.
Q. Okay. So would this be sometime in 2005?
A. Yeah, I believe so.
Q. Now, was Danny your connection to Jo Jo the entire time you purchased cocaine from Jo Jo?
A. No.
Q. Who else was your connection to Jo Jo?
A. I asked Carlos to make phone calls for me, too.
Q. The Defendant?
A. Yeah.
Q. And why did you ask the Defendant to make calls for you?
A. Because Danny was cutting the coke.
Q. What does that mean, Danny was cutting the coke?
A. He was taking some out and putting other stuff in it.
Q. And why would a drug dealer do that?
A. For either his own personal use or for money or whatever.
Q. So he was diluting your cocaine, is what you suspected at least?
A. Yes, ma'am.
Q. Now, what action did you initially take when you started to suspect that Danny was cutting your cocaine?
A. I complained.

Q. Complained to whom?
A. I complained to Danny first.
Q. And after you complained to Danny, who did you complain to?
A. I complained to Carlos.
Q. Now, have you, prior to testifying, had an opportunity to review some phone calls between yourself and Danny?
A. Yes.
Q. And were you able to recognize your own voice on that call?
A. Yes.
Q. Were you able to recognize Danny's voice on that call?
A. Yes.

MS. BECKNER: Your Honor, at this time the Government would move to admit as full exhibits Exhibits 2, 5, 6, 8 and 9. And I believe these exhibits are stipulated to by the defense. And let me clarify, your Honor, I think that should be 2-A, 5-A, 8-A and 9-A.

MR. MURPHY: Judge, the calls are stipulated to, not the transcripts.

THE COURT: That's fine.

MS. BECKNER: Yes, your Honor. And as I intend

to play these calls, I understand while they're not going to be moved in as full exhibits, what has been marked as Government Exhibits 2, 5, 6, 8 and 9, which are the transcripts, it is agreed between the parties that that may be shown to the jury.

THE COURT: All right. Now, I want to make sure I have the right ones. Two, 5, 6, 8 and 9-A?

MS. BECKNER: All the As are the calls, your Honor, correct.

THE COURT: I understand. Government's 2-A, 5-A, 6-A, 8-A and 9-A are full. Government's 2, 5, 6, 8 and 9 remain for ID.

(Government's Exhibits 2-A, 5-A, 6-A, 8-A and 9-A were admitted in full. Government's Exhibits 2, 5, 6, 8 and 9 were marked for identification)

THE COURT: And let me explain to our jury the difference in the procedure here. These phone calls are in English, and so the evidence in the case is what you will hear as the tape is played.

You do have transcripts of these as well. However, those transcripts are provided to you as an aid. If you notice a difference between what you hear on the tape recording and what you see in the transcript that is the coordinating exhibit with that tape recording, it's what you hear on the exhibit that

is the actual evidence in the case.

As I say, the transcripts are provided to you solely as an aid in these particular exhibits.

MS. BECKNER: Your Honor, at this time may I publish Government Exhibit 2 for the jury?

THE COURT: You may.

What that means, members of the jury, is that you may take your black notebooks, you may turn to Tab 2, remembering, however, that the transcript there is not evidence, it's what you're going to hear as the tape recording is played.

MS. BECKNER: Your Honor, I'd just ask that the witness follow along with the transcript as well.

THE COURT: Mr. Schwab, turn to Tab 2.

THE WITNESS: All right.

(Government's Exhibit 2-A was played)

Q. Mr. Schwab, I'd like to ask you a few questions about that phone call. First of all, about a third of the way down, if you look on the transcript, at the line where you say, Hey, I'm calling you 'cuz, um, the stuff he gave me the other day. What did you mean when you said stuff?

A. Cocaine.

Q. Why didn't you just say cocaine, Mr. Schwab?

A. I didn't want to say that over the phone.

Q. Why not?
A. I didn't want to get in trouble.
Q. Trouble by whom?
A. Police.
Q. Now, the next time you speak, you say, I don't think it's -- I don't think it's that good. I think it's redone. You understand what I'm saying?
What did you mean by redone?
A. Like they took some out, added something different and made it hard again to look like it was still good quality.
Q. Okay. So took some out, took some of what out?
A. The cocaine.
Q. And then did what?
A. Added something to it.
Q. Added more drugs to it?
A. No, something else. I don't know what, though.
MS. BECKNER: Okay.
THE COURT: Keep your voice up, please.
THE WITNESS: Sorry.
Q. To give an example, let's say you had ordered 100 grams.
A. Yeah.
Q. Can you give me an example of what you mean by redone in a situation like that? You say, Hey, I want

100 grams.
A. If it was redone, maybe they took out like 10, 20 grams or something and then added something else, 10, 20 grams of something else and then made it hard again.
Q. Something --
A. Compressed it again.
Q. Something that would look like cocaine but isn't?
A. Yes.
MR. MURPHY: Objection, form of the question, leading. Move to strike.
THE COURT: Sustained. Please don't lead your witness. The jury will disregard.
Q. Mr. Schwab, the next time you speak, you say, Well, when I cook it, I don't get what I'm supposed to get. What do you mean?
A. I'm supposed to get a certain amount, and I wasn't getting what I was supposed to get. It wasn't coming back right.
Q. Well, when you cook your cocaine into crack, how much are you supposed to get?
A. Twenty grams on every 100 grams.
Q. That would mean if you put in 100 grams of cocaine, you would get how much crack out of it?
A. One hundred twenty grams.
Q. And so what are you saying to him right there?

A. I didn't get the 120 grams.
Q. What does that mean to you? What does that signify to you?
A. A loss of money.
Q. But what does that signify to you in terms of the quality of the cocaine?
MR. MURPHY: Objection.
THE COURT: Sustained.
Q. Why did you say that to him, Mr. Schwab?
A. Why did I say what?
Q. That when I cook it, I don't get what I'm supposed to get.
A. Because I wasn't getting what I was supposed to get. I was complaining that it wasn't right.
Q. Well, how did you know the cocaine wasn't right?
A. When I cooked it.
Q. Because you weren't getting what you were supposed to get?
A. Yeah.
Q. Now, then -- right down near the bottom of the page you say, Tell him I got 300. I got 300. I got 400. What does that -- what does 300 mean?
A. Three hundred grams.
Q. Of cocaine?
A. Yes.

Q. And then you say, I got 400, but I'm about to get rid of a buck. What does that mean?
A. I'm about to get rid of a hundred.
Q. And then you say, I got 300 left, and I mean it's going to be hard for me to get rid of that like that. What do you mean there, sir?
A. It just doesn't look good. It wasn't what it was supposed to be, so it was going to be hard to give it to people.
Q. Hard to sell it?
A. Yes.
Q. Now, sir, when I asked you why you didn't just outright say cocaine on the telephone calls, you said, I was worried about getting caught. Did you ever or what other steps have you ever taken to avoid getting caught?
MR. MURPHY: Objection, relevance.
THE COURT: Overruled.
A. What other steps did I take for not getting caught?
Q. Right.
A. Just try not to talk on the phone, more or less.
Q. Well, how about if you're out on the street doing a deal, what other steps might you take to avoid getting caught?

MR. MURPHY: Objection, assumes facts not in evidence.

THE COURT: Sustained.

Q. What is counter-surveillance, Mr. Schwab?

A. Huh?

Q. What is counter-surveillance?

A. Counter-surveillance? Look and see if anybody's looking at you.

Q. See if who's looking at you?

A. Police.

MS. BECKNER: Miss Grassick, if you could play phone call 5-A. And, Mr. Schwab, if you could please turn to Tab 5.

THE COURT: Members of the jury can turn to Tab 5.

(Government's Exhibit 5-A was played)

Q. All right. Mr. Schwab, if you could go back to the first page and look at where Danny says, It's the same material he gives to everybody and he don't know what happened. What did you understand that to mean at the time?

A. He gave the same material to other people, and they didn't have any complaints.

Q. Well, what material?

A. Cocaine.

Q. Now, about halfway down the page you say, Does anybody else, do they, do they cook it or what did they do? Why did you ask that question?
A. That's a way you can tell how good it is.
Q. How -- how the quality your cocaine is?
A. Yes.
Q. All right. Now, the second to the last time Danny speaks, the last sentence, he says, He got another one, but if he open it, that's the same one. What did you understand that to mean?
MR. MURPHY: Objection.
THE COURT: Sustained as to form.
Q. What is one, Mr. Schwab?
A. One?
Q. He got another one, but if he open it, that's the same one. What is one?
MR. MURPHY: Objection, foundation.
THE COURT: Overruled.
A. Maybe a kilo.
MR. MURPHY: Move to strike.
THE COURT: Overruled.
Q. Now, on the next page, Mr. Schwab, about halfway through, you say -- on the last page, right -- I got, I got 400, but I cooked about 100, so I'm going to give the hundred to somebody else later on. I probably give

back the other three and see if he give me another three.

What are you trying to do there?

A. I had 100, I cooked 100, and I got 400. I cooked 100, and I didn't want the three. I was trying to give it back.

Q. And you wanted to exchange it?

A. Yes.

MS. BECKNER: Your Honor, may I publish Government's Exhibit 6-A for the jury?

THE COURT: Members of the jury may turn to Tab 6, remembering again that the evidence in the case is what you're hearing as 6-A is played.

(Government's Exhibit 6-A was played)

Q. Mr. Schwab, if you could turn back to the first page of Tab 6. During that call, did you hear any talking in Spanish in the background?

A. Yes.

Q. Did you recognize those voices?

A. Yes.

Q. Who were they?

A. Jo Jo and Danny.

Q. Could you understand what they were saying?

A. No.

Q. All right. Let's go down just past halfway on the

first page. You say, If he can give me another three, I'm a give him back that three if he got another three. I'll pay him for two.

What does that mean, sir?

A. I was going to pay him for 200, and I was trying to exchange 300.

Q. Two hundred what?

A. Grams.

Q. Of what?

A. Cocaine.

Q. And you wanted to exchange 300 grams of what?

A. Cocaine.

Q. Now, if you'll turn to the next page, what does it mean to break it?

A. Grind it down.

Q. Grind what down?

A. The cocaine.

Q. Why would you do that, sir? Why is that done?

A. Just to spread it out evenly.

Q. Why do you say, I do break it down?

A. Because he was telling me that, like, I don't break it down, and I was telling him I do break it down.

Q. Well, why do you need to break it down for what you do?

A. Because it wouldn't dissolve right in the water. It would stay dry in some places and wet in other places.
Q. Well, when you purchase the cocaine, what form is it in?
A. Usually like a slab.
Q. A slab? Can you try to describe that a little bit more, maybe approximate the size?
A. Like a brick, like around that big.
MS. BECKNER: Your Honor, may the record reflect the witness held his fingers up about an inch and a half apart.
THE COURT: Okay.
Q. How long would a typical piece that you purchased be?
A. Maybe like that big maybe, something like that.
THE COURT: Show the jury, please.
(Witness indicating)
Q. And so, now, why do you grind it down after you get it in this form?
A. To cook it.
Q. To cook it. So when you mix it with the baking soda and water?
A. Yeah.
Q. All right. If you could turn to page 3, and at

the top of that page you'll see you've mentioned the word redone, and Danny has responded using the word pressed. You've already explained redone, but what does pressed mean?

A. Basically the same thing, recompressed.

Q. Same thing as redone?

A. Yes.

Q. All right. Now, down at the bottom of the page, the last time you speak, you say, I'm gonna need another three because it's going to be done, you know what I mean. I want to get this guy something good. Why did you want to get this guy something good?

A. I didn't want to lose any customers.

Q. And this something that you're referring to?

A. Cocaine.

Q. All right. The next page at the top of the page you say, I got -- the other day I got 100. I got 106, but I'm supposed to get 120. You understand?

What does that mean, Mr. Schwab?

A. I only got 106 grams out of 100.

Q. A hundred grams of what?

A. Powder.

Q. And 106 grams of what?

A. Crack.

Q. And I'm supposed to get 120. What does that mean?

A. I'm supposed to get 120 grams.
Q. Of crack?
A. Yes.
Q. All right. Then down closer to the bottom of the page, before the discussion of color, you say, This right here is like probably out of a thousand, it's probably like 200 out of a thousand, that, that, that, they redid it.
What are you saying there, Mr. Schwab?
A. Probably out of a thousand grams, the guy took out like maybe 200 grams.
Q. All right. Then as you listen to the call and you heard the transcript, you heard the whole discussion about yellow versus white. And you have said that yellow is better. Why?
A. People always tell me it's better. The oils are thicker.
Q. And this is in the cocaine that you're talking about?
A. Yes.
Q. And what color cocaine were you getting from Jo Jo?
A. At that time it was white.
MS. BECKNER: Your Honor, at this time I would like to publish Government Exhibit 8-A for the jury.

THE COURT: Again, members of the jury, you may read along at Tab 8, but remember it is what you hear that is the evidence in the case.

MS. BECKNER: 8-A, please.

(Government's Exhibit 8-A was played)

Q. Mr. Schwab, what did you want 400 of?
A. Cocaine.
Q. Four hundred what, what unit of measurement?
A. Four hundred grams.
Q. What quantity were you typically purchasing cocaine in from Jo Jo?
A. Between 100 grams and 500 grams.
Q. Now, what does it mean to break a thing apart?
A. To break it off, like if you have a kilo, just break pieces off of it.
Q. And what is the advantage to you of having somebody break it off the kilo?
A. I can tell that somebody redid it.
Q. Okay. You can tell if someone's cutting it?
A. Yes.

MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 9-A for the jury.

THE COURT: Again, members the jury, you can turn to Tab 9, but listen to what is on the tape.

(Government's Exhibit 9-A was played)

Q. Mr. Schwab, why did you call Danny on this occasion?
A. To let him know it was fine.
Q. Why did you want to let Danny know -- well, first of all, what was fine?
A. Cocaine.
Q. Why did you want to let Danny know the cocaine was fine?
A. Just to let him know.
Q. Now, did talking to Danny about your suspicions here with respect to the quality of the cocaine, did that solve your problem?
MR. MURPHY: Objection, leading.
THE COURT: Sustained.
Q. Mr. Schwab, after you talked to Danny, what type of -- what quality of cocaine did you continue to receive for the most part?
MR. MURPHY: Objection, time frame.
THE COURT: Sustained.
Q. What quality of cocaine were you receiving from Danny, Mr. Schwab?
A. Not that good.
Q. And what did you do about it?
A. I complained.
Q. To whom?

A. I called Carlos.
Q. Carlos Diaz, the Defendant?
A. Yes, ma'am.
Q. And what did you call the Defendant for, Mr. Schwab?
A. Because I had no one else to call Jo Jo for me.
Q. And what was the Defendant able to do for you?
A. Speak Spanish.
Q. How did you communicate with the Defendant, Mr. Schwab?
A. Through telephone.
Q. And this was a cellular phone?
A. Yes, ma'am.
Q. Now, what would you call the Defendant for?
A. Just to translate for me.
Q. To translate what for you?
A. To buy cocaine.
Q. Who would you actually -- who would you actually receive the drugs from typically?
A. After Danny, this guy named Cocua.
Q. Cocua? Who would you actually pay -- who would you actually pay for the drugs?
A. Cocua.
Q. Was Cocua the only individual you ever paid?
A. No, ma'am.

Q. Who else did you pay?
A. I gave money to Carlos on two occasions.
Q. Did you ever give money to Jo Jo as well?
A. Yes.
Q. When you were placing your cocaine orders through the Defendant, what payment arrangement were you using with Jo Jo?
A. Could have been on consignment or maybe he wanted straight cash.
Q. Okay. And, once again, could you explain what you mean by consignment.
A. Like if he gave me 200 grams, maybe I only had money for 100 grams.
Q. And so you'd pay him later for the other hundred?
A. Yeah, I'd pay him later.
Q. At what price -- when you were ordering the cocaine through the Defendant, what price were you paying per gram?
A. Twenty-six.
Q. Twenty-six dollars?
A. Yes.
Q. Now, have you had an opportunity prior to testifying to listen to phone conversations between yourself and the Defendant?
A. Yes.

Q. Were you able to recognize the voices on those phone conversations?
A. Yes.

MS. BECKNER: Your Honor, at this time I would move Government Exhibits 17-A, 18-A, 21-A, 23-A, 26-A, 30-A, 47-A, 49-A, 51-A, 53-A and 55-A, the recorded calls that I believe are stipulated to by the defense, into evidence.

MR. MURPHY: Judge, as to the As of those numbers, I have no objection to them as long as they're played in court.

THE COURT: Government's 17-A, 18-A, 21-A, 23-A, 26-A, 30-A, 47-A, 49-A, 51-A, 53-A and 55-A are full.

(Government's Exhibits 17-A, 18-A, 21-A, 23-A, 26-A, 30-A, 47-A, 49-A, 51-A, 53-A and 55-A were admitted in full)

THE COURT: Again, members of the jury, you have been provided with coordinating exhibits. Those are transcripts. Again, because these conversations are in English, what you hear on the tape recording is the evidence. The transcripts are simply provided to you as an aid during these proceedings.

MS. BECKNER: Your Honor, at this time the Government would ask to publish Government Exhibit 17-A for the jury.

THE COURT: Members of the jury may turn to Tab 17 to look at the transcript, again remembering that it is what you're hearing that is evidence in the case.

MS. BECKNER: And if the witness hasn't already done so, may I ask the witness to do that.

THE COURT: Mr. Schwab, would you turn to Number 17.

THE WITNESS: I did.

(Government's Exhibit 17-A was played)

Q. Mr. Schwab, you said in that call, I'm going to come over there right now. Where were you going to go?

A. To his job.

Q. Where was that?

A. California Liquors.

Q. And this is -- the Carlos in this call is the Defendant?

A. Yes, ma'am.

Q. And did you, in fact, then go to California Liquors?

A. Yes.

Q. What did you go there for, Mr. Schwab?

A. Because I was around the area. I just wanted to give him some money.

Q. Some money for what, Mr. Schwab?

A. To give to Jo Jo.
Q. For what?
A. To pay him off.
Q. Pay him off for what?
A. The cocaine.
MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 18-A for the jury.
THE COURT: You may turn to 18.
(Government's Exhibit 18-A was played)
Q. Mr. Schwab, what's a buck?
A. A hundred.
Q. A hundred what?
A. Grams.
Q. Of what?
A. Cocaine.
Q. Who is the "he" that you and the Defendant are referring to in this conversation?
A. Jo Jo.
MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 21-A for the jury.
THE COURT: You may.
(Government's Exhibit 21-A was played)
Q. Mr. Schwab, what were you in a hurry to get done for the weekend in this call?
A. What was I trying to get done?

Q. For the weekend.
A. I was just trying to take care of everybody before I picked up my kid.
Q. Take care of everybody meaning who?
A. People that were coming to buy drugs off me.
Q. So you were -- when you said, I got one dude already waiting for me, what does that mean?
A. I had one guy already waiting for me.
Q. Waiting for what, sir?
A. For cocaine.
Q. So why did you call the Defendant?
A. Because I believe that I was probably waiting, it was taking longer than it was supposed to.
Q. What was taking longer than it was supposed to?
A. The time when I was supposed to get the cocaine.
Q. The cocaine from whom, Mr. Schwab?
A. From Cocua.
Q. Now, when you say, Does he have 200, who is the "he"?
A. Jo Jo.
Q. And 200, what was the 200 that you wanted to buy?
A. Two hundred grams.
Q. Of what, sir?
A. Cocaine.
Q. All right. At the end of the first page and onto

the top of the second, you say, No, I know, because right now I just feel like, you know what I mean, because right now I'm just trying to come up. You understand what I'm saying. Like everything's been going slow.

What did you mean there, sir?

A. Just saying that everything was going slow and it's like I needed to keep going on a consistent basis.

Q. Well, what was everything, sir?

A. Getting the drugs.

Q. And then you say, It's starting to get better, and I want to keep it going. You know what I mean? I don't like when I slow down because that's when people go other places. You know what I mean?

What do you mean there, sir?

A. When it slows down, people will find other places to go.

Q. To go for what?

A. To buy drugs.

MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 23-A for the jury.

THE COURT: You may. You may turn to Tab 23.

(Government's Exhibit 23-A was played)

Q. Mr. Schwab, who is this guy?

A. Jo Jo.

Q. What is a buck?
A. A hundred.
Q. A hundred grams?
A. Yes, ma'am.
Q. Of cocaine?
A. Yes.
Q. What is giving him 12 right now?
A. Twelve hundred.
Q. Twelve hundred dollars?
A. Yes, ma'am.
Q. Why did you agree that the rest would be 14? How do you arrive at 14?
A. Because that would be 2,600.
Q. So you bought 100 grams for -- what were you paying for a gram?
A. Twenty-six a gram.
Q. Twenty-six dollars. You pay $1,200 up front?
A. Yes, ma'am.
Q. So the 14, what does that mean?
A. I owe him the 14.
Q. Hundred?
A. Fourteen hundred, yeah.
MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 26-A for the jury.
THE COURT: Again, members of the jury, you may

turn to Tab 26.
(Government's Exhibit 26-A was played)
Q. Mr. Schwab, what does it mean to be cooking in this context?
A. Turning it into crack.
Q. Cooking the cocaine into crack cocaine?
A. Yes, ma'am.
Q. When you say, It come back good, what are you referring to, sir?
A. The cocaine.
Q. Well, what about the cocaine?
A. I got what I was supposed to get out of it.
Q. So you were getting the right quantity out of your cook?
A. Yes.
Q. But who's the "they" that don't like the taste?
A. My customers.
Q. Now, you -- further down the page you said, The last one was all right. Then the time before that one, the time -- the time before that one was really bad. What kind of time are you talking about, Mr. Schwab?
A. The kind of time, you said?
Q. Yes. You said the last one. I should say what was one? In that context, what did you mean by one?
A. The last time I seen him, the last time I got

something.
Q. And what do you mean by something?
A. Cocaine.
Q. The next time you speak in the -- in that call, you say, I can just tell how it is by the smell. What do you mean there, sir?
A. It had a funny smell.
Q. The cocaine had a funny smell?
A. Yes.
Q. Can you describe what it's supposed to smell like?
A. Not really. I can't really describe the smell for you.
Q. You just know?
A. Yeah.
Q. All right. At the end of the page, you say, But tell him -- who is the "him"?
A. Jo Jo.
Q. And then you say, I was going to come by there today to, and I'll give him that other two. What does that mean, sir?
A. I was going to go by his job and give him the other 200.
Q. Then the Defendant says to you, Don't come anymore. What did that mean to you, sir?
A. Don't come to his job no more.

Q. To California Liquors?
A. Yes, ma'am.
Q. Why is that, sir?
A. Because his boss told him to tell me don't go there.
MR. MURPHY: Objection. Move to strike.
THE COURT: Sustained. It may be stricken, and the jury will disregard.
Q. And now in the transcript it says Cocua. Who is Cocua?
A. He was a guy like Danny.
Q. A runner?
A. Yeah.
MR. MURPHY: Objection. Move to strike that question and answer.
THE COURT: It may be stricken.
Q. What was Cocua's job, Mr. Schwab?
A. He would give me the drugs and collect the money.
MS. BECKNER: Your Honor, at this time I'd ask to publish Government's Exhibit 30-A for the jury.
THE COURT: The jury may turn to Tab 30.
(Government's Exhibit 30-A was played)
Q. Mr. Schwab, what are you asking when you say, Is everything good?
A. Does he have anything, any cocaine.

Q. Who?
A. Jo Jo.
Q. What are you saying when you say, I'm going to need a buck?
A. Need 100 grams.
Q. Of cocaine?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time I'd ask to publish Government Exhibit 47-A for the jury.
THE COURT: You may. Members of the jury can turn to Tab 47.
(Government's Exhibit 47-A was played)
Q. Mr. Schwab, what were you going to the house on Union Avenue for?
A. To get cocaine.
Q. And from whom?
A. Cocua.
MS. BECKNER: Your Honor, at this time I'd ask to publish Government Exhibit 49-A for the jury.
THE COURT: You may. Again, the jury may turn to Tab 49.
(Government's Exhibit 49-A was played)
Q. Mr. Schwab, what are you trying to accomplish in this phone call?
A. What do you mean what am I trying to accomplish?

Q. Well, why did you place this call, sir?
A. He called me.
Q. That's right. I apologize. In the long paragraph in which you're discussing the man from Connecticut, what are you talking about giving the man from Connecticut?
A. Cocaine.
Q. And what is the man from Connecticut going to give you?
A. Money.
Q. And what are you going to do with that money?
A. Give it to Cocua.
Q. Did you, in fact, receive money from this man in Connecticut?
A. Yes, I did.
Q. And what did you do with the money you received, Mr. Schwab?
A. Gave it to Cocua.
Q. And what was the money for?
A. Cocaine.

MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 51-A.

THE COURT: You may. The jury may turn to Tab 51.

(Government's Exhibit 51-A was played)

Q. Mr. Schwab, what were you ready to see those guys about?
A. To give them the money.
Q. For what?
A. The cocaine.
Q. And what is it that the Defendant is asking to pick up later?
A. The money.
Q. For what?
A. Cocaine.
Q. And where are you and the Defendant going to meet?
MR. MURPHY: Objection. That's not the testimony. Move to strike.
THE COURT: Overruled.
Q. Where are you and the Defendant going to meet, Mr. Schwab?
A. At my house.
Q. Now, you say, Yeah, that's good. Yeah, that's perfect because I'd rather talk to you in person anyway. Why did you want to talk to the Defendant in person?
A. Just so -- I didn't like talking over the phone.
Q. And what was it you were going to be talking about, Mr. Schwab?
A. I wanted to complain to him about how everything

was going.
Q. How what was going?
A. It was going slow, and it seemed like it was hard for them to get me anything on consignment anymore.
Q. You're talking about drugs?
A. Yes.
Q. What do you mean it was hard to get anything on consignment? What were you having to do?
A. They wasn't giving it to me on consignment. A lot of times -- at the end I had to come cash.
Q. So they were making you pay up front?
A. Yes.
MS. BECKNER: Your Honor, at this time may I publish Government Exhibit 53-A for the jury.
THE COURT: You may.
(Government's Exhibit 53-A was played)
Q. Mr. Schwab, what were you ready for on that day?
A. Cocaine.
MS. BECKNER: Your Honor, at this time I would ask to publish Government Exhibit 55-A.
THE COURT: You may, and the jury may turn to Tab 55.
(Government's Exhibit 55-A was played)
Q. Mr. Schwab, what did you go inside for on that occasion?

A. The cocaine.
Q. During this period of time, Mr. Schwab, how often would you see the Defendant?
MR. MURPHY: Objection, time frame.
THE COURT: Why don't you set a time frame.
MS. BECKNER: Yes, your Honor.
Q. Between on or about September of 2005 and sometime in January of 2006, how often would you see the Defendant?
A. Only them two times.
Q. And what were those two times for?
A. I gave him money.
Q. For what?
A. Cocaine.
Q. Mr. Schwab, since you've been arrested, have you had any communication with the Defendant?
A. Yes.
Q. What kind of communication have you had with him?
A. I got a letter.
Q. What did the letter say, Mr. Schwab?
MR. MURPHY: Judge, I would object, if we can approach.
THE COURT: Sustained.
(Bench conference held on the record)
THE COURT: Do we have a copy of the letter?

MR. MURPHY: No.

MS. BECKNER: No, we do not, your Honor.

MR. MURPHY: Judge, first during discovery I was told that there were no statements made by my client. Last week I did get a letter from Ms. Rogers saying that my client met this witness, this person in church at the Wyatt Center and they had a conversation and my client said something to him.

Yesterday counsel informed me that that was incorrect, that that was a letter that my client purportedly showed at the Wyatt to this person.

I have no basis of knowing when the letter was, et cetera. I did file a motion last week to suppress --

THE COURT: I know. That's the subject of your motion to suppress.

MR. MURPHY: I have no idea what this person's going to say.

MS. BECKNER: Yes, your Honor. Last week when the Government's counsel interviewed Mr. Schwab, they asked Mr. Schwab if he had been approached or had had any conversations, spoken with or had any dealings with the Defendant since his imprisonment.

And let me be perfectly clear, the Government counsel has made it explicit that it was not going to

ask where the communications occurred. However, what the Government learned was that there were two communications, one in the form of a note that was shown to the Defendant by an individual, and the note was taken back.

And in this note, like I told -- if I could just finish. In that note, from the substance of the note, the Defendant or, excuse me, Mr. Schwab recognized it being from the Defendant, and the note said tell them the truth or tell them it was Durasex that you were getting, and I would have to look at my notes, something about I didn't get paid for this or something to that effect.

The other form of the communication that Mr. Schwab has had with the Defendant occurred in church in jail. The Government's counsel was not going to ask about that for two reasons. First of all, the Government's counsel is afraid of letting on as to where the Defendant is presently located and, secondly, the substance of that conversation was essentially the Defendant and Mr. Schwab discussing like how to handle their case, whether they should plead guilty, stuff that the Government didn't deem relevant.

THE COURT: What we're going to do is, we're going to break for lunch now. When we come back, I

want you to tell me more specifically how it was -- you say this was a different individual who showed him the note?

MS. BECKNER: Yes.

THE COURT: It was not the Defendant?

MS. BECKNER: No, it was not, your Honor.

THE COURT: And how is it that Mr. Schwab recognizes the note from the Defendant?

MS. BECKNER: The Government believes that, first of all --

THE COURT: Why don't we do this. Why don't we voir dire him on this point, and then I'll make a decision. I'll let the jury go to lunch for an hour and a half today, and then -- an hour and 15 minutes. It shouldn't take us too long. You guys get an hour. We'll be back here in an hour, and let's voir dire him on this issue.

MS. BECKNER: May I make one suggestion? Aside from this particular issue, I have one other question to ask. And if I could ask that question and then us do it, then if your ruling is such that --

THE COURT: Sure. Go ahead. Ask your one more question.

(End of bench conference)

Q. Mr. Schwab, I want to redirect your attention.

Between September of 2005 and your arrest in January of 2006, did you ever have any conversations with the Defendant about Durasex?

A. No.

MS. BECKNER: Your Honor, at this time, pending the Court's ruling, the Government has no further questions.

THE COURT: Members of the jury, we're going to break for lunch now. The good news for you is you get a little bit extra time for lunch today because there is a matter I need to tend to outside your presence. And I understand it's a pretty nice day out there, so you can enjoy a relatively warm day or cool day, as the case may be.

I'd like you back in your seats by 1:45. So you can go out, have a sandwich, have something cold to drink, and get here a couple of minutes beforehand so that Bob can get you all lined up and ready to come back into the courtroom.

Remember, three things. You can't talk about the case, you can't read or listen to anything about the case, and you have to stay healthy. So if you were thinking about taking up skydiving, now is not the time. All right. We'll see you at 1:45. I'll see counsel at 1:30.

(Lunch recess)

(The jury is not present for the following)

THE COURT: Before we begin, Ms. Beckner, we need to swear in our interpreter. Mr. DaSilva, would you stand, please.

(Interpreter sworn)

THE COURT: Mr. DaSilva, if anyone talks too fast, please let me know, even if it's me. Have a seat.

Ms. Beckner, please. The record should reflect that the Court is conducting this portion of the hearing outside the presence of the jury. Mr. Murphy had filed, on behalf of the Defendant, a motion to suppress certain statements that are alleged to have been made by the Defendant to a cooperating -- a witness cooperating with the Government, and the purpose of this hearing is to voir dire the witness with respect to those statements.

Ms. Beckner, please.

MS. BECKNER: Yes, your Honor.

**VOIR DIRE EXAMINATION**

**BY MS. BECKNER**:

Q. Mr. Schwab, when were you arrested?

A. January 30th.

Q. Of 2006?

A. Yes.
Q. Now, you had testified before lunch that you had been handed a note; is that right?
A. Yes.
Q. About how long after your arrest had you been handed this note?
A. Around three or four months maybe.
Q. Three or four months afterwards, so maybe April?
A. April or May.
Q. April or May. And who handed you the note, sir?
A. A Spanish guy.
Q. Do you know his name?
A. No.
Q. Had you met him before?
A. No.
Q. Have you had any contact with him since the time he handed you the note?
A. No.
Q. Now, this occurred while you were in detention; is that right?
A. Yes.
Q. And that was prior to your leaving Wyatt; is that correct?
A. Yes.
Q. And, now, sir, what was contained within this note

that this man handed you?
A. It said, Tell them the truth, tell them you were buying Durasex off me and I did this for you as a favor.
Q. Do you know who that note was from?
MR. MURPHY: Objection, foundation.
THE COURT: Well, it's voir dire. We'll find out. You can answer.
Q. Do you know who the note was from, sir?
A. I don't know specifically, but I believe it was Carlos.
Q. Why do you think that, sir?
A. Because of the contents of the letter.
Q. What specifically made you think that it was from the Defendant?
A. There was no one else who would write me a letter like that.
Q. And why is that, sir?
A. Because I don't have any case with anybody else. I'm in jail.
Q. Now, sir, have you had any other contact with the Defendant since being arrested besides the note?
A. Yeah. I see him in different blocks.
Q. Have you had any conversation with the Defendant since being arrested?

A. Yes.
Q. And where did this conversation occur?
A. At church.
Q. And this would be church in the jail; is that right?
A. Yes.
Q. And what was the nature of your conversation with the Defendant in church?
A. He asked me about my case, what the Government offered me, and I told him 10 years and that -- I asked him what was going on with him, and he says he was going to take it to trial, and I told him don't.
Q. What happened first, the conversation in the church or the note being handed to you?
A. The note.
Q. Was there anything else about the note besides the substance that indicated to you who the author was?
A. No.
Q. Had you ever seen that individual with the Defendant?
A. No.
Q. And I can't remember if I asked this question. Did you say whether or not you had seen the individual that passed you the note after he passed you the note? Like, did you ever see him again?

A. Yeah, he was in my block.

MS. BECKNER: Your Honor, if I could have just a moment.

(Pause)

Q. Mr. Schwab, how was it that you came to go to the church where the Defendant went?

A. Another guy asked me, told me to go to church.

Q. And can you describe this gentleman?

A. He's a bald guy, Spanish guy.

Q. He was Hispanic as well?

A. Yes.

Q. And what did he say to you?

A. He said, Go to church on Wednesday.

Q. And did he say why?

A. He said, Carlos wants to talk to you.

Q. Did the Defendant mention the note at church?

A. No.

Q. Is there any other contact with the Defendant that you remember having since the time of your arrest?

A. No, just when I used to see him in different blocks.

Q. Would he say anything to you on those occasions?

A. We would just talk about what was going on with the case.

Q. Can you remember anything more specific,

Mr. Schwab? And if you can't, that's okay.
A. Not that I remember, no.
MS. BECKNER: I have no further questions, your Honor.
THE COURT: Mr. Murphy, do you wish to inquire?
MR. MURPHY: Yes, your Honor.

**VOIR DIRE EXAMINATION**

**BY MR. MURPHY**:
Q. Mr. Schwab, you said that you received the note first; correct? You just said that?
A. Yes.
Q. And you got the note three or four months after your arrest?
A. Yes.
Q. And you were arrested on January 31st of 2006?
A. Yes.
Q. So three or four months would have been late April or late May; correct?
A. Yes.
Q. Now, you agreed to -- you spoke with the Government in April of 2006; correct?
A. I believe so, yes.
Q. In fact, you signed a proffer letter with the Government with your lawyer sometime in April of 2006; correct?

A. Not with the Government, with just my lawyer.

MR. MURPHY: Judge, for purposes of the hearing, would you rather have me approach or on the ELMO?

THE COURT: Why don't you use the ELMO. Do you have an exhibit number on that?

MR. MURPHY: I don't, Judge, for purposes of this hearing.

THE COURT: I think we should if you're going to show him something.

MR. MURPHY: I will mark it, Judge, as Defendant's Y for identification.

(Defendant's Exhibit Y was marked for identification)

Q. Mr. Schwab, if you could look on the screen, please. I'm showing you a letter that -- Mr. Bevilacqua, John Bevilacqua of 380 Broadway in Providence, Rhode Island, is your attorney in this case, sir?

A. Yes, sir.

Q. And he was your attorney in February of 2006?

A. Yes.

Q. And he's still your attorney; correct, sir?

A. Yes.

Q. Now, Mr. Schwab, this letter dated March 30th, 2006, states that Patrick Schwab agrees to meet with

representatives of the United States; is that correct?
A. Yes.
Q. You've seen this letter. You saw this in April, correct, early April?
A. Yes.
Q. And directing your attention to page 2 of the letter, Mr. Schwab, you've read the letter, it indicates that you read the letter, discussed it with your attorney and understand the terms and conditions contained in the letter; correct?
A. Yes.
Q. And you signed that letter on April 22nd of 2006?
A. Yes.
MR. MURPHY: Judge, I would move this for purposes of this hearing as Defendant's Exhibit V.
MS. BECKNER: No objection, your Honor.
THE COURT: I thought you said it was Y.
MR. MURPHY: Oh, Y. I'm sorry, Judge.
THE COURT: Just for purposes of this hearing, not to be entered in the case-in-chief.
MS. BECKNER: No objection from the Government.
THE COURT: So Defendant's Y, then, is full.
John, that needs to be kept separate from the others.
Q. So, again, not knowing -- I don't want to know the

contents of your discussions with Attorney Bevilacqua; but prior to signing that letter, you agreed that you would cooperate with the Government; correct?
A. Yes.
Q. When did you physically first meet with the Government, Mr. Schwab?
A. It was after I pleaded out.
Q. After you pled to the Indictment?
A. Pled guilty, yes.
Q. The day that you were arrested, did you meet with law enforcement officers?
A. Yes. They interviewed everybody.
Q. And you gave an interview, sir?
A. Yeah. Yes.
Q. You gave a discussion about your involvement?
A. Not really a discussion. They just asked me a couple of questions.
Q. What were the questions that they asked you when you were arrested, sir?
A. They would just ask me --
MS. BECKNER: Your Honor, I'm going to object. This is outside the scope.
THE COURT: Sustained. Why don't we stick to the matter at hand, Mr. Murphy. You'll have an opportunity to cross him later.

Q. Now, the note that you received, you don't know who physically wrote the note, do you, sir?
A. No.
MR. MURPHY: Judge, I would move, then, to object to the admission of the note.
THE COURT: I'm going to sustain the objection. I think it's way too attenuated for us to assign its authorship to the Defendant. And so the motion to suppress it, the objection to your asking the question, the motion to suppress is granted and the objection is sustained.
MR. MURPHY: Thank you, Judge. And, Judge, I believe that the Government has said that they are not trying to introduce the conversation between my client and --
MS. BECKNER: I'm sorry, I couldn't hear.
MR. MURPHY: Judge, I believe before we broke at the noon recess that the Government indicated that they were not seeking to introduce the alleged oral statement of the conversation between my client and Mr. Schwab.
THE COURT: That's correct.
MS. BECKNER: That's correct, your Honor. I did want to, and I spoke to the clerk, ask one more question after conferring with counsel.

THE COURT: I understand that, so I will permit you to do that.

So, Mr. Schwab, my ruling means that you will not be testifying about receiving that note while you were at the Wyatt Detention Facility. You understand that?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. We're going to continue with your examination as soon as we get the jury in here.

MR. MURPHY: Judge, I had handed up the proffer letter, and I'm going to try and refer to that during my cross-examination of Mr. Schwab.

THE COURT: It's an exhibit.

MR. MURPHY: Can I then -- does the Court want me to relabel it for purposes of --

THE COURT: If the Government has no objection to Defendant's Y, which is the proffer letter, coming into the case-in-chief, then it's part of the case-in-chief. He's going to use it in his presentation -- in his cross-examination.

MS. BECKNER: If I may for just a moment. The Government has no objection to it coming in in full.

MR. MURPHY: Judge, I'm not going to offer it yet, but if I just know that I can take it back if I

need to refer to it.

THE COURT: You need a copy of it, is what you're saying?

MR. MURPHY: Can I have that one and then give it back to the clerk?

THE COURT: Not once it's an exhibit. We'll make you a copy while we're getting the jury in. Can you let Bob know to bring the jury in.

MS. BECKNER: May I approach the podium again, your Honor?

THE COURT: That's fine. Just don't start asking questions.

MS. BECKNER: Should I turn this off?

THE COURT: Are you going to use it?

MS. BECKNER: I'm not going to use it.

THE COURT: Well, Mr. Murphy may.

MR. MURPHY: Judge, I may.

THE COURT: Leave it on. You can leave it on.

(The jury is present for the following)

THE COURT: Ms. Beckner, do you have another question for the witness?

MS. BECKNER: Yes, your Honor.

**CONTINUED DIRECT EXAMINATION**

**BY MS. BECKNER**:

Q. Mr. Schwab, could I direct your attention to

Tab 55, please. Now, sir, what were you going inside for in reference to that conversation?
A. To get cocaine.
Q. And where were you going to get it?
A. I don't recall exactly where on that date.
MS. BECKNER: Your Honor, may I have just a moment, please?
THE COURT: You may.
(Pause)
Q. Mr. Schwab, do you remember who you met with on that occasion?
A. Probably Cocua.
MS. BECKNER: I have no further questions, your Honor.
THE COURT: Cross-examination.

**CROSS-EXAMINATION**

**BY MR. MURPHY**:
Q. Mr. Schwab, you are presently being held at the Adult Correctional Institution in Cranston, Rhode Island?
A. Yes, sir.
Q. And, Mr. Schwab, you have pled guilty to an Indictment which charged that you, on January 30th, 2006, in the District of Rhode Island, that you knowingly and intentionally possessed with intent to

distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base; correct?
A. Yes, sir.
Q. And cocaine base is not powder cocaine, it's crack cocaine; correct?
A. Yes.
Q. And you pled guilty to that charge?
A. Yes.
Q. You were charged by yourself in the Indictment; correct?
A. Yes.
Q. You weren't charged as part of a conspiracy, were you?
A. In the beginning when I was first arrested I was.
Q. I'm talking about the Indictment to which you pled to.
A. An Indictment, yeah, just me.
Q. Now, Mr. Schwab, you pled here in Federal Court; correct?
A. Yes.
Q. And you signed a plea agreement with the Government; correct?
A. Yes.
Q. And under the plea agreement, you were scheduled

to get at least a minimum mandatory sentence of 10 years; correct?
A. Yes.
Q. But you've since decided to cooperate with the Government; right?
A. Yes.
Q. And by cooperating with the Government, you're going to get a sentence less than 10 years; right?
A. Yes.
Q. So you're giving your testimony here in court today to get a sentence less than 10 years; right?
A. Yes.
Q. You indicated on direct examination that you've been unemployed for 10 years; right, Mr. Schwab?
A. No, two years.
Q. You've been unemployed for two years?
A. Yes.
Q. What did -- you're 27 years of age?
A. Yes.
Q. What did you do for work from 18 to 21?
A. I've done siding. I worked at the casino, did landscaping.
Q. So is it your testimony, sir, that only during the last two years had you started selling drugs?
A. Yes.

Q. You never sold drugs before that?
A. No.
Q. The first time you sold drugs in your life was when you were 25 years old?
A. Yes.
Q. And you started off right away selling cocaine?
A. Yes.
Q. You didn't sell marijuana first?
A. No.
Q. And you've been smoking marijuana for 15 years; correct?
A. Yes.
Q. You've been smoking every day for 15 years; right?
A. Yes.
Q. And how much a day do you smoke, sir?
A. Two joints.
Q. Sir, your memory sometimes fails; right?
A. I don't believe so.
Q. Well, were you ever treated for any memory loss, sir?
A. No.
Q. You were never treated as a child for any memory loss at Bradley Hospital?
A. I don't recall.
Q. You don't recall being at Bradley Hospital?

A. Yeah, I remember being at Bradley Hospital. I don't remember what I was treated for.
Q. Now, Mr. Schwab, you indicated, and if I can direct your attention to September of 2005 until the date of your arrest on January 30th of 2006, you were a drug dealer; correct?
A. Yes.
Q. And two years prior to that September date, you were dealing drugs; right?
A. Yes.
Q. Now, Mr. Schwab, you have a girlfriend by the name of Kathy Pimental; correct?
A. Yes.
Q. Kathy Pimental is not a drug dealer, is she?
A. No.
Q. She never sold drugs for you?
A. No.
Q. She never bought drugs for you?
A. No.
Q. You never saw her with drugs?
A. No.
Q. Did she ever get drugs for you?
A. No.
MR. MURPHY: Judge, one moment, please.
(Pause)

Q. Sir, I'm going to direct your attention to 14, Tab 14.

MR. MURPHY: And, Judge, I would ask if 14-A could be played for the jury, please.

MS. BECKNER: I'm going to object. I don't believe the witness was privy to these conversations.

THE COURT: Approach, please.

(Bench conference held on the record)

THE COURT: What are we doing with this?

MR. MURPHY: Judge, I'm sorry, that's 14. I have a different 14 because I have a different book. Okay. I'm trying to --

THE COURT: What's the date?

MR. MURPHY: One second. 10/9/05.

THE COURT: That's 15. That's also 13.

MR. MURPHY: It would be 13 in the book.

THE COURT: What's the purpose of playing this?

MR. MURPHY: Well, I want to show that this is his girlfriend ordering cocaine for him.

THE COURT: Sustain the objection.

(End of bench conference)

Q. Sir, did you ever have Kathy -- excuse me, I'll rephrase that. You've had Kathy Pimental call Jo Jo to translate for you before; correct?

A. Yes.

Q. And you had her translate so you could buy drugs; correct?
A. Yes.
Q. And you've done that on more than one occasion; correct?
A. Yes.
Q. And that's because you don't speak English; correct?
A. I speak English.
Q. Excuse me, you don't speak Spanish? I'm sorry, sir.
A. Yes.
Q. And, Mr. Schwab, you directed your girlfriend to call Jo Jo because you needed to secure drugs from Jo Jo; correct?
A. Yes.
Q. And she helped you order those drugs because she speaks Spanish; right?
A. Yes.
Q. Now, as it relates to Carlos Diaz, you never physically received drugs from Carlos Diaz, did you?
A. No, sir.
Q. And, by the way, your girlfriend visits you at prison, does she not?
A. Yes.

Q. And to your knowledge, she wasn't arrested, was she?
A. No.
Q. Now, Carlos has never physically given you drugs, has he?
A. No, sir.
Q. And, Mr. Schwab, you went to Carlos to translate for you; correct?
A. Yes.
Q. That's your testimony?
A. Yes.
Q. That Carlos is not a drug dealer, he was your translator; correct?
A. Yes.
MS. BECKNER: Objection, your Honor. It speaks to facts not in evidence.
THE COURT: Sustained. Mr. Schwab, when the prosecutor stands up, wait before you answer.
Q. Sir, in your mind, Carlos Diaz was a translator for you; correct?
A. Yes.
Q. Just as Kathy, your girlfriend, was a translator for you; correct?
A. Yes.
Q. Now, Mr. Schwab, you said earlier on direct

examination that you were addressed to this person or you were introduced to this person, Jo Jo, by Carlos Diaz. Do you remember saying that this morning?
A. Yes.
Q. Well, in fact, you were introduced and addressed to Jo Jo by your girlfriend Kathy; correct?
A. What was the question again?
Q. Kathy is the one that first introduced you to Jo Jo; right?
A. No.
Q. So is it your testimony under oath, sir, that your girlfriend Kathy never introduced you to Jo Jo?
A. Not introduced me, no.
Q. Were you ever with Kathy and Jo Jo at the same time?
A. Yes.
Q. And Kathy is indirectly related to Jo Jo through the marriage of her sister; correct?
A. Yes.
Q. And your girlfriend Kathy's sister is married to Carlos Diaz; correct?
A. Yes.
Q. Now, sir, you don't want to do 10 years, do you?
A. No, sir.
Q. And that's why you're here today testifying;

correct?
A. Yes, sir.
Q. Now, Mr. Schwab, during the course of the past two or three weeks, how many times have you met with representatives of the Government?
A. In the past two or three weeks?
Q. Yes.
A. Two or three times.
Q. In the past two months, how many times have you met with the Government?
A. Just one other time besides the couple of times in the past week.
Q. Directing your attention to this week and last week, you've met with them on two or three occasions?
A. Yes.
Q. Going back to last Monday, you were at the Plymouth House of Corrections in Massachusetts?
A. Yes.
Q. From that day forward, where did you meet with the Government?
A. I met with them once here and once at Plymouth County.
Q. Who did you meet with at Plymouth County?
A. Sandy and the officer right there and another guy.
Q. The officer right here at the table from the FBI?

A. Yes.
Q. The prosecutor in the middle?
A. Yes.
Q. And one other guy? Who was the other guy?
A. I believe his name is Ruggiero.
Q. You believe it was Ruggiero?
A. I believe so, yes.
Q. What did he look like, sir?
A. He had a ponytail.
Q. He came to Plymouth?
A. Yes.
Q. And you met with Co-Agent Morehead?
A. Yes.
Q. And the prosecutor?
A. Yes.
Q. And you met with all three of them at once; correct?
A. Yes.
Q. And was that to go over your testimony, sir?
A. No. They just asked me -- played the phone calls for me.
Q. So they played the phone calls for you? Yes or no?
A. Yes.
Q. And you were able to listen to the phone calls?

A. Yes.
Q. And were they taking notes when they were asking you questions?
A. Yes.
MR. MURPHY: Judge, I would move at this time to produce any statements of this witness that were given within the past couple of weeks.
MS. BECKNER: Your Honor, I don't believe that notes of a case agent with respect to an interview of a third party --
THE COURT: Approach.
(Bench conference held on the record)
THE COURT: What rule are you moving under?
MR. MURPHY: Judge, I would say 26.2 and also under discovery. I'm trying to find out what exactly he said. There were people there taking notes. I think I should be entitled to some type of summary.
MS. BECKNER: What the Jencks Act specifically provides is that a statement of the witness that has been adopted by that witness must be disclosed. However, in this case, the fact that an attorney or an agent may have been jotting down notes to themselves, of which the Government will say nobody has shown notes to this witness and him sign off on, is not discoverable under Jencks.

To the extent there were any inconsistencies, I would say that that would have to be turned over under *Giglio*. At this point the Government is not aware of any inconsistencies between its initial meeting with Mr. Schwab and his testimony today.

THE COURT: I'm going to sustain the objection.

MR. MURPHY: Okay. Thanks.

(End of bench conference)

Q. Mr. Schwab, so Monday, last Monday, that would have been July 10th at the Plymouth House of Corrections, Officer Ruggiero, Special Agent Morehead and the prosecutor were there interviewing you; correct?
A. Yes.
Q. And they played the tapes that they played today in court?
A. Yes.
Q. These same times?
A. Yes.
Q. And you were able to look at those same transcripts?
A. Yes.
Q. Did you sign anything, sir?
A. I signed a paper saying that I agreed to talk to them.

Q. This was last week?
A. Yes, I believe so.
MR. MURPHY: Judge, I would move for that document.
MS. BECKNER: Your Honor, I believe what the witness is referring to is the medical release for his hospital records from Bradley Hospital, is what he signed.
THE COURT: That's it, Mr. Murphy.
Q. Now, sir, for how long of a period of time were these three individuals with you last Monday?
A. How long of a time?
Q. Yes.
A. Say around an hour.
Q. Long enough to play all those tapes; correct?
A. Yes.
Q. Long enough to read through with you those transcripts; correct?
A. Yes.
Q. Long enough to ask you questions; correct?
A. Yes.
Q. Long enough to give you a preview of what was going to be asked of you today in court; correct?
A. Yes.
Q. Now, Mr. Schwab, after that time last Monday,

July 10th, at the Plymouth House of Corrections, when was the next time that you met with law enforcement?
A. I believe it was a couple days later.
Q. And where was that, sir?
A. Back here.
Q. You were actually physically transported from Plymouth House of Corrections to this building; correct, sir?
A. Yes.
Q. And you were interviewed in this building?
A. Yes.
Q. On that occasion, who were the people that were interviewing you, sir?
A. It was Sandy, this guy right here and another guy named Patrick. I don't know who he was.
Q. Another guy named Patrick? Was he the other co-case agent?
A. I don't know what he was.
Q. Okay. If I gave you a description, would you recognize it?
A. A description?
Q. Of Patrick.
A. If I seen his face, I could recognize him. I don't know by description.
Q. Do you watch football?

A. No.

MS. BECKNER: Your Honor, I'm going to object to the relevance of this line.

THE COURT: Sustained.

Q. So it was a person named Patrick; correct?

A. Yes.

Q. And Patrick, would you know the last name if I told you it was Patrick Reilly?

A. I believe so.

Q. So Patrick Reilly, Special Agent Morehead and a prosecutor met with you in this building?

A. Yes.

Q. And they met with you at the same time?

A. Patrick came in at the end.

Q. But he was there when you were still being questioned?

A. For a second.

Q. And on that date, did you go over the tapes again?

A. No.

Q. Did you go over the transcripts?

A. Yes.

Q. And you went over questions that were going to be asked of you today on the stand; correct?

A. Yes.

Q. And, sir, were you told that if you do your job

and do a good job, that when it comes time to sentencing, that you'll be taken care of?
A. No, they didn't say anything about that.
Q. When are you going to be sentenced, sir?
A. When? Next week.
Q. July 28th; correct?
A. Yes.
Q. And if you -- in your mind, if you do a good job here in this case, you'll get a reduction in your sentence; correct?
A. It doesn't affect whether I do a good job or not, as long as I tell the truth.
Q. Who told you that, sir?
A. My lawyer.
Q. And when did he tell you that?
A. A long time ago, a while ago.
Q. That was sometime after you pled; right, sir?
A. Yes.
Q. So the first time you sat down with representatives of law enforcement, where was that?
A. The first time?
Q. Yes.
A. Here.
Q. In this building?
A. Yes.

Q. And who was with you the first time?
A. My lawyer, Mary Rogers and the guy, Ruggiero.
Q. Again, sir, your lawyer is who? Who do you have for a lawyer in this case?
A. John Bevilacqua.
Q. And Mr. Bevilacqua was present with you the first interview?
A. Yes.
Q. And you were indicted on possessing with intent to distribute 50 grams or more of crack cocaine; correct?
A. Yes.
Q. Not powder cocaine; correct?
A. No.
Q. And as you said previously, you were indicted by yourself as a sole Defendant; correct?
A. Yes.
Q. Now, sir, what do you expect to get at your sentencing next week?
A. I don't have an expectation. I just hope it's less than 10 years.
Q. And you know it's going to be less than 10 years because you cooperated; correct?
A. Yes.
Q. Any ballpark idea?
A. No.

Q. Now, sir, this morning and this afternoon before the lunch break, you went through a series of telephone calls that were in English. You recall those; correct?
A. Yes.
Q. And the first set of phone calls were between you and an individual named Danny?
A. Yes.
Q. And Danny is a person who you got drugs from over the course of two years; correct?
A. Yes.
Q. You've been handed drugs from Danny; correct?
A. Yes.
Q. You've given Danny money on numerous occasions; correct?
A. Yes.
Q. He's given you drugs on numerous occasions; correct?
A. Yes.
Q. Now, sir, you spoke about cooking crack cocaine. When you cooked crack cocaine, Carlos Diaz was never with you, was he?
A. No.
Q. Kathy was never with you, was she?
A. No.
Q. But one of Danny's friends was with you to teach

you how to cook it; correct?
A. Yes.
Q. Now, sir, before the lunch break, you were asked a question about Durasex. Do you recall being asked that?
A. Yes.
Q. Do you know what Durasex pills are?
A. No.
Q. You don't know what Durasex pills are?
A. I don't know what they do. I seen the sign. I seen the advertisement sign, but I don't know what they are.
Q. You and Kathy have never purchased Durasex from California Liquors?
A. No.
Q. Sir, you're under oath.
A. I know.
Q. You've never purchased Durasex from California Liquors?
A. Never.
Q. Where have you seen the signs, sir?
A. Seen it in stores. I've seen it on a van.
Q. You saw it on a van. What stores have you seen it at?
A. A couple stores on Broad Street.

Q. What stores, sir?
A. I don't recall. I seen it a couple of places.
Q. It's all over the place, isn't it?
A. Yes.
Q. But your testimony under oath is that you have never taken a Durasex tablet in your life?
A. I never took one.
Q. You've never sold them?
A. No.
Q. They're illegal; right?
A. I don't know.
Q. Well, they sell them over the counter, don't they, sir?
A. Are they legal, you said?
MS. BECKNER: Objection, your Honor, relevance.
Q. Yes.
A. I believe so.
THE COURT: Just a minute, Mr. Schwab. Wait. The objection is sustained.
Q. Sir, how long have you known Carlos Diaz?
A. About as long as I've been with my girlfriend.
Q. And you know that he's been married to your girlfriend's sister for 10 years; right?
A. Yes.
Q. You know they have children together; correct?

A. Yes.
Q. You know that he's your girlfriend's brother-in-law; correct?
A. Yes.
Q. You know that he's worked at California Liquors for several years; correct?
A. Yes.
Q. Sir, you would agree with me that you do not know the owner of California Liquors; correct?
A. Yes.
Q. Sir, you never paid Carlos Diaz to translate for you; correct?
A. No.
Q. And you've never paid Kathy to translate for you; correct?
A. No.
Q. Sir, Carlos Diaz, you don't know him to go by the name of Luis Almonte, do you?
A. No.
Q. Do you know if he has an uncle named Luis Almonte?
A. No.
Q. Now, sir, when you met in the last couple of weeks, at first you said it was two or three times. Was there a third time?
A. The last time I seen them was the day they moved

me to the ACI.
Q. And when was that, sir?
A. I believe it was Monday.
Q. And who came to see you on that day?
A. That was the guy Patrick and the officer right here and Sandy.
Q. And was that another day that they were together asking you questions, sir?
A. That was the one day that guy Patrick was there. That was the one day that guy Patrick was there.
Q. Sir, so is it your testimony that when your girlfriend Kathy called Jo Jo, that was for you as a favor?
A. Yes.
Q. And, likewise, is it also your testimony that when Carlos called Jo Jo for you, that was a favor to translate, also; correct?
A. Yes.
Q. You've never seen Carlos Diaz with drugs, have you?
A. No.
Q. You've never seen him sell drugs, have you?
A. No.
Q. You've never seen him use drugs, have you?
A. No.

Q. Sir, when you were arrested on January 30th, I believe you said this morning that when the police pulled up to your address, that you tried to run away?
A. Yes.
Q. And they were able to tackle you?
A. Yes.
Q. And then they went into your house and searched?
A. Yes.
Q. And you said that they found somewhere over 50 grams of crack cocaine; correct?
A. Yes.
Q. You never got crack cocaine from Carlos Diaz, did you?
A. No.
Q. Aside from the crack cocaine, there were other related drug paraphernalia implements in your house; correct?
A. Yes.
Q. You had a scale?
A. Yes.
Q. Did you have any inositol or acetone?
A. No.
Q. Or baby powder?
A. No. Baby powder maybe.
Q. Okay. But you had a scale; correct?

A. Yeah.
Q. And that was a scale that you used to weigh the crack; correct?
A. Yes.
Q. And they seized money from you, too; right, sir?
A. Yes.
Q. Both from your person and from your house; right?
A. From my person.
Q. And you've forfeited that money, sir?
A. Yes.
Q. You forfeited it to the Government; correct?
A. Yes.
Q. Was that part of the deal, too?
A. It never was mentioned as part of the deal, I don't think.
Q. So, Mr. Schwab, just so I can put this in the proper chronological order, you were arrested on January 30th?
A. Yes.
Q. And sometime from January 30th until you got indicted, you got questioned by law enforcement; correct?
A. Sometime between January 30th and the time I was indicted?
Q. Yes.

A. Just the first night I got arrested.
Q. And then you were indicted sometime early February and charged with the 50 grams of crack; right?
A. Yes.
Q. And then sometime in April you signed a letter saying that you were going to meet with the Government, and when I say Government, I mean police and representatives of the U.S. Attorney's Office; correct?
A. Yes.
Q. And you signed a plea agreement in April; correct?
A. Yes.
Q. And, sir, you were also told that if you assisted, you may get some relief from your sentence; correct?
A. From my lawyer, yes.
Q. Now, was your lawyer present with you, just yes or no, in these last three meetings you've had in the last two weeks?
A. No.
Q. Were these meetings recorded?
A. I don't believe so.
Q. You didn't see a tape recorder in front of you?
A. No.
Q. And did you discuss in these three meetings in the last two weeks anything at all about sentencing?
A. No.

Q. Were you told when the date would be?
A. Of my sentencing?
Q. Yes.
A. We never discussed the date of my sentencing.
MR. MURPHY: Judge, one moment, please.
(Pause)
Q. Sir, at any point did the Government ask you to testify and cooperate against Kathy?
A. No.
MS. BECKNER: Objection, relevance.
THE COURT: Sustained, and the answer may be stricken. The jury will disregard.
MR. MURPHY: Judge, I have nothing further.
THE COURT: Redirect?
MS. BECKNER: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MS. BECKNER**:
Q. Mr. Schwab, on cross-examination you testified that you'd met with the Government, whether it was myself or agents, three times over the last week or two leading up to trial. Do you also remember the meeting where you signed the medical record release?
A. Yes.
Q. And both myself and Ms. Rogers were present at that one; right?

A. Yes, ma'am.
Q. And your attorney was present, at least while you signed the release; is that right?
A. Yes.
Q. Now, with respect to your girlfriend, what did your girlfriend tell you about the assistance she was providing you with Jo Jo? What did she say she wanted to do with that?
MR. MURPHY: Objection, beyond the scope.
THE COURT: Just a minute.
MR. MURPHY: Objection, beyond the scope.
THE COURT: Well, I'm going to sustain the objection.
MS. BECKNER: Your Honor, may I confer with counsel just briefly?
(Pause)
MS. BECKNER: I have no further questions, your Honor.
THE COURT: All right. We'll take a short recess. Members of the jury, you'll have about 10 minutes, again, to stretch, relax, have a cold drink. Remember, however, you're not to discuss the case at all during the recess. We'll take about 10 minutes.
(Recess)
THE COURT: Would counsel approach, please.

(Bench conference held on the record)

THE COURT: What's the problem?

MS. ROGERS: I don't think there's a problem. I just had an inquiry. If we were going to break at 3:30, Mr. Murphy thinks he's going to go through until 3:30 with his witness, and then we're asking for time to finish reading the 302s.

THE COURT: This is not an issue I need to deal with now. We'll deal with it at the end. Let's put him on, and you can cross.

MR. MURPHY: I don't mean to interrupt, but I saw 302s at the lunch break that I need to go through. So when we get done, I'll ask if I can excuse the witness as long as I can have him for recross.

THE COURT: He's going to be here anyway, isn't he?

MS. ROGERS: After he was done testifying, he was going to leave.

THE COURT: Let's see how far we get. Mr. Reilly, please.

(End of bench conference)

THE COURT: You're still under oath.

THE WITNESS: Yes, ma'am.

THE COURT: For members of the jury, you'll recall that we interrupted Mr. Reilly's

cross-examination. We'll continue with that now.

**PATRICK REILLY, GOVERNMENT WITNESS, RESUMES**

**CONTINUED CROSS-EXAMINATION**

**BY MR. MURPHY**:

Q. Detective Reilly, directing your attention for the purpose of the next several questions to January 20th of 2006, you were on duty that day; correct?
A. Yes.
Q. And you were the co-agent in charge of the investigation into any activity at or around California Liquors on Union Avenue and Althea Street in the city of Providence that day; correct?
A. Yes, sir.
Q. Now, sir, you stated, I believe it was yesterday when asked by Ms. Rogers, that you saw Mr. Diaz get to the store in his car at approximately 9 a.m.; correct?
A. Yes, sir.
Q. Based on your investigation in this case, you know that Mr. Diaz works at California Liquors; correct?
A. Yes, sir.
Q. And California Liquors opens at 9 a.m.; correct?
A. Around 9 a.m.
Q. So there was nothing odd about him getting to work on January 20th at 9 a.m., was there?
A. No, there was not.

Q. Now, California Liquors, aside from being a liquor store, they sell videos there; correct?
A. I don't know if they sell videos.
Q. Have you ever been inside of California Liquors?
A. Yes, sir.
Q. Have you ever seen videos for sale behind the counter?
A. I did not take note of that, no. It's possible, but I just don't know.
Q. Have you ever seen a product called Durasex for sale behind the counter?
A. I've seen the truck there, and I am aware that they sell it there, yes.
Q. And when you say the truck, there's a large van that's often parked in front of California Liquors that says Durasex with the name on it?
A. It's parked there at times, yes.
Q. And you know that to be a business that's also operated out of California Liquors; correct?
A. Yes, sir.
MR. MURPHY: Judge, I would be introducing Defendant's C. I'm sorry.
THE COURT: Ms. Rogers?
MS. ROGERS: Objection to relevance.
MR. MURPHY: If I can first show it for

identification.

THE COURT: Just a minute. Overruled.

Q. Sir, I'm showing you on the screen a van and ask you if you recognize that van.

A. Yes, I do.

Q. And what is that van, sir?

A. Durasex van.

Q. And where is it parked in front of?

A. The California Liquors location.

MR. MURPHY: Judge, I would move Defendant's Exhibit C full.

THE COURT: Any objection?

MS. ROGERS: Objection to relevance.

THE COURT: Overruled.

MR. MURPHY: Judge, I would ask that it be published for the jury.

THE COURT: It may. Defendant's C is full.

(Defendant's Exhibit C was admitted in full)

Q. And, sir, you've seen that van parked in front of the liquor store on many occasions from September to January 30th, 2006; correct?

A. Yes. It would be intermittently parked there, yes.

Q. And, sir, have you also done surveillance at Mr. Bernard's house?

A. Yes, sir.
Q. And Mr. Bernard, his first name is?
A. Estoredarcio.
Q. And where does Estoredarcio -- from the time frame of September 2005 to the end of January 2006, where did he reside?
A. One Shannon Way in West Warwick, Rhode Island.
Q. Sir, did you ever have occasion to see the Durasex van parked at his house on One Shannon Lane?
MS. ROGERS: Objection, relevance.
THE COURT: Sustained.
Q. How many times did you go by his house, sir, from September to January?
A. I'm not sure of an exact figure, but quite often.
Q. Did you see the Durasex van that you've just identified in my past exhibit parked in front of the house on One Shannon Lane in West Warwick?
MS. ROGERS: Objection.
THE COURT: Approach. Step down.
(Bench conference held on the record)
THE COURT: How is this relevant?
MR. MURPHY: Judge, it goes to my theory of the case. If they saw a car that belonged to one of those people at California Liquors --
THE COURT: Who is Bernard?

MR. MURPHY: Bernard is Belige.
THE COURT: How do we know that?
MR. MURPHY: Oh, I'm sorry. I assumed that. I'll point that out.
THE COURT: I don't know who he is.
(End of bench conference)
Q. Detective Reilly, I asked you about Mr. Bernard and his first name, and his first name is?
A. Estoredarcio.
Q. And Estoredarcio Bernard is also the same person that you referred to over the course of the past two days as Belige?
A. Belige.
Q. Belige?
A. Yes.
Q. And Belige, to your knowledge, is the person from September until January of 2006 who owned California Liquors?
A. Yes, sir.
Q. Now, Belige or Estoredarcio Bernard resides at One Shannon Lane in West Warwick; correct?
A. Yes, sir.
Q. And you've seen the Durasex van that you've previously identified on Defendant's Exhibit C parked in front of his house or in his driveway at One Shannon

Lane; correct?
MS. ROGERS: Objection.
THE COURT: Overruled.
A. Yes, I have.
Q. Sir, for purposes of identification, I'm showing you Defendant's Exhibit F and ask you if you recognize the location of that van for purposes of identification.
A. I mean, I think you'd have to back up your image a little bit.
Q. Does it look familiar, the location?
A. It could be the driveway of One Shannon Way, but all I'm seeing is the driveway. If you had a more distant view, I would be able to better clarify that.
Q. So when you went by One Shannon Lane, you didn't pay close attention to it?
A. What?
MS. ROGERS: Objection.
THE COURT: Sustained.
Q. Now, Detective Reilly, when you were doing the investigation as the agent in charge or the co-agent in charge, you checked background data on Belige, Mr. Bernard; correct?
A. Yes, sir.
Q. You checked with the Division of Motor Vehicles

and were shown that he had an active license; correct?
A. Yes.
MR. MURPHY: Judge, I would move Defendant's Exhibit L full.
MS. ROGERS: Objection.
THE COURT: Just a minute. Basis for the objection?
MS. ROGERS: Relevance.
THE COURT: Sustained.
MR. MURPHY: Judge, if I could be heard.
THE COURT: Move ahead.
Q. Well, sir, did you learn what Mr. Bernard's license number was?
A. Yes.
Q. And what was his driver's license number?
MS. ROGERS: Objection.
THE COURT: Sustained.
MR. MURPHY: Judge, if I could be heard.
THE COURT: Approach. Step down.
(Bench conference held on the record)
MR. MURPHY: Judge, this goes to the heart of my theory of the case. This is a record that should come in as a business record.
THE COURT: What's the relevance?
MR. MURPHY: The relevance would be shown later

on during cross-examination.

THE COURT: Then you'd better tell me what it is now, otherwise it's not coming in.

MR. MURPHY: Okay.

THE COURT: Unless you want to try again after you've established some basis for its relevance.

MR. MURPHY: I could call in somebody from the Registry.

THE COURT: That doesn't make it relevant. I don't think the Government is disputing the authenticity of it. The question is, how is it relevant in this particular case?

MR. MURPHY: It's relevant when I get to my case.

THE COURT: Then do it in your case because right now it's not.

MR. MURPHY: Then I can tell you. If you look at my other exhibits from Copley and Providence Beverage, you will see the person that picked up the beer has the same license number as Bernard. It's on the form.

THE COURT: So?

MR. MURPHY: They're trying to say there was no beer in the truck.

THE COURT: Mr. Murphy, you're going to have to

do a lot more to establish relevance. Step back.

(End of bench conference)

THE COURT: L remains for ID at this time.

Q. Detective Reilly, so somewhere in your notes you wrote down Belige's license number; correct?

A. I may have. I'm not quite sure.

Q. But you did check out his license number with the Rhode Island Division of Motor Vehicles; correct?

A. I believe so.

Q. And you'd agree with me that you found him to have an active Rhode Island operator's license; correct?

A. Yes, sir.

Q. He had a valid driver's license?

A. Yes.

Q. Now, sir, on the 20th -- during cross-examination, you said on January 20th, 2006, that you brought more manpower to the vicinity of the California Liquors store; correct?

A. Yes, we did.

Q. Can you please describe to me or please name who was there on that date on January 20th from law enforcement.

A. Almost every active member of the unit was. They would have shifts. Normal shifts would occupy a certain number of individuals. There were three

separate shifts. Because of the activity and what we believed to be happening, we would call back almost all of the individuals.

Q. If I can stop you there and go through the shifts. What time was the first shift?

A. It varied depending on what we would possibly have.

Q. On January 20th, what was the first shift?

A. Everyone worked pretty much the entire day.

Q. How long were the shifts?

A. You mean that day?

Q. January 20th.

A. There was no shift. There was no defined shift on that day.

Q. There was one shift?

A. Yes, I would say that would be accurate.

Q. Okay. How many people were on that shift, sir?

A. At various points during the day, who was actually there and not doing other details assigned to it, I would say maybe --

Q. Ten?

A. -- ten or more.

Q. Ten or more; correct?

A. Yeah.

Q. For time frame, between 12:00 and 4:00, how many

people were there?
A. Almost everybody.
Q. And that's more than ten; correct?
A. Yes.
Q. Can you please give me their names.
A. Sure. Rick Ruggiero, Dorian Rave. Dorian Rave was actually in the monitoring room. Myself, Ray Studley, John A'Vant.
Q. John who?
A. John A'Vant.
Q. Yes.
A. Scott Sullivan, John Theroux, Ryan Gwaltney, Michael Dicomitis, Steve Branch, Chris Nugent, Ray Mazzone, Kevin O'Brien, Jimmy Demers, and then we had additional personnel that were in the monitoring room.
Q. So you've listed by name off the top of your head at least 14 people that were there, and you said there were additional people in the vicinity; correct?
A. Well, the people that were there were actually -- might not have been actually at the facility, but they were doing something -- some sort of a role that was there, correct.
Q. Connected between 12 and 4 at the California Liquors store on January 20th, 2006; correct?

A. Some role, yes.
MR. MURPHY: Judge, I would ask if we could play Government's Exhibit 79 again, please.
THE COURT: Can you cue that up?
(Government's Exhibit 79 was played)
MR. MURPHY: If we could stop it right there.
Q. Sir, that minivan that just pulled into the lot, you would agree with me on Exhibit 79 that this was approximately 2:35 p.m. on January 20th?
A. Around that time frame, yes, sir.
Q. I believe you said this morning that when that minivan left -- and if I could have it rolled, please, your Honor.
(Government's Exhibit 79 continued)
MR. MURPHY: If I could have it stopped right there.
Q. Sir, when that minivan left, you said this morning that as it pulled around in front of California Liquors and took a left, that you tried to have I guess a uniformed officer stop it, but you lost it in traffic?
A. No, we never lost it in traffic. We were complicated because of the traffic having the uniform car get there in time to stop it prior to its pulling into a driveway.
Q. So you weren't able to stop it with the uniformed

police officer?
A. Correct. We could have stopped it with the members of the unit that were there; but not to compromise the investigation at that time, we wanted to make it as a routine traffic stop depending on what happened after the cruiser got there.
Q. So the van got to wherever it was going; correct?
A. Yes, sir.
Q. And it parked in a garage; correct?
A. Yes, sir.
Q. And then at some point whoever followed the van in an unmarked car left; correct?
A. We maintained surveillance of that location for a number of hours.
Q. How many hours, sir?
A. Approximately two hours.
Q. And then --
A. Or somewhere over an hour.
Q. And then you left; correct?
A. We secured from that location, correct.
Q. What does it mean you secured from that location?
A. The units that were posted up at that location disembarked.
Q. They left?
A. They left.

Q. They left the van parked in the garage; correct?
A. Correct.
Q. Now, Detective Reilly, you had mentioned on direct examination this morning that there was a Budweiser truck parked on the other side of the California Liquors; correct?
A. Yes, sir.
Q. Do you know, does the Budweiser company or Budweiser truck, do they deliver Corona?
A. I'm not sure.
Q. Do they deliver Beck's?
A. I really don't know what products Budweiser delivers.
Q. Do they deliver Miller?
A. I'm sorry, I don't know.
Q. Do they deliver Miller Lite?
A. I don't know. I know they deliver Budweiser.
Q. And your times inside of California Liquors, you saw other beer aside from Budweiser in the coolers; correct?
A. I actually didn't take note of the beers at the time.
Q. But when you were in California Liquors, was it on January 30th or did you ever go in there before January 30th?

A. I went there before one time inside.
Q. Do you know the date?
A. No, I don't.
Q. So you didn't see if there was beer in the coolers at the liquor store?
A. I didn't notice. I'm sure there was. It was a liquor store.
Q. Did you notice if there was beer on the floor?
A. Strewn about or just stacked?
Q. No, stacked. You've been into a liquor store before, haven't you?
A. It represented a liquor store, correct.
Q. Okay, thanks. Now, sir, during a video that you saw this morning, you saw an individual lift the hood of Mr. Diaz's car; correct?
A. Yes, I did.
Q. And you saw him check the oil?
A. He appeared to be checking the oil, yes.
Q. Wiped it and appeared to smell it?
A. I didn't note him smelling it, but he appeared to be checking the oil.
Q. Now, sir, when this was going on, where were you physically?
A. I was off-site, which is where the pole camera monitor was.

Q. You were actually in a building off-site?
A. Yeah. I had control of the video pole camera.
Q. In a building?
A. A separate building, yes.
Q. That was in the vicinity of California Liquors?
A. Yes.
Q. Now, sir, California Liquors, the shape of the building -- one moment, please, Judge.
(Pause)
MR. MURPHY: Judge, may I publish to this witness Government's Exhibit 60 full?
THE COURT: Can the jury see that?
Q. Sir, this photograph was taken just recently, correct, 60?
A. Yes, sir.
Q. But as far as the building of California Liquors, that building hasn't changed since January of 2006, has it?
A. No. It appears the same.
Q. Now, Detective Reilly, where these two streets meet, can you tell us what those streets are, first with the one on the left?
A. That is Althea Street, and the other one is Union Avenue.
Q. So where Althea and Union meet, the building's on

the corner; correct, sir?
A. Yes.
Q. And your pole camera, I'm placing an X on the screen, your pole camera was past this X down Union Avenue, correct, away from the building of California Liquors?
A. Yes, not far but a little bit by it.
Q. Heading this way; correct?
A. Yes.
Q. And you were somewhere in a building on the right here on this side of Union Avenue where I have placed another X; correct?
A. Say that again.
Q. You were located in a building down here where I have placed the second X, down this vicinity; correct?
A. No.
Q. Where were you, sir?
A. Off-site, which is not in that exact vicinity. It's a little bit away.
Q. Which direction, sir?
A. Southerly.
Q. Can you point it out to me?
A. That way.
Q. You were down here, sir?
A. Yes.

Q. So where you were physically, you could not see the U-Haul truck that was parked here; right?
A. Well, physically, no, but I had the controls of the pole camera to zoom in.
Q. Let me drop the pole camera for a second, if you can please follow me. This square depicts an approximation of where the U-Haul was by the back door of California Liquors sometime between 2:00 and 2:45 on January 20th; correct?
A. Yes.
Q. When you were operating, you were operating with a monitor, with a computer, the pole camera that was here by the X that I just circled; correct?
A. Yes.
Q. The pole camera was actually up on a telephone pole; correct?
A. Yes.
Q. And you maintained it from where you've placed the arrow in a building down there?
A. Yes.
Q. You could not see physically, without the assistance of the pole camera, the truck itself; correct?
A. That is correct.
Q. And when the truck was backed up against the

liquor store, it was backed up right near the rear door of California Liquors; correct?
A. Yes.
Q. So physically, even with the pole camera, you could not see the back of the U-Haul that had its back to California Liquors; correct?
A. That is correct.
Q. So when you said earlier this morning that you could not see or did not see Carlos Diaz unloading beer from the U-Haul, you couldn't physically see it, could you?
A. Well, I did see him at times, and I did not see the back of the U-Haul if that's what you're asking me. At the times I did see him, I didn't see him unloading beer.
Q. He's not going to bring beer outside of the U-Haul down the street, he's going to bring it into California Liquors if the truck backed up to California Liquors; correct?
A. I wouldn't know what his intentions would be.
Q. Sir, if he was in the back of the U-Haul by the back door of California Liquors unloading beer, you would not be able to see him from your vantage point with the pole camera; correct?
A. Correct.

Q. Detective Reilly, going back to this code, when Ms. Rogers showed you transcripts over the course of the past day and a half, you would agree with me that almost every conversation you described as being coded; correct?
A. Yeah, the majority of them. Yes, sir.
Q. And then there were two conversations in which we heard the conversations where Belige actually calls the U-Haul dealer. Do you recall that phone call?
A. Yes.
Q. And you don't describe any code in that call, nor were you asked; correct?
A. I was not asked.
Q. Then there was another call after that where Belige has a conversation with my client, Mr. Diaz, and Belige makes a reference to be there to help me unload the truck, the beer; correct? Do you recall that tape?
A. Yes, sir.
Q. And you weren't asked, nor did you offer, as to any code that was used in that conversation; correct?
A. I was not asked.
Q. Now, sir, with your 14-and-a-half years experience with the Rhode Island State Police and as the co-case agent in this case, you'd agree with me that different people have different codes; correct?

A. There are times when they are different, yes.
Q. Well, if somebody was a car dealer selling cocaine and mentioned I have 15 cars for you, that could be a code; correct?
A. That is correct. They would use cars as code for kilograms or other set units.
Q. And at the same time, the person could be wholesaling 15 cars; correct?
A. It's possible.
Q. A person who has a basketball store could say I have basketballs in; correct?
A. I never heard that, no.
Q. A person who has a shoe store could say the Timberlands are in; correct?
A. They could. I've never heard shoes referenced, though.
Q. A person who has a clothes store could say the clothes are in; correct?
A. Possibly.
Q. Now, Detective Reilly, you, yourself, do not speak Spanish; right?
A. No, sir.
Q. Now, Detective Reilly, in this case I had asked you this morning, graduating from the State Police Academy, that you've learned the value of writing

police reports; correct?
A. Yes, sir.
Q. And, sir, for purposes of my questions, I will just say a police report for the purpose of our questioning right now could mean a narrative, a report, a written report, just for purposes of this questioning. Okay?
A. You're not specifying whether it's an FBI 302 or if it's any other, just a report in general?
Q. Just a report in general.
A. Okay.
Q. Now, sir, did you, in relation to your investigation on this case from September of '05 to January 30th of '06, prepare reports to your superiors at the State Police?
A. On occasion, yes.
Q. And where are those reports, sir?
A. You mean reports about the surveillances that we did at all or --
Q. As a detective with the State Police who was in charge of an investigation, the boss of the State Police is the colonel; correct?
A. Yes. Actually, governor.
Q. Well, some people think so. So the person in charge of the State Police is the colonel; correct?

A. Yes.
Q. And then it goes down to two majors; correct?
A. Yes, sir.
Q. And then it goes down to lieutenants; correct?
A. Yes.
MS. ROGERS: Objection.
THE COURT: Basis for the objection?
MS. ROGERS: Relevance.
THE COURT: Well, let's see where we're going.
Q. So the State Police is set up almost like a military organization as far as chain of command. You'd agree with me on that?
A. Yes, sir.
Q. Now, as a detective, when you're assigned an investigation, you have to generate reports up the chain of command; correct?
A. No. You actually do reports on what you observe for surveillance or traps; but we don't do chain of command reports, if that's what you're asking.
Q. You said you do reports based on surveillance and stuff of that nature; correct?
A. Specifically with this case, the supervisors in our unit were assigned to this full time. Our whole task force was. Every member was for that five-month block. There were no other cases conducted. Those

supervisors may have done reports and updates on the activity that was occurring, but --
Q. Who were the supervisors?
A. Supervisors in the State Police at the time?
Q. On this case, yes.
A. It was varied. One was -- John A'Vant was corporal, Ray Studley was a sergeant, Jimmy Demers was a lieutenant.
Q. Did you submit any reports in your five months to any of those individuals?
A. I don't recall doing so, no. Not specific ones. They obviously had access to all of the reports that we were doing, so. . .
Q. And all the reports that you did, you, yourself in this case, are they all contained in FBI 302s?
A. Yes.
Q. There were no separate investigatory reports?
A. Not that I can recall. At some point there may have been. I have no recollection of one, though.
Q. Now, sir, you would agree with me in your 14 years' experience that code language could change from case to case; correct?
A. Sure.
Q. And, sir, do you know an individual by the name of Patrick Schwab?

A. Yes, sir.
Q. And in the past four months, have you ever met with Patrick Schwab?
A. Yes, I have.
Q. Where, sir?
A. At the courthouse.
Q. And how many times have you met with him in the four months?
A. Once.
Q. And were you able to question him about his testimony here in court?
A. No.
Q. And you knew well prior to today and yesterday that Patrick Schwab was going to be a witness for the Government in this case; correct?
A. Yes.
Q. Now, Officer Reilly, Detective Reilly, sir, I believe yesterday, if I'm not mistaken, you said that you had made in your career at least a thousand narcotics arrests?
A. Been involved with a thousand.
Q. Been involved with a thousand?
A. Yes.
Q. How many search warrants have you participated in, approximately, the execution of?

A. Hundreds.
Q. Hundreds, correct, sir?
A. More than a hundred. I'm not sure exact number but quite a few.
Q. Now, Detective Reilly, participating in the execution of a search warrant, you've done other execution of search warrants aside from drug cases; correct? You've assisted on other ones?
A. You mean like drawing blood for a DWI or something?
Q. No, meaning on the execution of search warrants to houses, I mean you've gone as a State Police officer on other cases aside from drug cases in which search warrants were executed; correct?
A. Yes. Small percentage, yes.
Q. So the hundreds of search warrants that you have participated in the execution of, most of them were drug cases?
A. Yes.
Q. And that's over the course of your 14 years of experience; correct?
A. Yes, sir.
Q. You spent the first six as a road trooper; correct?
A. Yes.

Q. And on some occasions as a road trooper you were asked to participate in the execution of search warrants with members of the narcotics squad; correct?
A. Occasionally.
Q. And also other search warrants; correct?
A. What other ones?
Q. Well, any other type of crime that you may have participated in assisting as a person who helped execute a search warrant.
A. I don't remember doing so that wasn't narcotics related as a uniformed trooper, but that's possible.
Q. Now, sir, out of these hundreds of warrants, you have been the affiant on how many, if you can approximate? I'm not going to hold you to a specific number.
A. I couldn't even give you one, but dozens.
Q. Fifty?
A. That might be too high, but somewhere around there. I have no idea.
Q. And these 50 in which you were the affiant, the affiant is the person who submits an affidavit to the Court for a search warrant; correct?
A. Yes.
Q. Now, sir, on these search warrants that you've executed -- and let me just back up for a minute. I'm

not directing my attention now to September of '05 to January of '06, but in other cases in which you have investigated as --

A. Can you say that first part again.

Q. Yes. I'm not talking about this case right now.

A. Okay.

Q. So prior to September of 2005, you've been the affiant in numerous search warrants; correct?

A. Yes.

Q. And those search warrants pertained to narcotics investigations; correct?

A. Not all of them, but the majority of them, yes.

Q. If you can direct your attention to those narcotic investigations in which you were the affiant.

A. Okay.

Q. You went after people who you had suspected of dealing drugs; correct?

MS. ROGERS: Objection.

THE COURT: Sustained. Approach. Step down.

(Bench conference held on the record)

MR. MURPHY: I'll get off this real quick. I'm going to get into what he looks for, what he goes into to execute a search warrant on a drug dealer.

THE COURT: Was there a search warrant in this case?

MR. MURPHY: Yes.
THE COURT: With this Defendant?
MR. MURPHY: Yes.
THE COURT: I mean, let's just get at it. We don't need to go through his entire career.
MR. MURPHY: Okay.
(End of bench conference)
MR. MURPHY: Thanks, Judge.
Q. Detective Reilly, when you execute search warrants as it relates to drug cases, you go in the homes looking for certain things; correct?
A. Yeah, a variety of things. Yes, sir.
Q. Number one, you go in looking for drugs; correct?
A. Not necessarily. It would depend on the role of the individual. It could be cash, documentation, you know, videos, anything, but not always.
Q. On a drug case, when you go in to execute a search warrant, you look for drugs, don't you?
A. No, that's not necessarily the case. The majority of them you would, yes. Obviously, depending on the role of the individual or what it was at the time, it would be limited to the scope.
Q. So the majority of cases in which you participate in the execution of a search warrant on a drug case, you go in the house looking for drugs?

A. The majority, yes.
Q. You also look to see if there's any drug ledgers; correct?
A. Yes, sir.
Q. And drug ledgers are records of either buying, selling drugs; correct?
A. Yes, sir.
Q. You look for drug paraphernalia; correct?
A. Yes, sir.
Q. What is drug paraphernalia?
A. What is it in general?
Q. Yes. What is it based on your experience?
A. Well, drug paraphernalia is implements used in the either consummation or the distribution of narcotics.
Q. Let's look at the drug cocaine. If you're investigating a cocaine case and you go into a premises with the search warrant, you look for a scale; right?
A. If that individual would be in the role of breaking up cocaine and selling it as different units, weighing it and stuff, absolutely.
Q. If the individual wasn't in that role and you go in the house and find a kilo of cocaine and a scale, you would seize it, wouldn't you?
A. Absolutely.
Q. Inositol?

A. That's a cutting agent, correct.
Q. Acetone?
A. Also used in the production.
Q. Baking soda?
A. Yes.
MS. ROGERS: Objection, same basis.
THE COURT: Sustained.
Q. You also look for financial records detailing drug trafficking; correct?
A. Well, all types of financial records, yes.
Q. You look for safes; correct?
A. Yes.
Q. And you'd agree with me that's because, based on your experience, that most people associated with drug trafficking don't keep their money in banks; correct?
A. No, they cleverly disguise it. That would be correct.
Q. You look for safe deposit keys; correct?
MS. ROGERS: Objection.
THE COURT: Sustained.
Q. Now, when you prepare an affidavit in support of a search warrant, you give that affidavit under oath in front of a judicial officer; correct?
A. Yes, sir.
Q. In this case you were the affiant in support of a

search warrant at Mr. Diaz and Alanka Diaz's house at 101 Paine Avenue in the city of Cranston, Rhode Island; correct?

MS. ROGERS: Objection.

THE COURT: Approach. Step down, please.

(Bench conference held on the record)

THE COURT: I think we'll break here. I'm going to let the jury go home, and then I'll take up this issue with you after they've left.

(End of bench conference)

THE COURT: Members of the jury, we're going to break for the day. We'll continue with the cross-examination of Mr. Reilly tomorrow morning. I do have another matter on the calendar tomorrow morning, and so I'd like to start here -- I'm sorry, that's Friday. We'll get started with this case at 9 a.m. again tomorrow morning. So do whatever it is that you did this morning to get yourselves here on time.

Tonight, remember you're not to talk about the case. You're not even to think about the case. Don't read or listen to anything about the case.

Instead, again, get a good night's sleep, have a nice meal and come in tomorrow ready to go to work again. Please fold up your notebooks, leave them on your seats, and Bob will escort you out. We'll see you

tomorrow morning at 9 a.m.

(The jury is not present for the following)

THE COURT: Counsel, please. And would you bring up the affidavit.

(Bench conference held on the record)

THE COURT: Do you have the affidavit?

MR. MURPHY: Yes. I'm sorry, I have a copy. Judge, there was a multi-affidavit for multi-residences and I think a business. I am focusing in on Mr. Diaz's residence at 101 Paine Avenue where he resides with his wife, Alanka, and I believe there's only two or three paragraphs that pertain to him.

THE COURT: So why don't we just get to it. I mean, what's the point?

MS. ROGERS: I don't understand how it's relevant.

THE COURT: Because he's going to get Mr. Reilly to say when they went there and executed the warrant, they didn't find any of those things.

MS. ROGERS: Which I would object to because it's not relevant.

MR. MURPHY: Sure it is.

THE COURT: Well, it probably isn't, but I don't know what his defense is. So I'm probably going to let it in. So you've preserved the record. I just didn't

want you to go through this line by line.

MR. MURPHY: Okay.

THE COURT: Don't go away. We can go off the record now.

(Bench conference held off the record)

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/Karen M. Wischnowsky

Karen M. Wischnowsky, RPR-RMR-CRR

June 3, 2008

Date